'(Rev. 10/2002) General Document

# UNITED STATES DISTRICT COURT

## Southern District of Florida

Case Number: _____

# 14-23032-CIV-Williams/Simonton

Allan Nanton-Marie, propria persona
_____
                    Plaintiff(s)

v.

Alberto M. Carvalho, Superintendent of Schools,
_____
Miami Dade County Public Schools and Miami-Dade
_____
County Public Schools, Board
_____

_____
                    Defendant(s)

FILED BY_____ D.C.

AUG 1 8 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## EMPLOYMENT DISCRIMINATION COMPLAINT

### *(TITLE OF DOCUMENT)*

I,   Allan A. Nanton-Marie, propria persona            plaintiff, in the above styled cause,
brings this action for compensatory and injunctive relief under 42 USC Sections 2000e-16, and for
declaratory relief under 28 U.S.C. Section 2201 against defendant Alberto M. Carvalho, in his
official capacity as  Superintendent of Schools and the Miami-Dade County Public School Board, in its
official capacity as Board, based on the discriminatory and retaliatory employment  practice of the
Miami-Dade County Public Schools (MDCPS) against plaintiff, a current employee of the MDCPS,
Transportation Department, at North Transportation Center, 16150 N.W. 42nd.  Avenue, Miami, Florida
33054.

1

## PARTIES

1.

The Plaintiff, Allan A. Nanton-Marie is a Black, mixed origins citizen of the Republic of Trinidad and Tobago who has a record of disability, and participated in activities protected by Title VII, the ADEA, and the ADA when he complained that supervisors subjected him to **ongoing** discriminatory retaliation, harassment, heightened scrutiny, retraining because of his record of a disability, sending him to the Employee Assistance Program, twice, without documenting the reasons, denying  access and documents in his personnel file as part of a cover-up, and cutting his wages by reducing his hours because **pursuant to the ADA as amended, plaintiff believed that defendants were also violating the civil rights of the SPED pupils on Route 2244, in school year 2012-2013, in not providing them a bided bus aide, along with the attendant safety guarantees for which the State and Federal government had provided in transportation and other grants to MDCPS, and persistently requested a bided bus aide up the chain of command.**

In continuing retaliation, his bided route in 2013-2014 was changed to a greater distance from the North Transportation Center with pupils who constantly insulted, cursed, harassed and called plaintiff "massise", "maricon" and "faggot" and made other derogatory statements about him in the Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Asexual (LGBTQIA) community on a daily basis, as well as, threatening to shoot Plaintiff. Plaintiff experienced discrimination in that MDCPS targeted him for discriminatory retaliation because he was and still is the only 68 years old Black, mixed origin citizen of the Republic of Trinidad and Tobago who worked at both John Schee Transportation Center and now works at North Transportation Center with prior service to Lou Panci Alternative School, Biscayne Gardens Elementary School, Miami Carol City Middle School, and Associated Marine Institutes, North (AMI), respectively, in school years 2010-2011, 2012-2015. Plaintiff has been a legally permanent resident of the United States of America continuously since 1979.

2.

The Defendants, Alberto M. Carvalho, Superintendent of Schools, and Miami-Dade County Public School Board are the Chief Executive Officer, and ultimate policy and decision makers, respectively, in all matters related to the Public School System in Miami-Dade County,  which at all relevant times

2

employed plaintiff.

## JURISDICTION AND VENUE

### 3.

This Court has jurisdiction to hear this complaint and to adjudicate the claims stated herein under 42 U.S.C. Section 2000e-5(f). The action is brought under the Civil Rights Act of 1866, 42 U.S.C., the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq. ("Title VII") the Age Discrimination in Employment Act of 1967, 29 U.S.C. Section 621 et seq. ("ADEA") and the Americans with Disabilities Act of 1990, 42 U.S.C. Section 12101 et seq. ("ADA") as each has been amended from time to time, to redress and enjoin employment practices of defendants in violation of these statutes. Plaintiff further assert claims under the Florida Civil Rights Act, of 1992 (FHRA), for which jurisdiction is based on the doctrine of pendent jurisdiction and which also prohibits discrimination on the basis of age, race, national origin, or disability and proscribe retaliatory acts for filing discrimination complaints or opposing practices made under these statutes.

Venue is proper in the Southern District of Florida because the employment practices complained of occurred in the Southern District of Florida and because plaintiff and each defendant resides in the Southern District of Florida within the meaning of 28 U.S.C. Section 1391(b) and (c), and because the primary office of the defendants is located in the Southern District of Florida.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

### 4.

Plaintiff has exhausted his administrative remedies in accordance with 42 U.S.C. Section 2000e- 16(c). Plaintiff filed his first administrative complaints with the Miami-Dade County Public Schools, Office of Civil Rights Compliance (OCRC) on the 20th. December 2013. (See exhibit 1). Plaintiff also filed a charge with the United States Equal Employment Opportunity Commission (EEOC) on the 31st. December 2013 asserting that he suffered on-going retaliation, bullying and harassment motivated by illegal discrimination against him based on age, race, national origin and disability. (See exhibits 2 & 3) Plaintiff filed a first supplement to his initial claim of violation of his Title VII, ADEA and ADA with both the EEOC and the OCRC for continued heightened scrutiny and surveillance of his bided route 2034.

3

Plaintiff filed a second supplement to his initial claim of violation of his Title VII, ADEA and ADA rights with both the EEOC and OCRC for on-going violations of the relevant Statutes. Numerous other retaliatory acts against plaintiff have occurred, but plaintiff has found chronicling them, without AFSCME Local 1184 or other support to be truly exhausting. Hence, plaintiff has simply discussed these episodes with different fellow employees or requested Grievance procedure through AFSCME Local 1184, Vice-President/ Shop Steward Terry Haynes (Haynes) or Charles Hepburn, (Hepburn) AFSCME Vice-President of Transportation, without success.

### FACTS GIVING RISE TO PLAINTIFF'S CAUSE OF ACTION

#### 5.

**Nota bene**: Please be advised that the "Retaliation Details of What Occurred and the Specific Action Deemed Retaliatory" must be read in tandem with "The Statement of Essential Facts Relevant to Retaliation Claim" (**attached as exhibit # 4**)

#### 6.

The complaints investigated by the OCRC recorded libelous, slanderous, fabricated misrepresentations and unsubstantiated gossip, and hearsay in a "blame the victim and assassinate his character" mantra in reaching its findings regarding plaintiff and his complaint. For example: In plaintiff's OCRC complaints against North Transportation Director I, Randy Mazie, (Mazie) Coordinator III, Portia Walden (Walden) and Field Operation Specialist (FOS) Charlene Bentley, (Bentley) when the OCRC investigator asked (FOS) Karen Wallace (Wallace) on February 12, 2014 "if she had knowledge of any employee, student or parents having concerns with regards to Mr. Nanton-Marie" Wallace's identical answer for all three investigations was: "With reference to Mr. Nanton-Marie she said, "I have concerns about him. It's just the way that he carries himself. He's strange, he'll just come up to you and say, 'Is the sky blue?' and I'll say, 'What type of question is that?' and he'll respond, 'I just wanted to see what you were going to say.' I try to avoid him." ... "I had to ride a bus with him (Nanton-Marie) once (last school year 2012-13) and found him to be strange. He had to ride to Biscayne Garden Elementary with all ESE kids and he had all of the ESE kids calling him "daddy," and I found that to be strange. As all the kids got on they started calling him "daddy" and as they conversed they called him "daddy, daddy" and I found that to be inappropriate. He had an aide on his bus, but he had to be the one to get up and buckle the car seat and

4

the seat belts and he would not allow the aide to do it." (See exhibits 5, 6 & 7)

7.

Wallace further perjured herself and fabricated misrepresentations in her April 2013 ride-along report on Route 2244.

8.

On February 13, 2014 the MDCPS, OCRC investigator reported additional slanderous information by Hepburn; For example: In plaintiff's OCRC complaints against Mazie, Walden and Bentley, where the OCRC investigator stated **"Mr. Hepburn** was asked if he was aware of any employees, students/parents having concerns with regards to / Mr. Nanton-Marie. In reference to Mr. Nanton-Marie, Mr. Hepburn said, "Nobody likes Mr. Marie. Everyone complains about him. They say he does crazy things like park his Mercedes on the Job and then takes the bus. They call him the bag man, because he always has a bag full of papers. Other drivers complain that they don't want to drive with him 'cause he drives crazy." "I think he has a problem with women supervisors. He had a problem before with Ms. Trousdale. She (Walden) has highlighted his name a few times for him to come and see her and he doesn't come and see her." (See exhibits 5, 6 & 7)

9.

MDCPS, OCRC intentionally refused to interview numerous key witnesses with first-hand knowledge of plaintiff's allegations, or to rely on the 200 pages of documents plaintiff presented, choosing instead to either repeatedly rely on hearsay or to completely ignore and misrepresent plaintiff's charge of retaliatory discrimination. Plaintiff believes these and other action embodied in the OCRC reports constitutes malicious, intentional, deliberate, willful, systematic acts, conducted in callous disregard of the rights of plaintiff and have adversely impacted plaintiff. These subjective and arbitrary practices have been adopted, condoned, and approved by defendants' management including the Superintendent of Schools, School Board and the MDCPS, OCRC which conducted the internal administrative investigation of plaintiff's claim.

10.

**The MDCPS, OCRC investigation returned a finding of No Probable Cause.** (See exhibits 8, 9 & 10)
**The EEOC investigation issued plaintiff a Right to Sue letter dated the 23rd. June 2014.** (See exhibit 11)

**11.**

Plaintiff began employment with MDCPS as a Teacher Assistant in the 2004-2005 school year to the present.

12.

Beginning in August 2006 and continuing to the present, plaintiff has been employed as a full time school bus Driver with MDCPS,  working approximately 32-34 hours per week, on a ten month contract.  Generally, plaintiff's duties as a school bus Driver require him to safely transport regular and special needs pupils (SPED) to and from schools throughout Miami-Dade County.  Plaintiff has been reliable and dependable by showing up for work on time, ready to work, on a reliable basis; to observe established work hours and scheduled appointments; to complete work on time; and to obtain permission before being off work and to schedule leave in a manner that minimizes work disruption.

13.

Plaintiff's first assignment, out of training, was at Central West Transportation Center where he worked for approximately three (3) months under the Directorship of Mr. Millar,(Millar) before he attained full-time status and was transferred to Northeast Transportation Center mandatorily.  Plaintiff knows of no verbal or written disciplinary claims by Millar.

14.

Plaintiff worked at Northeast Transportation Center, under the Directorship of Mr. Thaddeus Moss, (Moss) for approximately four (4) years,  2006-2010. Plaintiff knows of no verbal or written disciplinary claims by Moss.

15.

Plaintiffs family relocated further to the North Miami-Dade County line and plaintiff sought a transfer closer to North Miami-Dade County line.

**16.**

After multiple requests, an opening occurred at John Schee Transportation Center, 2755 N.W. 122nd. Street, Miami, Florida, 33167, where Mazie was Director.  Plaintiff worked for one (1) year at John Schee Transportation Center in school year 2010-11. Because of the toxic and dysfunctional work environment at John Schee  plaintiff complained of unfair practices to Mazie and plaintiff copied an

6

October 2010 memo alleging his fear of discriminatory retaliation from Mazie and his staff to

Mr. Jerry Klein, (Klein) Administrative Director of Transportation and the immediate supervisor of

Mazie. (See exhibit 12)

**17.**

In May 2011, after plaintiff made at least six (6) applications for promotional positions, in which plaintiff

exceeded the minimum qualifications,  and all were denied without as much as an interview.  Plaintiff

discussed the applications with AFSCME Local 1184 Senior Vice-President, Vicki Hall (Hall) and Executive

Board member Phyllis Le Flore (Le Flore). On the advice of AFSCME Local 1184, plaintiff filed an age in

employment discrimination claim against Patricia Snell, (Snell) District Director of Transportation who

had signed all the letters of denial. (See exhibit 13) Plaintiff also discussed the age in employment claim

with Mr. Davis of the OCRC office. Plaintiff subsequently withdrew the claim, before the investigation

was initiated, because  the investigator assigned to the case, Rudolfo Garcia (Garcia) of OCRC informed

plaintiff his claim was meritless.

**18.**

Since the 2010-2011 school year when plaintiff first worked under Mazie, plaintiff has made a total of

approximately seventy-two (72) applications for promotions with MDCPS, in which plaintiff believes he

exceeded the minimum qualifications, without result.  Until today, plaintiff has only had one interview

for any of the 72 applications he submitted to the MDCPS.  The single interview plaintiff received came

shortly after plaintiff filed the aborted age discrimination claim in school year 2010-2011. Since then

SEVENTY-ONE of plaintiff's applications have been denied without an interview.  Plaintiff was

discouraged from applying for positions by the lack of results obtained from those positions for which he

did apply.  Plaintiff believes these facts constitute the basis of retaliatory discrimination against him.

19.

When no action was taken on plaintiff's October 2010 memo, and fearing further discriminatory

retaliation from Mazie and his staff at John Schee Transportation Center, plaintiff willingly transferred to

Northwest Transportation Center in school year 2011-12, where Mrs.  Enid Lamblogia was Director.

(Lamblogia)  Plaintiff knows of no verbal or written disciplinary claims by Lamblogia.

**20.**

A Driver transfer vacancy opened up at North Transportation Center in school year 2012-2013, much

7

closer to the family home, and so plaintiff accepted it, only to discover that Mazie, the same Mazie, who had been Director at John Schee Transportation Center and who had supervised retaliatory discriminatory behavior against plaintiff, had just been named Director of North Transportation Center.

21.

**This year will mark Plaintiff's tenth (10) year with MDCPS where plaintiff began as a Teacher Assistant in the 2004-2005 school year. The record will show that plaintiff is neither a saint nor perfect and has even made mistakes, inadvertently. However, in ten (10) years at MDCPS, and prior to working with Mazie at John Schee Transportation Center and now at North Transportation Center, plaintiff's personnel file and the record will also show that plaintiff had never received a verbal or written warning, reprimand, unsatisfactory work performance evaluation, suspension, refusal to follow supervisory instructions/refusal to meet with supervisors - insubordination, or conference for the record. Until now, Plaintiff has never been accused of, failure to follow route instructions, stealing time, unauthorized use of School Board vehicle, being almost blind, discussion of verbal interactions with parents, schools and staff or the litany of other baseless and unproved allegations orchestrated and fabricated in discriminatory retaliation by Mazie, Walden, Bentley and others.**

22.

### CONCLUSIONS BASED ON RETALIATORY ALLEGATIONS

It is Plaintiff's belief that an orchestrated set of events involving FOS' and Bus-Aides, and specifically authorized or set in motion by Walden and Mazie, continues to retaliated against him in violation of Title VII, as amended, the ADEA as amended, the ADA as amended and HIPPA as amended because he:

1. pursuant to the ADA as amended, plaintiff believes that defendants were also violating the civil rights of the SPED pupils on Route 2244, in school year 2012-2013, in not providing them a bided bus aide, along with attendant safety guarantees for which the State and Federal government has provided transportation and other grants to MDCPS, and insisted and persisted all the way up the chain of command that Route 2244 required a bided bus aide in 2012-2013;

8

2. engaged in verbal disagreements regarding safety concerns with Gordon and Walden because of their refusal to entertain, appoint, provide, assign or otherwise put-up for bus-aide bid Route 2244 in 2012-2013, plaintiff's first year at North Transportation Center;

3. rebutted in two critiques the April 2013 ride-along reports by Wallace and Bentley, respectively;

4. when verbally threatened and bullied by Walden and Bentley, repeatedly exercised his right under Weingarten to have an AFSCME representative present in conversations and questions by and with them;

5. made at least three written request to Walden, for a copy of unsubstantiated written allegations she read at an April 16th. 2013 meeting stating it was written by Harris;

6. requested at least twelve (12) Grievance procedure against both Walden and Mazie to AFSCME Local 1184, without result;

7. inquired regarding bringing Civil Rights harassment charges against Walden and Mazie in May and October 2013 at MDCPS Office of Civil Rights Compliance;

8. provided AFSCME Local 1184 and the Employee Assistance Program (EAP) with copies of his draft rebuttals of Wallace and Bentley's April ride-Along report in May of 2013 as one explanation of why Mazie made an unnecessary and incomplete referral to the EAP;

9. Denial of due process in: (a)not being advised by either Mazie or Walden, that he was entitled to mount a rebuttal of Wallace and Bentley's ride-along reports, presented his May 2013 rebuttal to Mazie. These rebuttals are now missing from Plaintiff's personnel file although the FOS ride-along reports were there at Plaintiff's review of his personnel file on October 29th. 2013. (b) not being given first verbal warnings and then written warnings of each and every issue charged at the October 14th.2013 Conference for the Record. (c) not being provided complete copies of the Wallace and Bentley April 2013 ride-along reports despite multiple written requests to Mazie, Alonzo and the MDCPS Office of Public Records;

9

10. Challenged and then copied a memo to Mazie's immediate supervisor, Klein back in 2010-2011 school-year when Plaintiff worked at John Schee Transportation Center.

23.

At a minimum, this discriminatory retaliation included:

A. Heightened scrutiny and surveillance by all FOS' at North Transportation Center - Wallace, Bentley, Gordon, Truesdell and Benby-Walthour during school years 2012-2014.

B. Reduction of Route time on 2244 beginning on April 16th. 2013 by at least twenty-five (25) minutes a day based on discreditable, incorrect Reports by Wallace and Bentley.

C. Reduction of Route time on 2034 beginning in March 2014, by at least twenty-five (25) minutes a day based on undisclosed Walthour and Wallace reports.

D. Two unwarranted and incompletely executed referrals to the Employee Assistance Program under School Board Rule. The fact that the two Employee Assistance Program referrals provided no specifics, a necessary requirement under School Board Rule 6GX13-4D1.11, in order for the Employee Assistance Program to act, a fact that an experienced Director such as Mazie knew or ought to have known, only serves to buttress Plaintiff's allegation that this was simply another way of retaliating and harassing Plaintiff.

E. Convening an unwarranted October 14th. 2013 Conference for the Record in which none of the four (4) charges leveled against plaintiff were substantiated.

F. Bentley's unilaterally or possibly in collusion with Walden, Mazie and Central Routing, revoking Plaintiff's bided block time on route 2034 and reassigning Plaintiff to AMI , within one (1) day of Plaintiff rejecting Bentley's unproven allegations that she observed Plaintiff utilizing a school bus for his personal use and then denying Plaintiff AFSCME representation during her accusatory questioning.

10

G.  Assigning sporadically, at least  seventeen (17) and possibly as many as twenty-two (22) different standby Bus-Aides to Route 2244 in 2012-2013 instead of a bided aide as the route required. The record will show that a bided bus aid attended Route 2244 in 2011-2012 and has been restored to Route 2244 in 2013-2014 as in prior years based on demographics similar to 2012-2013.

H.  Mazie verbally bullying and threatening Plaintiff with reprimand, suspension, verbal warning, citation for insubordination, convening Conference for the Record and possible recommendation of dismissal if he did not comply with violation of the ADA as amended and HIPPA law and bring a letter from his ophthalmologist.

I.  During school year 2012-2013, because of the lack of support and the constant harassment and hostility of the workplace at North Transportation Center, Plaintiff had three accidents while driving the School Bus on days when no bus-aide was assigned to Route 2244, none of which were cited for retraining until Mazie changed and misrepresented his written reasons for sending plaintiff to training, during the OCRC investigation.

J.  Failure to provide Plaintiff due process in: (1) his right to respond to the FOS ride-along reports which reduced his Route time on 2244 and 2034 and (2) not giving first a verbal warning and then a written warning for each and every issue raised at the Conference for the Record on October 14th. 2013 and (3) not providing Plaintiff complete copies of the Wallace and Bentley April 2013 ride-along reports.

K.  Plaintiff believes when Bentley revoked his Carol City Middle School block time she did not act in good faith but punitively and in retaliation after Plaintiff established the groundless nature of her unproven allegations that plaintiff had utilized a MDCPS bus for personal use.  More importantly, retaliatory animus is not negated, in this instance, by the fact that management has the right to change or revise a block assignment based on I.E.P., load or mileage factors and

11

requirements, because the unnecessary notices Bentley suddenly began to give Plaintiff,

immediately after her baseless allegations on regarding his private use of a MDCPS bus, and

their equally sudden secession after her unilateral reassignment of Plaintiff to AMI was effected,

within one day of this incident, shows a malice with reckless indifference to Plaintiff's state and

federally protected rights against harassing retaliation.

L.   Bentley further perjured herself, fabricated misrepresentations and pursuant to the ADA

discriminated against plaintiff in her April 2013 ride-along report on Route 2244.

24.

It is also Plaintiff's belief that both Mazie and Walden approved, or knew or ought to have known of the

above listed retaliatory acts.  Further to that, they not only failed to take any action to correct these

retaliatory and illegal discriminatory harassing actions but that they themselves actually engaged in,

fostered, cover-up and continue to perpetrate and provide tacit and actual approval of retaliatory

discriminatory actions against Plaintiff, even after he indicated he had been discriminated against, filed

his complaints and thus continue to create an atmosphere it is okay to discriminate against Plaintiff.

25.

As a result of the foregoing conduct Plaintiff has lost income not been allowed to interview and compete

for promotions at MDCPS. Plaintiff has further suffered future pecuniary losses, emotional pain,

suffering, inconvenience, mental anguish, loss of employment of life and other non-pecuniary losses.

Defendants' discriminatory and unlawful employment practices identified above have been intentional,

deliberate, willful, systematic, and conducted in callous disregard of the rights of plaintiff and have

adversely impacted plaintiff. The practices have been adopted, condoned, and approved by defendants'

management including the Superintendent of Schools, School Board and OCRC which conducted the

MDCPS internal administrative investigation of plaintiff's claim.

**RELIEF SOUGHT**

26.

By reason of defendants' discriminatory employment practices, plaintiff has suffered, libel, slander,

misrepresentation, embarrassment, emotional distress, humiliation, indignity and the resulting injury

and loss. The practices described violate four different statutory regimes. First, they constitute a denial

of equal employment opportunities in violation of Title VII, entitling a plaintiff asserting Title VII claims

to monetary and injunctive relief.

27.

Second, defendants have prevented the plaintiff with a place of origin other than the United States,

because of his ancestry, from making employment contracts on the same basis and with the same

freedom as is enjoyed by persons with origins in the United States. Defendants therefore have violated

Section 1981, entitling plaintiff to monetary and injunctive relief under both Sections 1981 and 1988.

28.

Third, the discriminatory practices constitute a denial of the rights of plaintiff with a national

origin other than the United States to equal employment opportunity in violation of Title VII, entitling

plaintiff's asserting Title VII claims to monetary and injunctive relief.

29.

Fourth, Plaintiff believes Defendants acts or lack of acts violated the civil rights of the SPED pupils in not

providing SPED pupils bided bus-aides and safety guarantees for which the State and Federal

government had provided in transportation and other grants to MDCPS and that for the safety of these

SPED pupils bided bus-aides ought be restored for these routes but especially to routes with codes 4A,

5A or 8 SPED pupils.  If the Court will not or cannot order the provision of this small safety protection,

then plaintiff prays the court to indemnify school bus drivers who now bear the brunt of this enormous

safety burden regarding SPED pupils by themselves.

30.

In addition, the plaintiff is threatened with further injury and loss for which he has no adequate remedy

at law. This action seeking, in part, permanent injunctive relief is the only means for securing complete

relief and bringing to an end the irreparable injury resulting from defendants' violations of the civil rights laws.

31.

Finally, the forms of discrimination identified in this count constitute a denial of the rights of a Black, mixed origin Republic of Trinidad and Tobago plaintiff to equal employment opportunities in violation of the Florida Human Rights Act, entitling plaintiff to monetary and injunctive relief under the FHRA.

32.

The monetary relief to which plaintiff is entitled includes but is not limited to compensatory and punitive damages, from mental anguish, and back-pay.

33.

There are questions of law and fact raised by plaintiff's claim. This complaint presents questions of whether defendants, through acts and omissions of their management, supervisory workforce and OCRC and through a common plan, discriminated against a Black mixed origin Republic of Trinidad and Tobago plaintiff through the retaliatory discrimination that have taken place or will take place and through the failed conduct of an impartial OCRC investigation. Inquiry into OCRC as well as defendants' employment practices, procedures, data, will be required to resolve these questions and to fashion appropriate relief for the plaintiff.

34.

The claim of the plaintiff which was implemented in a discriminatory fashion and with discriminatory intent and impact, by defendants, through, among other devices, an arbitrary and subjective in house investigation by MDCPS, OCRC.

35.

Defendants have acted and refused to act, and continue to do so, on grounds generally applicable to the plaintiff, in that they have made and effectuated decisions affecting the opportunities and conditions of plaintiff based on his age, race, disability and national origin thereby making appropriate final injunctive

14

Plaintiff seeks an immediate preventive injunction revoking any assignment to Associated Marine

Institute (AMI) or any similar type institution for the duration of the 2014-2015 school year or until such

time as this matter is resolved.  (Plaintiff seeks the preventive injunction because AMI pupils and pupils

from similar type schools whom plaintiff has transported : (a) referred to Plaintiff as "masisse",

"maricon" and "faggot" as well as using other derogatory language applicable to the LGBTQIA

community to describe plaintiff; (b) have threatened to shoot plaintiff; (c) Plaintiff has had to request

law enforcement on the bus on at least two occasions. In one instance North Miami police removed a

chronically disruptive pupil from the school bus.  Plaintiff has penned at least thirty-five referrals for

disruptive pupil behavior on the AMI leg of the route; (d) unidentified pupils at the school have

vandalized the bus by breaking the front glass door.

37.

Expungement of all referrals to the Employee Assistance Program from all MDCPS records and files.

38.

Expungement of the April 2013 ride-along by Wallace and Bentley from plaintiff's personnel file Mazie's

personal file as well as all MDCPS records and files.

39.

Expungement of plaintiff's October 14th. 2013 Conference for the Record and all documents

appertaining thereto from all MDCPS records and files.

40.

Plaintiff is requesting, should this Court find that Director I, Randy Mazie of North Transportation

Center, retaliated and harassed plaintiff in violation of State and Federal Law that the information be

turn over to the appropriate law enforcement in Florida to  investigate the conduct with an eye to see if

violations of law occurred.  His business address is: 16150 N.W. 42nd. Avenue, Opa-locka, Florida, 33054.

15

41.

Plaintiff is requesting, should this Court find that Coordinator III, Portia Walden of North Transportation Center retaliated and harassed plaintiff in violation of State and Federal Law, that the information be turned over to the appropriate law enforcement in Florida to  investigate the conduct with an eye to see if violations of law occurred. Her business address is: 16150 N.W. 42nd. Avenue, Opa-locka, Florida, 33054.

42.

Plaintiff is requesting, should this Court find Field Operations Specialist, Charlene Bentley of North Transportation Center retaliated and harassed plaintiff in violation of State and Federal Law, that the information be turned  over to the appropriate law enforcement in Florida to investigate the conduct with an eye to see if violations of law occurred.  Her business address is: 16150 N.W. 42nd. Avenue, Opa locka, Florida, 33054.

ALLAN A. NANTON-MARIE

The 18th. August 2014

16

Exhibit   1



# MIAMI-DADE COUNTY PUBLIC SCHOOLS
### Office of Civil Rights Compliance

## EMPLOYEE COMPLAINT FORM

**NAME:** NANTON-MARIE, ALLAN      **EMPLOYEE #:** 275229

**ADDRESS:** 7580 NW Fifth St. Unit 15442   **POSITION:** DRIVER

**CITY/STATE/ZIP:** Fort Lauderdale, FL 33318 **WORK LOCATION:** 9232

**HOME PHONE:** 305-332-7904      **WORK PHONE:** 305-625-9086

**Instructions**: The purpose of this form is to assist you in presenting your complaint, in accordance with School Board guidelines. The information you provide on this form will allow staff in the Office of Civil Rights Compliance (CRC) to decide what questions to ask of individuals with knowledge of the facts concerning your complaint.

It is requested that you provide as much detail as possible when completing the *Employee Complaint Form*. Please attach any documents which you believe will support your statement. If you need additional space, feel free to attach additional pages. All the information provided must be true and accurate.

1.  *What person(s) allegedly discriminated, retaliated and/or harassed you?*

> 1. Mr. Randy Mazie, Director, North Transportation Center
> 2. Ms. Portia Walden, Coordinator, North Transportation Center
> 3. Ms. Charlene Bentley, Field Operation Specialist, North Center

2.  *As to each person who allegedly discriminated, retaliated and/or harassed you, please describe in detail, what occurred and specifically describe the exact event or action which you believe was discriminatory, retaliatory and/or harassing.* Driver will present his allegations of RETALIATORY DISCRAMINATION AND HARRASSMENT in exhibits:
A. Mr. Randy Mazie, Director North Transportation Center
B. Ms. Portia Walden, Coordinator, North Transportation Center
C. Ms. Charlene Bentley, Field Operation Specialist, North Transportation Center

> (SEE NUMBERED EXHIBITS WITH ATTACHMENTS)

3.  *When did the alleged discrimination, retaliation and/or harassment occur? (Give an approximate date for the first time the alleged discrimination, retaliation and/or harassment occurred and, if there has been more that one act/episode.)* This retaliation first occured between September 2012 and April 2013. Driver believes Director Mazie and Coordinator Walden orchestrated retaliation in collusion with FOS'and Bus-Aides, culminating in the first instance an April 15-16 2013meetings which rec-ommended that Driver's route be reduced by twenty-five (25) minutes a day. This was followed up by other heightened scrutiny and a Conference for the Record dated October 14th. 2013.     1    (SEE # EXHIBITS AND ATTACHMENTS)

FM-5148 Rev. (01-11)

Exhibit    1

4.  *Is this the first time you have been discriminated, retaliated or harassed by this individual?  If not, please explain.* In the case of Coordinator Walden and FOS Bentley, possibly, yes.  However in the case of Director Mazie, NO.  While at the time Driver did not view it as little more than a workplace irritation, Driver is now of the opinion that when he worked at John Schee Transportation Center in 2010-2011, where Mr. Mazie was the Director at the time, Director Mazie had several FOS apply heightened scrutiny to Driver's work - following Driver in stealth, riding the route three times in three weeks and refusing to pay Drive for seven (7) hours. This scrutiny was a form of harrassment and retaliation.

5.  *How long, and what capacity have you known the person(s) who allegedly discriminated, retaliated and/or harassed you?  (Example:  "I have known Mr./Ms. X for 10 years.  Who He/She is currently my work site supervisor.  At the time of harassment, I directly reported to him/her.")* Driver is acquainted with Coordinator Walden going back to 2006-2007 when he worked at Northeast Transportation where Ms. Walden was also the Coordinator.   Driver is acquainted with Director Mazie since 2010-2011, when Mr. Mazie was Director of John Schee Transportation Center.  Driver is acquainted with FOS Bentley since he transferred to North Transportation Center in 2012-2013.  FOS Bentley has never been Driver's FOS of record.  However, FOS Bentley was one of a team assigned to ride-along and report in writing on Route 2244 in April of 2013. Driver rebutted her report.  She retaliated in September 2013

6.  *In what department/office/school were you working at the time of the alleged discrimination, retaliation and/or harassment?*

North Transportation Center, worksite 9232

7.  *Where are you currently working?*

North Transportation Center, worksite 9232

8.  *What action(s), if any, did you take after the alleged discrimination, retaliation, and/or harassment?  (State as specific as possible, the dates of the action(s) taken.)* a. visited the office of civil rights in May of 2013 and again in October 2013.  (b) Documented in writing and verbally to AFSCME Local 1184 and Employee Assistance Program (c) Spoke to Director Mazie regarding the need for bidedbus-aide on Route 2244 and pupil experiencing seizures.  These conversations with Mr. Mazie took place in 2012-2013 in his office and after a parent/child/teacher conference at Biscayne Gardens Elementary School.        (See EXHIBITS AND ATTACHMENTS)

9.  *Did you report this to an administrator or worksite administrator?  If yes, please give the name(s) of those individual(s) and if possible, provide a work location or phone number where they can be reached.  State specifically what you said and the response(s) given and/or the action taken by the administrator.* Because of my concern with the 16 ESE puipils on Route 2244 as well as the additional 25-40 regular pupils, I spoke to Mr. Mazie about the need for a bided aide and the response I had gotten from Mr. Gordon and Ms. Walden.  He told me I was doing a good job and not to worry but did nothing concretely except to heighten scrutiny, reduce my route time and eventually convene a Conference For the Record I beleve, in retaliation.

(SEE EXHIBITS AND ATTACHMENTS)

2

*Exhibit 1*

10. *List the name(s) of other individuals who may have first-hand knowledge of the facts related to your complaint. If possible, please provide a work location or phone number where they may be reached.*

| Name | Contact Information |
|------|---------------------|
| SHARON LEWIS        9239 | 954 - 864 - 8857 |
| MAE DAVIS           9232 | |
| | |

11. *Please check the applicable category upon which your complaint is based. It should be noted that the descriptions provided below are intended to assist you with understanding the varying categories and should not be considered "legal definitions."*

_____ **Age** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's age.

_____ **Color** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's skintone. Color discrimination can be a subclass within a race and is based on the fact that a person's skin tone is different from their own. As such, color discrimination can occur within the same race. For example someone who is darker complexioned may discriminate against someone who has a lighter complexion although they are both members of the same race.

_____ **Disability** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because a person either has or is perceived to have a permanent impairment that substantially limits or prevents a major life activity.

_____ **Ethnic or National Origin** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's or his/her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.

_____ **Family Medical Leave Act (FMLA)** - this category prevents discrimination for an eligible employee exercising their right to take up to 12 workweeks of leave during any 12-month period for one or more of the reasons defined in the Family Medical Leave Act (FMLA) statute.

_____ **Gender** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's gender or sex; it ensures that males are not treated differently from females and/or vice versa. Gender discrimination also includes sexual harassment and pregnancy discrimination which are explained below.

_____ **Genetic Information Nondiscrimination Act (GINA)** - this category prevents denial of equal employment and/or harassment because of a person's genetic information; it ensures that individuals are not treated differently because of genetic information.

3

FM-5148 Rev. (01-11)

Exhibit 1

____ **_Linguistic Preference_** - a subclass of national origin discrimination, this category prevents denial of equal employment and/or educational opportunities and/or harassment because of the language a person speaks unless there is a legitimate business need for requiring that a specific language be spoken.

____ **_Marital Status_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because a person is or is not married.

____ **_Political Beliefs_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's support and/or affiliation or lack thereof with a particular political party.

____ **_Pregnancy_** - this discrimination is a form of gender/sex discrimination, this category prevents denial of equal employment and/or educational opportunities and/or harassment of women who are with child.

____ **_Race_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's race. The five recognized races are American Indian or Alaska Native, Asian, Black or African American; Hawaiian or Other Pacific Islander; and White.   Because everyone has a race they can be discriminated against because of race. Persons from mixed racial backgrounds do not need to prove their exact heritage in order to assert that they have been discriminated against based on race. Likewise this category covers persons being discriminated against because they are married to persons of a different race from their own.

____ **_Religion_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's sincerely held religious practices. In certain circumstances it affords persons accommodations based upon their sincerely held religious practices.

__X__ **_Retaliation_** - this category prevents  persons from taking an adverse employment or educational action against any person that has opposed activity that violates a persons Civil Rights or participated in an investigation pertaining to Civil Rights where there is a link between the adverse employment action and the person's opposition to Civil Rights violations or participation in a Civil Rights investigation.

____ **_Sexual Harassment_**  - this category prevents unwelcome sexual advances; requests for sexual favors; and other verbal or physical conduct of a sexual nature, when submission to such conduct is made – either explicitly or implicitly – a term or condition of employment or participation in an educational program; submission to or rejection of such conduct by an individual is used as the basis for employment or educational decisions affecting such individual; or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or offensive working or educational  environment.

____ **_Sexual Orientation_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's sexual preference, this is based on whether an individual is heterosexual, homosexual, or bi-sexual.

FM-5148 Rev. (01-11)

Exhibit 1

_____ ***Social and Family Background*** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's socio-economic, familiar and/or educational background.

I understand that the information I have provided will determine the scope of CRC's investigation of my complaint. I have read the above complaint and commit that the content provided is true and to the best of my knowledge, accurate. I understand that knowingly submitting false information may lead to disciplinary action(s) against me.

_____
Signature of Complainant

NANTON-MARTE, ALLAN
_____
Printed Name

THE **20**th DECEMBER 2013
_____
Date

*(Please be sure to retain a copy of this form and all other supporting documents for your records.)*

200 pages provided to MDCPS, OCRC in supportive documents.

5

FM-5148 Rev. (01-11)

*Exhibit (2)*



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### INTAKE QUESTIONNAIRE

DEC 31 2013

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination. When we receive this form, we will review it to determine EEOC coverage. Answer all questions completely, and attach additional pages if needed to complete your responses. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." **(PLEASE PRINT)**

**1. Personal Information**

Last Name: NANTON-MARIE   First Name: ALLAN   MI: I

Street or Mailing Address: 7580 N.W. Fifth St   Apt or Unit #: 15A A2

City: Fort Lauderdale   County: BROWARD   State: FL   Zip: 33318-5AAI

Phone Numbers: Home: (305) 332-790A   Work: ( )

Cell: (305) 332-790A   Email Address: ANAL-TRINI @ Yahoo .com

Date of Birth: The 15th August 1946   Sex: ☒ Male ☐ Female   Do You Have a Disability? ☐ Yes ☒ No

**Please answer each of the next three questions.** i. Are you Hispanic or Latino? ☐ Yes ☒ No

ii. What is your Race?   Please choose all that apply. ☒ American Indian or Alaskan Native ☐ Asian ☐ White

☒ Black or African American ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? TRINIDAD and TOBAGO

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: _____   Relationship: _____

Address: _____   City: _____   State: _____   Zip Code: _____

Home Phone: ( ) _____   Other Phone: ( ) _____

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)

☒ Employer  ☐ Union  ☐ Employment Agency  ☐ Other (Please Specify) _____

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

Organization Name: Miami-Dade County Public Schools

Address: 16150 N.W. 42nd Avenue   County: Miami-Dade

City: Opa-locka   State: FL   Zip: 33054   Phone: (305) 685-9086

Type of Business: Education/Transportation   Job Location if different from Org. Address: _____

Human Resources Director or Owner Name: Superintendent Alberto Carvalho   Phone: (305) 995-1000

**Number of Employees in the Organization at All Locations:** Please Check (✓) One

☐ Fewer Than 15  ☐ 15 - 100  ☐ 101 - 200  ☐ 201 - 500  ☒ More than 500

**3. Your Employment Data** (Complete as many items as you are able.) **Are you a federal employee?** ☐ Yes ☒ No

Date Hired: 6/2-00A   Job Title At Hire: Substitute Teacher

Pay Rate When Hired: 13 ⁰⁰ per hour   Last or Current Pay Rate: $12.05 per hour

Job Title at Time of Alleged Discrimination: DRIVER   Date Quit/Discharged: _____

Name and Title of Immediate Supervisor: Mr. Randy Marie, Director, Mr. Moses Mace, Mr. ____

**If Job Applicant, Date You Applied for Job** _____   Job Title Applied For _____

1

Exhibit 2

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To:
☐ FEPA
☒ EEOC  510-2014-01237

and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. Allan Nanton-Marie** | **(305) 332-7904** | **08-15-1946** |

Street Address                     City, State and ZIP Code
**7580 N.W. Fifth St., Apt. 1-5442, Ft. Lauderdale, FL 33318-5442**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **MIAMI-DADE PUBLIC SCHOOLS** | **500 or More** | **(305) 995-1430** |

Street Address                     City, State and ZIP Code
**1450 N.E. Second Avenue, Miami, FL 33132**

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address                     City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **01-02-2013**   Latest **01-02-2014**

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

**I am a Black Trinidadian, 67 yrs. of age, who has a record of a disability. I participated in activities protected by Title VII, the ADEA, and the ADA when I complained that my supervisors, Randy Mazie, Portia Walden, and Charlene Bentley were retaliating against me and harassing me with unfair monitoring by Field Operation Specialists on and off my bus, retraining me because of my record of a disability, sending me to Employee Assistance twice without documenting the reason, denying me documents in my personnel file, and cutting my wages by reducing my hours. In continuing retaliation, my route has been changed to a greater distance from my home with students who constantly harass me with insulting, disrespectful names.**

**I believe I am being discriminated against because of my race, Black, and my National Origin, Trinidadian, and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended, and because of my age, 67 yrs., and retaliated against in violation of the Age Discrimination in Employment of 1967, as amended, and because of my record of a disability and retaliated against in violation of the Americans With Disabilities Act of 1990, as amended.**

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Jan 02, 2014       _(signature)_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date     Charging Party Signature | |

Nanton-Marie- # 275229    **Statement of Essential Facts Relevant to Retaliation Claim  - 2012-2014**

Date: The 20th. December 2013

### I.RETALIATION IN VIOLATION OF SCHOOL BOARD AND TRANSPORTATION DEPARTMENT RULES

**A..** During 2012-13 school-year Plaintiff, successfully bided for route 2244. At the beginning of school on the 20th. August 2012 the route had approximately eleven (11) Special needs pupils, (SPED) all requiring home stops.  One (1) pupil was coded 8 requiring a harness and according to Director Mazie's In-service edict a Bus-Aide.  Four (4) pupils were coded 2, signifying they were Pre-K, each requiring a car-seat. One (1) pupil was coded 2A, signifying s/he required a car-seat, aide or monitor because s/he was deemed educable mentally handicapped. One (1) pupil was coded 4 signifying they had a home stop with supervision.  Three (3) pupils were coded 1 requiring home stops without supervision. One (1) pupil was coded 1A signifying home stop without supervision although the pupil was deemed educable mentally handicapped and required an aide or monitor because the pupil had regular seizures. (In fact this pupil had a total of at least six (6) seizures on the bus in 2012-2013 and was eventually recoded 4A after a pupil/parent conference which Plaintiff's referral action triggered.)  In addition, Plaintiff had a list of sixty-six (66) regular students with 25-40 travelling twice daily.  As the school year progressed pupils were added to the list of sixty-six (66). Neither Director Mazie nor Coordinator Walden scheduled a bided regular bus aide for route 2244 for the duration of school year 2012-2013. Hence, with the beginning of the school year, and despite the fact that 2244 in prior years had a regular bided aide and with its compliment of pupils in 2012-2013 cried out for a bided bus aide, no bus aide was assigned in 2012-2013. From the beginning of the school year on August 20th. 2012 to the middle of September 2012, Plaintiff had no bus aide whatsoever.  Based on safety concerns as well as his knowledge and experience, Plaintiff assessed the need for a different configuration of bus as well as regular bided bus aide.

Plaintiff approached acting FOS Tammy Coley and Transportation Operations Manager, Moses Moore, and after describing the above, made a request for a different configuration of bus and a regular bided bus aide.  Ms. Coley and Mr. Moore arranged for route 2244 to have an occasional bus aide on an "as available basis".  This meant that on most days route 2244 still had no bus aide.  More importantly, Ms. Coley and Mr. Moore informed Plaintiff that he must request a permanent bided bus aide and a different configuration of bus through Coordinator Portia Walden because the SPED responsibilities fell under her portfolio.  Plaintiff now approached Coordinator Walden with the request for a permanent bus-aide and a configuration of bus which would accommodate the challenges of route 2244 in school year 2012-2013. Coordinator Walden rejected the request on the grounds that the route had not been put up for aide bid and that 2244 did not even require an aide. Plaintiff disagreed with Coordinator Walden and made this known to the Coordinator because the coded 1A, 2A and 8 pupils in conjunction with the sixty-six (66) regular pupils assigned to Route2244, triggered safety concerns and showed the route required an aide and should have been put up for bid. Moreover, at the In-service meeting held at Parkway Elementary School, weeks before, and at which Coordinator Walden was in attendance, when North Transportation Center Director, Randy Mazie referred to an auditorium full of employees as "knuckleheads whom I have come to straighten out" the Director had expressly and without equivocation stated that any route with harnesses and or wheel chairs i.e. codes 5 or 8 required an aide.

1

Nanton-Marie- # 275229   **Statement of Essential Facts Relevant to Retaliation Claim   - 2012-2014**

This disagreement between Coordinator Walden and Plaintiff persisted well into June of 2013 and even as the complexity of the composition of pupils on Route 2244 changed and increased.

In a related incident in September 2012, Plaintiff approached Coordinator Walden to further enquire regarding the availability of a bided bus-aide for Route 2244. Coordinator Walden asked Plaintiff "Why didn't you come to see me?" Baffled, Plaintiff responded: "I did not know you wished to see me because my name was not highlighted with a note to see you" (Procedurally, when an administrator or FOS wants to see a Plaintiff or Aide they send dispatch an e-mail with the request. Dispatch then highlights the Plaintiff or Aide's name with a note to see the relevant person.) Coordinator Walden asked Plaintiff to accompany her to her office and with the door open began to berate Plaintiff. "Whenever I say I want to see you, you must come immediately! I told you I wanted to see you and you ignored me!" Startled and puzzled by the heavy handed, bullying nature of the remark, Plaintiff asked: "When and where did this occur?" Coordinator Walden answered: "Yesterday in the sign-in room." Plaintiff again repeated he had no idea that the Coordinator wished to see him.  Coordinator Walden became adamant and insisted "You knew I wanted to see you because I told someone to let you know and you ignored me." Plaintiff asked: "Whom did you ask to tell me to see you?" Coordinator Walden did not answer but raised her voice absolutely insisting Plaintiff knew and heard that she wished to see him.  Plaintiff then repeated that since his name was not highlighted when he signed in he did not know the Coordinator wished to see him and that no one had informed him the Coordinator wished to see him. This did not satisfy Coordinator Walden who continued to vociferate and rave and assert her claim that Plaintiff knew she wanted to see him but choose to slight her. Plaintiff thought a minor matter was being blown out of proportions. However, still wishing to discuss the need for a bided aide for Route 2244, due to the safety concerns, but realizing the Coordinator might be serious in her allegations, Plaintiff said: "I think we should cease and desist because none of us will win this argument and probably I should get a Union representative to help us resolve this matter." As Plaintiff turned to leave the office and find Shop Steward Haynes, Coordinator Walden yelled: "Get out!" and slammed the door behind Plaintiff. Plaintiff was astonished and bewildered by this unprofessional behavior.  Plaintiff reported the matter to Shop Steward Haynes, who stated: "This has got to stop because there have been other similar incidents with her of this nature." Plaintiff asked whether he should chronicle this incident.  Shop Steward Haynes replied: "It's up to you."  Since Plaintiff was new to North Transportation Center he concluded that Coordinator Walden might simply be having a bad day, and choose to overlook the matter, probably to his detriment.

Significantly, by the 19th. September 2012, when Plaintiff still did not have a regular bided bus aide, Plaintiff was now transporting fifteen (15) SPED pupils, all requiring home stops and to Plaintiff's trepidation the safety hazards persisted.  One (1) pupil was coded 8, requiring a harness and a Bus-aide according to Director Mazie's In-service edict.  Two (2) pupils were coded 5A using wheel chairs. The SPED pupils was deemed educable mentally handicapped and required an aide or monitor.  Five (5) pupils were coded 2 meaning they were Pre-K in car seats.  One (1) pupil was coded 2A requiring car seat, aide and monitor because s/he was deemed educable mentally handicapped.  One (1) pupil was coded 4 requiring home stop with supervision.  Two (2) pupils were coded 1 requiring home stop without supervision. One (1) pupil was coded 1A requiring home stop without supervision although the

2

Nanton-Marie- # 275229    **Statement of Essential Facts Relevant to Retaliation Claim   - 2012-2014**

pupil was deemed educable mentally handicapped and needed an aide or monitor because s/he got regular seizures.  Two other pupils who were no longer coded still needed supervision on the bus and at their home stops since one pre-k pupil had a severe speech impediment and is fed with an enteral (ETF) tube and disembarked at a very busy stop adjacent to N.W. 27[th]Avenue.  The other pupil cried incessantly if no one was at the home to meet her/him. The list of sixty-six (66) regular students also remained with 25-40 travelling twice daily.

By the 27th. September 2012, when Route 2244 now had an occasional bus-aide – maybe once or twice of the five day school week – Plaintiff was transporting sixteen (16) SPED pupils. One (1) was code 8 requiring a harness. Two (2) pupils were coded 5A using wheel chairs. The SPED pupils were categorized as educable mentally handicapped and required an aide or monitor. **(In the case of the wheel chairs when Plaintiff had no Bus- aide,** <u>and had to load or unload a wheel chair pupil, with the bus running, Plaintiff had to activate the stop arms and secure the bus, leave approximately fifty (50) SPED and regular pupils unattended on the bus.  Plaintiff then activated the handicapped door and wheel chair lift from the outside, placed the wheel chair pupil on the lift, secure the wheel chair and initiate the assent of the pupil to the bus.  Plaintiff then left the wheel chair pupil on the outside of the bus on the extended raised lift. Plaintiff reentered the bus, unsecured the wheel chair, spotted the wheel chair pupil inside the bus and secured the wheel chair inside the bus.  Plaintiff then went back outside and activated the wheel chair lift until it was in its original position.  Plaintiff then manually closed the lift door.  Plaintiff then re-boarded the bus deactivated the stop arms and proceeded to the next stop. Theoretically and actually, when there was no Bus-aide Plaintiff would do this four (4) times a day adding at least twenty-five  to twenty-eight (25-28 minutes per day to the route time.)</u>  Six (6) pupils were coded 2 meaning they were pre-k in car seats. One (1) pupil was coded 2A requiring car seats, aide or monitor because s/he was educable mentally handicapped. One (1) pupil was coded 4, requiring home stop with supervision. Two (2) pupils were code 1 requiring home stops without supervision.  One (1) pupil was coded 1A requiring home stop without supervision although the pupil was deemed educable mentally handicapped and required an aide or monitor because s/he got regular seizures.  This pupil, who experienced the seizures was now coming to the bus dribbling her medication on her clothes on the bus seat and floor and often not stable on her feet. Two other pupils who were no longer coded still needed supervision on the bus and at their home stops because one pre-k pupil had a severe speech impediment and is fed with an enteral (ETF) tube and disembarked at a very busy stop adjacent to NW 27th Avenue.  The other pupil cried incessantly if no one was at the home to meet her/him.  In addition Plaintiff had the list of sixty-six (66) regular students with twenty-five to forty (25-40) riding twice daily.  Plaintiff was at his wits end driving and trying to control the pupils. Was this a violation of School Board and AFSCME safety work rules?  What would have occurred if Plaintiff had a tragic or fatal incident or accident and it was shown he had no bus- aide? Who would have been responsible?  Would Plaintiff have been fired for operating Route 2244 in 2012-13, without a necessary bus-aide?  Would either FOS Gordon, Coordinator Walden or Director Mazie have indemnified Plaintiff? I think not! Like Pontus Pilate they would have washed their hands clean of any knowledge or involvement because Plaintiff's request for the bided bus-aide was only verbal and not in writing.  Even more sinister, they could even claim they assigned an aide and Plaintiff left the Center without the assigned aide.

3

EXHIBIT (A)

Nanton-Marie- # 275229    **Statement of Essential Facts Relevant to Retaliation Claim   - 2012-2014**

In the final Route Reports Plaintiff received in school year 2012-13, and shortly before the April ride-along by FOS Wallace and Bentley when Route 2244 still had sporadic Bus-Aides, Plaintiff now had Seventeen (17) SPED pupils with home stops. Three (3) of the pupils were coded 8 requiring harnesses and according to Director Mazie's In-service edict a Bus-aide as well. One (1) pupil was coded 5A using a wheel chair and requiring an aide or monitor because s/he was deemed educable mentally handicapped.  One (1) pupil, **previously coded 1A,** was now coded 4A requiring home stop with supervision as well as an aide or monitor because the pupil was deemed educable mentally handicapped due to the fact that the pupil had regular seizures. One (1) pupil was coded 4 requiring home stop with supervision.  Six (6) pupils were coded 2 designating pre-k students in car seats. One (1) pupil was coded 2A indicating a pre-k pupil in car seat, requiring an aide or monitor and deemed to be educable mentally handicapped. Two pupils were coded 1 indicating home stop without supervision.  Two other pupils who were no longer coded but still needed supervision on the bus and at their home stops since one pre-k pupil had a severe speech impediment and is fed with an enteral (ETF) tube and disembarked at a very busy stop adjacent to N.W. 27th Avenue. The other pupil cried incessantly if no one was at the home to meet her/ him and received an on an off code 1 during school year 2012-2013. Although disputed, the school kept putting this pupil on the bus until at least the middle of May 2013 when FOS Beneby-Walthour researched and resolved the matter. In addition, Plaintiff had a list of sixty-six (66) regular students with 25-40 travelling twice daily.

When FOS, Mr. Gordon, the FOS of record for Route 2244, returned in September 2012 from vacation, replacing acting FOS Coley, Plaintiff sought to bring the above concerns to his attention and request help getting a bided  bus-aide due to the obvious safety issues.  FOS Gordon would not even extend the courtesy of hearing Plaintiff out.  Plaintiff approached FOS Gordon in the TOH office at the beginning of an A.M. shift with the Route Report listing the SPED students and the list of sixty-six (66) regular pupils. Plaintiff asked: "May I have a little of your time" FOS Gordon responded loudly: "What?"  Plaintiff showed FOS Gordon the Route Report and the List of sixty-six (66) pupils and began to explain: "This year I'm the Driver on Route 2244 in which I have fifteen (15) SPED pupils – one gets regular seizures.  One is in wheel chair, 1 is in harness.  In addition, I have sixty-six (66) regular pupils but...." FOS Gordon cut Plaintiff off and asked loudly: "What's the point?  Get to the point!" Plaintiff was astonished and asked the FOS "Why are you being so impatient with me?" FOS Gordon became agitated and raised his voice louder and declared:  "You can't talk to me that way!  You don't know me like that!!" Shocked, Plaintiff stepped back looked at FOS Gordon and loudly retorted: "Then you can't talk to me that way either!" Plaintiff believed FOS Gordon was impatient, unprofessional and showed a disrespect that escalated into verbal abuse. Plaintiff left the TOH office immediately and after describing the above encounter with FOS Gordon requested that Transportation Manager Moses Moore immediately reassign him to another FOS because he would not work with FOS Gordon. Transportation Operations Manager Moore stated he would look into the change with Coordinator Walden.  Shortly thereafter, Mr. Moore informed Plaintiff he was reassigned to acting FOS Willie Mae Davis.  This one change triggered a set of events which saw Plaintiff being assigned to five (5) different FOS' in 2012-13.

In late September of 2012, when Plaintiff received no help in having an aide assigned to Route 2244 and after he had again sought Ms. Walden's help in getting a bided bus aide but was unprofessionally and

4

Exhibit (A)

roughly rebuffed when the Coordinator slammed the door on him, Plaintiff approached Director Mazie. Plaintiff told Mr. Mazie he had several safety concerns regarding Route 2244, including no assignment of a regular bided bus- aide, despite the fact that he had harness, code 8, wheel chair pupils, code 5A and a pupil who got regular seizures code 4A. (Plaintiff reminded the Director that at the In-service meeting weeks before, when Director Mazie referred to the auditorium full of employees of color as "knuckleheads whom I have come to straighten out" the Director had expressly and unequivocally stated that any route with codes 5 or 8 i.e. harnesses and or wheel chairs required an aide.) Since Plaintiff's route had two codes 5A and one code 8 Plaintiff was optimistic that the Director would enforce his own edict. But on this occasion, Director Mazie smiled, waived his hand as if to waive Plaintiff aside and told Plaintiff: "I am busy now and you're doing a good job, not to worry." Plaintiff refused to take this for an answer and insisted: "Even if I am doing a good job, now I need help." Director Mazie told Plaintiff: "Have a good day I have got to go now." **This disagreement between Director Mazie and Plaintiff over the need for a bided Bus-aide on Route 2244 also persisted until the completion of the 2012-13 school year.** At other times, Director Mazie was absent from the Center and could not be reached.

Through neglecting to implement the necessary safeguards called for by the MDCPS Transportation work rules and regulations and despite the fact that Plaintiff went up and down the chain of command at North Transportation Center, Route 2244 did not receive the required help one associates with a route facing the complexities described in this request or a bided bus-aide for the duration of 2012-2013. Plaintiff verbally reported his sense that work-rules were not being followed, in the case of Route 2244, to AFSCME Local 1184 Shop Steward, Terry Haynes, without result.

Moreover, if they speak honestly, without fear of retaliation or being fired and without amnesia, all of my fellow Drivers at Biscayne Gardens Elementary during school-year 2012-2013 – Mrs. Thelusma, Mr. Cham, Ms. Stephanie Smith or Sr. Pedro La Rosa and even some personnel at Biscayne Gardens Elementary, upon observing Plaintiff coming to the school on a daily basis with the sixteen (16) SPED pupils including wheel chairs, car-seats, harnesses as well as the 25-40 regular students, but no bus-aide, repeatedly asked: "Why don't they assign you a regular Bus Aide? This route had a bus aide last year"

In the final analysis, it was acting FOS Willie Mae Davis who proactively responded to Plaintiff's plea for a fulltime bus-aide, after Plaintiff shared with her as he had done with Coordinator Walden, FOS, Mr. Gordon and Director Mazie the Route Report and list of sixty-six (66) regular pupils assigned to ride Route 2244 in 2012-13. Mrs. Davis walked into dispatch and possibly back to Coordinator Walden's office, and returned to inform Plaintiff she had arranged to have standby Bus-aide, Agnes Laurent placed on Route 2244. Bus Aide Laurent served with distinction from October 2012 until February of 2013 when she was abruptly and mysteriously reassigned by Coordinator Walden, without explanation. WHY?

The composition of route 2244 had not changed with the abrupt departure of bus-aide Laurent because at the end of February 2013, Plaintiff still had Fifteen (15) SPED pupils with home stops. Three (3) of the pupils were coded 8 requiring harnesses and according to Director Mazie's In-service edict a Bus-aide as well. One (1) pupil was coded 5A using a wheel chair and requiring an aide or monitor because s/he was deemed educable mentally handicapped. One (1) pupil, **previously coded 1A,** was now coded 4A

requiring home stop with supervision as well as an aide or monitor because the pupil was deemed educable mentally handicapped due to the fact that the pupil had regular seizures. One (1) pupil was coded 4 requiring home stop with supervision. Six (6) pupils were coded 2 designating pre-k students in car seats. One (1) pupil was coded 2A indicating a pre-k pupil in car seat, requiring an aide or monitor and deemed to be educable mentally handicapped. Two pupils were coded 1 indicating home stop without supervision. One pupil who was no longer coded but still needed supervision on the bus and at the home stop since that pre-k pupil had a severe speech impediment and is fed with an enteral (ETF) tube and disembarked at a very busy stop adjacent to N.W. 183 Street and 27th Avenue. In addition, Plaintiff had a list of sixty-six (66) regular students with 25-40 travelling twice daily.

**B..** Two Incidents Plaintiff radioed to dispatch on the 20th. May 2013 from Route 2244 and again on the 26th. November 2013 from Route 2034 still have not received Plaintiff's succinct description and signature. Usually Plaintiff has to write a pithy statement describing the incident, present his Driver's license and have it copied and attached to the report and then sign the statement which is then forwarded to a liaison in the Transportation Department. Because neither Coordinator Walden nor FOS Gordon was at the scene when these Incidents occurred, they have no first-hand knowledge and can only report hearsay from a third source. Hence Plaintiff's statements and signatures on the Incident Reports take on special importance because he has firsthand knowledge of the Incident/s. In the May 20th.2013 Incident, a pupil had a seizure and 911 Rescue and School Police were called. FOS Gordon, the FOS on duty, has yet to present the Incident report to Plaintiff. In the November 26th.2013 Incident, North Miami police were called and removed a chronically disruptive pupil from the bus. Neither the FOS on duty nor Coordinator Walden has presented the Incident report for Plaintiff's statement or signature. As of this writing, none of the protocols have been followed with Plaintiff's descriptive statement and signature with regard to either of the Incidents. Plaintiff reported the 20th. May 2013 Incident, which he thought, at the time was an oversight, to Transportation Operations Manager Moore, the Administrator on duty at that time of day, but the necessary Incident report documents have still not been presented for Plaintiff's review and signature. Is this new School Board policy and now normal protocol to process these Incident reports without Plaintiff's statement and signature? Will Plaintiff eventually be accused of lack of cooperation, unsatisfactory job performance and dereliction of duty by FOS Gordon, Coordinator Walden and the Administration?

## II.RETALIATION IN APPLYING HEIGHTENED SCRUTINY AND SURVEILLANCE

Following the departure of Bus-aide Laurent in February 2013, Plaintiff experienced **heightened scrutiny** by FOS', Bus-Aides and Administrators. Instead of putting Route 2244 up for bus-aide bid as they do routinely and as was done with other routes requiring a bus-aide in 2012-2013 the Administration, elected, beginning in March 2013, to assign at least seventeen (17) and possibly as many as twenty-two (22) different standby bus-aides and sometimes even other Drivers, at first on a sporadic basis, but then more steadily to Route 2244. (Coordinator Walden denies that (17-22) different bus-aides were assigned to Route 2244 in 2012-2013.) Several of the seventeen to twenty-two (17-22) different standby bus-aides assigned during the rest of the school year 2012-2013,complained of difficulties working with Plaintiff and often violated School Board rules by using their cell phones to call dispatch, FOS' and others

6

to inform on Plaintiff's every movement during the route. Verbal requests to Dispatch and Ms. Angela Moore in payroll for a list of the specific bus-aides assigned to route 2244 during school year 2012-2013 and the date on which they were assigned was denied on the grounds that it would take too much time. However, Plaintiff had kept his own written record of the surnames as they were given to him by the bus-aides assigned, but not the dates of most of the bus-aides assigned to 2244 during school year 2012-2013. As of this writing, many of these bus-aides still work for MDCPS.

The administration now retaliated by moving to reduced Plaintiff's route time while not supplying the necessary support Plaintiff had requested.  Coordinator Walden issued a written order to FOS Wallace and possibly to FOS Bentley to ride along with Plaintiff. Upon sign in at 5:50 a.m. on April 11th. 2013, without prior notice, dispatch immediately notified Plaintiff that FOS Wallace would ride-along with him on the A.M. trip of Route 2244.  Please note that because of multiple add-ons the Routing Department had scheduled the new sign in time for Route 2244 as 5:50 a.m. and that this was duly reviewed and approved by Coordinator Walden on 3/5/2013. In an even more surprising move FOS Bentley stopped and boarded the bus at the exit from the Center in the P.M. on April 12th.2013 and without comment rode-along Route 2244.  Plaintiff believes there was no need to have FOS Wallace and Bentley ride-along and make recommendations to reduce Plaintiff's time based on bogus and fabricated assertions, except for retaliation, since due to at least twelve (12) add-ons to the route with the last change occurring as little as a month before, it was clear that the Route time was warranted. In anticipation of reduction of Plaintiff's time and even before the ride-along reports were complete and submitted; Coordinator Walden prepared and signed a new work performance payroll report form dated April 12th. 2013 but pulled it subsequently, after Plaintiff protested, because of its premature nature.  Is this evidence of premeditated retaliatory animus against Plaintiff?

Plaintiff also observed FOS Gordon surveilling 2244 in stealth fashion, at Biscayne Gardens Elementary, North Transportation Center, at Route 2244's last stop on N.W. 175 Street and 32 Avenue and at other points throughout the route. While it is possible that FOS Gordon simply happened to be "hanging around" in those places at those times and during working hours, Plaintiff believes it is highly improbable. Where are FOS Gordon's surveillance report?

Mr. Mazie convened and presided over a 15th. April 2013 meeting to discuss the FOS Reports and received and made recommendations. Those present at the meeting were Director Mazie, Coordinator Walden, and FOS' Wallace, Bentley, Gordon and Truesdell, AFSCME Local 1184, Shop-Steward Terry Haynes and Plaintiff. In effect all of the FOS' and two of the three administrators stationed at North Transportation Center, at the time, were in attendance at the meeting.  Why the show of force?  Was this full force assault designed to legitimize the undercurrent of collusion, retaliation and intimidation against Plaintiff? Moreover, Plaintiff was not accorded due process by being advised or provided any opportunity to verbally or otherwise rebut the presumptions of FOS Wallace and Bentley's reports used to reduce his route time by at least twenty-five (25) minutes a day.

At the conclusion of the April 15th. 2013 meeting, Plaintiff requested and received excerpts of both FOS Wallace and Bentley's reports from Director Mazie.  Plaintiff also made a verbal request to Shop Stewart

7

Exhibit (A)

Haynes that AFSCME Local 1184 file a Grievance against Director Mazie and Coordinator Walden, without result.

Beginning with the 17th.April 2013 meeting in Mr. Mazie's office, and approximately thirty-five (35) days before the ending of the school year, Plaintiff experienced **increased heightened adaptive scrutiny** with respect to his route time. Once again**,** instead of putting route 2244 up for bus-aide bid, as is routinely done, Director Mazie and Coordinator Walden now ordered Plaintiff to call dispatch before he left the Center, at least twice a day, to verify that a supply bus-aide was on board Route 2244. Even this did not work because on several occasions no bus-aide was available and Plaintiff had to expedite the route alone. On the 17th. April 2013 Route 2244 still had Fifteen (15) SPED pupils with home stops.  Three (3) of the pupils were coded 8 requiring harnesses and according to Director Mazie's In-service edict a Bus-aide as well. One (1) pupil was coded 5A using a wheel chair and requiring an aide or monitor because s/he was deemed educable mentally handicapped.  One (1) pupil, **previously coded 1A,** was now coded 4A requiring home stop with supervision as well as an aide or monitor because the pupil was deemed educable mentally handicapped **due** to the fact that the pupil had regular seizures. One (1) pupil was coded 4 requiring home stop with supervision. Six (6) pupils were coded 2 designating pre-k students in car seats. One (1) pupil was coded 2A indicating a pre-k pupil in car seat, requiring an aide or monitor and deemed to be educable mentally handicapped. Two pupils were coded 1 indicating home stop without supervision.  One pupil who was no longer coded but still needed supervision on the bus and at their home stop since that pre-k pupil had a severe speech impediment and is fed with an enteral (ETF) tube and disembarked at a very busy stop adjacent to N.W. 27thAvenue. In addition, Plaintiff had a list of sixty-six (66) regular students with 25-40 travelling twice daily.  Is this micro-management, workplace harassment or not?  Could a reasonable person conclude that Plaintiff was targeted selectively for enforcement of quasi School Bus Rules in the requirement that he call dispatch twice daily?  **Second,** FOS Truesdell told Plaintiff she had also been instructed by her supervisors to have Plaintiff initial the date and time he turned in extra time sheets, a practice applied to no one else in any of the four MDCPS transportation centers in which I have worked.  Is this strict micro-management?  Do all Drivers have to initial and have the time they turn in their extra time sheets initialed by an FOS?  On May 3rd. 2013 Coordinator Walden verbally informed Plaintiff: "I will not sign your extra time sheets.  This behavior is irresponsible and will not be tolerated because you are not abiding by the new time agreed to on April 16th." On information and belief, Plaintiff believes Administrators and FOS' were now instructed to forward any of Plaintiff's extra time sheets directly to Director Mazie for approval.  No one else could approve Plaintiff's extra time sheets. Are all Plaintiffs extra time sheets at North Transportation Center initialed by the Plaintiff and FOS and then referred to Director Mazie for approval?  Has Plaintiff been singled out for Director's approval of extra time sheets?  And is not this a peculiar form of workplace harassment?  **Third,** Plaintiff believes that the bus-aide assigned to Route 2244 may have been ones known to be prone to informing. Hence, either by cellphone or once they got back to the Center they reported any and all occurrences on route 2244. Plaintiff also believes that Bus-aides who were either unwilling or had nothing to snitch were summarily taken off Route 2244. Is this informing for retaliation purposes the normative?  Does this rise to the level of workplace harassment?

**III.RETALIATION IN DENIAL AND LACK OF DUE PROCESS AS WELL AS FABRICATION OF FACTS**

8

Exhibit A

Nanton-Marie- # 275229    **Statement of Essential Facts Relevant to Retaliation Claim  - 2012-2014**

On the 17th April 2013, two days after the meeting which focused on FOS Wallace, Bentley and Gordon's reports and one day after the unilateral reduction of Plaintiff's Route time by at least twenty-five (25) minutes a day went into effect, Plaintiff met with Director Mazie.  Plaintiff informed the Director that after a cursory review of the excerpts from FOS Wallace and Bentley's April ride-along reports he found them to be flawed and incomplete and hence not credible. Plaintiff informed Mr. Mazie that cutting the route time by over 2 hours a week would work a hardship in executing the route and urged the Director to reconsider the decision.  Plaintiff then made a verbal request that he be given opportunity to rebut the inaccuracies in the reports used in the decision-making in order to show the blatant discrepancies. Mr. Mazie rejected these pleas out of hand.  The Director went on to say that we had an extensive meeting on 4/15/2013 and that he was busy and did not have any more time to spend on this matter, thus further and actually denying Plaintiff Due Process and any opportunity to rebut the inaccurate reports.

Ignoring the Director's failure to accord him Due Process, Plaintiff drafted and fashioned a response to Director Mazie's 15th. April 2013 meeting based on the excerpts the Director had given Plaintiff at the conclusion of that meeting. Plaintiff subsequently provided draft copies of these rebuttals to the Employee Assistance Program and completed rebuttals to AFSCME Local 1184, AFSCME Council 79 and Director Mazie in May 2013. Although, both FOS Wallace and Bentley's April 2013 ride-along reports were in plaintiff's personnel file, when he reviewed that file on the 29th. October 2013, his rebuttals were missing from the personnel file. WHY?

In a meeting convened by Coordinator Walden on the 16th. April 2013, Bus aide Harris, FOS Trusedell, AFSCME's Shop Steward Haynes and Plaintiff were present. In the meeting on the 15th. April 2013, Mr. Mazie had directed that a meeting to reconcile difference between Plaintiff and Bus-Aide Harris be convened by FOS Truesdell.  Plaintiff was informed that this was the meeting Mr. Mazie ordered. However instead of reconciling differences, Coordinator Walden read off a litany of accusations, she stated, Bus-aide Harris had written against Plaintiff. Accusations of pre-K and K SPED pupils calling Plaintiff "daddy" and of one SPED pupil going into his pocket and touching Plaintiff were verbally presented by Bus-aide Harris. AFSCME's shop steward, Haynes also expressed the opinion that these charges were very serious.  Although astonished, Plaintiff rebutted the accusations as spurious and untrue. Bus-aide Harris broke down in tears.

At the conclusion of the meeting Plaintiff verbally requested a copy of Ms. Harris' written allegations against him.  Coordinator Walden stated she was busy right then but would get Plaintiff a copy, later. Plaintiff offered to take the document to Dispatch – three (3) doors away and where there was a copying machine to have it copied. Ms. Walden refused to allow this accommodation. Over several days, Plaintiff repeated his verbal request to Ms. Walden for a copy of Ms. Harris' written allegations. On each occasion, Ms. Walden smiled and heartily promised to get Plaintiff a copy of Ms. Harris' written allegations, but never did.  On the 22nd. April, 2013, Plaintiff penned his first request to Ms. Walden for a copy of Ms. Harris' written allegations, with a copy delivered to AFSCME Local 1184 Shop Steward Terry Haynes. When Plaintiff still did not get a copy of the document, he penned a second request to Ms. Walden, dated the 2nd. May 2013 and copied to AFSCME Local 1184 Shop Steward Terry Haynes.

9

Plaintiff then visited Coordinator Walden's office on May 3rd. and asked her for bus aide Harris' document citing his two prior written requests. Ms. Walden told Plaintiff she was very busy catching up on her work and filling in for Mr. Mazie, who was away. Coordinator Walden then asked Plaintiff: "Why do you want a copy of Ms. Harris' memo?" Plaintiff explained: "First of all the contents of the memo were about me and second, I consider the allegations made by Ms. Harris regarding me to be grave and troubling and I need to respond to them in writing." Coordinator Walden then informed Plaintiff that her office had misplaced the document and that her staff could not find it, but she would be glad to have Ms. Harris write another document.  Plaintiff told her another document was not acceptable because no one, including Coordinator Walden or Bus-Aide Harris for that matter, could guarantee that such a document would be identical to the original document with its spurious accusations. On the 9th.May 2013 Plaintiff penned his third request, copied to AFSCME Local 1184 Shop Steward, Terry Haynes.  As of the date of this writing, Plaintiff has not received as much as an acknowledgement from Coordinator Walden. Why has Coordinator Walden denied Plaintiff Due Process? What is Ms. Walden hiding? What were Coordinator Walden's motives? Did bus-aide Harris really write allegations against Plaintiff? Since Coordinator Walden was brave enough to commandeer FOS Truesdell's reconciliatory meeting to assert that Ms. Harris had made written allegations wasn't Plaintiff entitled to a copy of this document? Plaintiff views this episode as troubling and as part of an ongoing pattern of workplace retaliation, harassment, fabrication and attempts to intimidate and urges investigators and AFSCME Local 1184 to press Ms. Walden for a copy of the original allegations set forth by Bus-aide Harris.

Although it has not materialized as of this writing, Plaintiff also had a real fear because both Bus-aide Harris and Atterly have verbalized threats to beat Plaintiff up or vandalize his car or have their people beat Plaintiff up and vandalize his car.  Independent witnesses to some of this conversation have also reported hearing threats chatter leveled against Plaintiff in the employee lounge but this was probably only hearsay.( In a September 2013, retaliatory related turn of events, which Plaintiff will more fully explain later, and which saw FOS Bentley unilaterally revoked Plaintiff's block time at Miami Carol Senior Middle within a day - September 27th.2013 to be implemented September 30th, 2013 subsequent to Plaintiff resisting spurious accusations, debunked at the October 14th. 2013 Conference for the Record, that FOS Bentley allegedly saw Plaintiff utilizing a School Board vehicle for his personal business and reassigning Plaintiff to the Juvenile Justice's Associated Marine Institutes, North (AMI). )  Plaintiff believes placing him in a position where he would have difficulty getting to the school on time and where he might also have violence directed at him was the real purpose for the retaliatory change to AMI.   In this way the Administration would be able to cite Plaintiff for unsatisfactory job performance and incompetence.

Additionally, during one of these meetings, Plaintiff believes Mr. Mazie tried to intimidate him when he asserted that he witnessed Route 2244 pulled over outside the North Transportation Center and would personally testify to same.  He subsequently instructed Operations Manager Moore to give Plaintiff a verbal warning with the stipulation that any further breach would incur a Conference for the Record. Are all Plaintiffs who are pulled over either directly outside the Center or somewhere else in Miami-Dade County issued a verbal warning, without due process?  Even if we ignore the multiple daily routine request from dispatch and the administration that Plaintiffs pull over and call North, Northeast, Central

*Exhibit (A)*

Nanton-Marie- # 275229    **Statement of Essential Facts Relevant to Retaliation Claim**  **- 2012-2014**

West, Northwest or any of the Transportation Centers, by phone, is there no legitimate circumstance under which a Plaintiff may pull over? Did Director Mazie know if Dispatch had requested that Plaintiff pull over and call the Center or if Plaintiff faced a medical or other emergency?  Would you say Plaintiff is being targeted here?  Because, what Director Mazie did not ask nor instruct Transportation Operations Manager Moses Moore to ask was: "Why was Plaintiff pulled over outside North Transportation Center?"  What if Plaintiff had pulled over to make or receive an urgent cell-phone call? Regulations governing Miami-Dade County Public School CDL Plaintiffs state that school bus Plaintiffs must not use cell phones while operating a school bus. Why the double standard?

Further to that, on the 2nd.May 2013, as Plaintiff returned for his P.M. shift, he was accosted by FOS Gordon who stated Plaintiff had not returned a survey.  Plaintiff informed FOS Gordon he had no knowledge of any survey and did not know to what the FOS was making reference.  As Plaintiff signed in FOS Bentley informed Plaintiff he needed to see FOS Beneby-Walthour, who was beginning only her second day at North Transportation Center.  Plaintiff saw FOS Beneby-Walthour who leveled charges that Plaintiff had come to her office on the prior day, her very first day at North Transportation Center, with a survey and refused to give it to her. Plaintiff believes this was probably a case of mistaken identity. Plaintiff is not even sure he went to FOS Beneby-Walthour's office on May 1st. 2013. FOS Beneby-Walthour even went as far as to assert that FOS Truesdell had given Plaintiff a survey, which is not true, since FOS Truesdell had already been reassigned to a Center in the South. Plaintiff was confused and surprised and denied any knowledge of any survey.  FOS Beneby-Walthour then said: "Let's go to Ms. Walden." In Ms. Walden's office, FOS Beneby-Walthour repeated her baseless charges. Plaintiff denied any knowledge of having received a survey or having possession of same. Notwithstanding this, and without any further evidence than FOS Beneby-Walthour's word, Coordinator Walden instructed FOS Beneby-Walthour to issue Plaintiff a TOP'S REMINDER designating "Neglect of duty- failure/refuse to perform duty." demanding that Plaintiff sign the document. Plaintiff quickly called AFSCME's Shop Stewart Haynes who confirmed that Plaintiff was under no obligation to sign this form since it was only a survey and not required under the contract. Plaintiff refused to sign the TOP'S REMINDER.  This was intimidating and scary. Plaintiff's subsequent call to AFSCME's Senior Vice-President, Vicki Hall confirmed Shop Steward Haynes' statement. Management seems prepared to overstep its boundaries with scurrilous and reckless charges, retaliation and bullying threats designed to intimidated Plaintiff for simply seeking to do his job and for matters unrelated thereto also.

### IV. RETALIATION IN VIOLATION OF PRIVACY UNDER HIPAA of 1996 P.L. 104-191

On April 17th. 2013 Director Mazie issued Plaintiff a memorandum dated April 16th. 2013 in violation of HIPPA of 1996, as amended and the ADA of 1990, as amended, demanding medical information regarding Plaintiff's eye drop regimen within 10 days, because as his memorandum states: " It had come to my attention that you are putting eye drops in your eyes while in the process of operating your route…." Is Plaintiff the only employee who puts eye drops in his eye while in the process of operating a route?  Does putting eye drops in your eyes mean that you need an eye exam ASAP?  What about the many other Transportation employees with cataracts, high blood pressure or diabetes or heart problems or undisclosed  and special problems who also take medication during the operation of their route or

11

Exhibit (A)

Nanton-Marie- # 275229   **Statement of Essential Facts Relevant to Retaliation Claim  - 2012-2014**

while on the job? Must they also bring the School Board a letter? What happened to the Americans with Disabilities Act which allows special accommodations for such persons? *Is Plaintiff being singled out and harassed here?* Plaintiff also believes that when school bus aide Harris and FOS Bentley reported "putting eye drops in eyes" to management they violated Plaintiff's privacy. AFSCME's Shop Steward Haynes expressed the opinion, in the April 16th. 2013 meeting, that Mr. Mazie's request for Plaintiff's medical information was unwarranted.  Mr. Mazie cut Mr. Haynes off and tried to muzzle the Shop Steward, without result.  Moreover, when Plaintiff, under duress, told Mr. Mazie that it could take more than 10 days to get the medical provider's response, and that Plaintiff needed more time to get such a letter, Director Mazie stated that was Plaintiff's problem.

Plaintiff has been putting prescription drops in his eyes since 1996, a time which predates his employment at MDCPS.  Moreover, since employment at MDCPS, Plaintiff has passed an annual Florida Department of Transportation (FDOT) and School Board mandatory and certified physical and eye examination for at least eight (8) consecutive years in order to procure his annual Medical Examiner Certificate (MEC).  Unless Plaintiff passes this mandatory test annually he is not issued the requisite MEC and cannot drive the School Bus.  Hence, there was no need for Plaintiff's privacy to be invaded, under verbal bullying and threats, with a doctor letter request in May 2013, based on hearsay statements of Bus-aide Harris and FOS Bentley who have no expertise in eye diseases because at the time of the bullying and threats Plaintiff had passed and was operating the school bus under the requisite MEC which was current and active.  Any questions regarding Plaintiff's ability to safely  operate the school bus, or even if Plaintiff was blind, ought to have been put to a duly authorized tester such as the one who issued Plaintiff's MEC, not Plaintiff's private physician.  Plaintiff's physician is not an authorized tester for FDOT purposes and so in effect his statement bears no weight on Plaintiff's ability to perform CDL safety driving at MDCPS.  Plaintiff considered this a retaliatory violation based on HIPAA as amended, and the ADA as amended, the mandatory annual FDOT and Board approved examinations as well as both AFSCME Local 1184 and Plaintiff's objection to this intrusive demand at the time.

## V... RETALIATION DESPITE OVERWHELMING CONTRIDICTORY EVIDENCE

The findings of FOS Wallace, Bentley and Gordon, initially due to be implemented on 4/12/2013 were eventually implemented on 4/16/2013 when, Coordinator Walden insisted Plaintiff sign, under duress, a new work performance payroll report form, and school bus stop report changing his time from 33.67 hours per week to 31.42 hours per week.

This was done despite the fact that 4 new work performance payroll report forms changing Plaintiff's weekly route time all reviewed, based on add-ons, and signed by at least two (2) different FOS and approved by Coordinator Walden between the 3rd. September 2012 and March 5th, 2013. In addition, Plaintiff had submitted at least 2 School Bus Stop Reports requesting change of time and supporting his requests, because of the multiple add-ons. More importantly, however, these time changes were made on the basis of at least 13 neutral Route Report changes made by the Routing Department over the course of the school year 2012-2013.

12

Director Mazie continued to pressure Plaintiff with a referral for retraining dated: April 24th.2013 also in violation of the ADA as amended. In his referral to the training department dated 4-24-13  the Director advanced the following reasons for his referral: "(a) Two FOS have driven with Plaintiff. They state Plaintiff does not mind the " big picture", (b) defensive driving needs "touching up", (c) pulls up very close to the rear of vehicles in front of him, (d) **other issues with driving such as putting in eye drops while at a stop,** (e) pulling over to side of the road to increase the amount of his route time". *Clearly management has the right to refer any employee for training or retraining.  However in this case, Plaintiff had three accidents in 2012-2013, all when he had no bus aide, and even though he was not found at fault, Plaintiff notes that although there was overwhelming evidence to refer Plaintiff for retraining based on cause- the three accidents - the Director did not take the time to research these accidents and refer him for retraining due to any of these accidents, but rather for bogus and fabricated matters not substantiated by the FOS reports or the Director's written statements.* Ms. Phyllis Le Flore, in the training department, expressed genuine concern that Plaintiff had not been sent for retraining due to any of the three accidents and that the reasons the Director stated on the retraining referral had nothing to actually do with retraining. These are primarily hearsay reports phoned to FOS Gordon, and brought to Dispatchers, Coordinator Walden and Director Mazie by one or more of the 17-22 different bus-aides placed on route 2244 to snitch on Plaintiff. (Did any of these bus aides received special treatment for snitching on Plaintiff?)  Moreover, the Administrators and both FOS Wallace and Bentley simply appear to have rubber stamped much of the hearsay allegations in their April ride-along reports and referral for retraining.

Plaintiff believes Director Mazie exaggerates the facts, as did the FOS's report because only FOS Bentley's report states: "Plaintiff does not get the big picture…" This assertion is groundless.  It is also patently false that I pulled over to increase time. Plaintiff believes this was the fabrication of bus-aides, Harris and Waldon who reported to FOS Gordon. Both Bus Aide Harris and Waldon expressed displeasure that Plaintiff pulled over and stated they would report to FOS Gordon that Plaintiff pulled over: (1) and waited for pupils to come to the bus at the Golden Lakes stop where over between 25-40 pupils usually boarded the bus; (2) at the request of school officials, dropped regular pupils off in front of the school before proceeding to complete the route and (3) at the final stop at N.W. 175 and 32 Avenue stop where Plaintiff conducted a post-trip inspection pursuant to article 2.6 of Handbook for School Bus drivers, Aides, and Operations Staff, a routine required of all drivers at the completion of each run, as well as at the Transportation Center storage facility. Plaintiff also put an eye drop in his eye. I informed the panel at the April 15th.2013 meeting that these were my reasons for pulling over at my last stop which was adjacent to the busy corner of N.W. 175 Street and 32 Ave. *To my knowledge*, no FOS accused me of pulling over to increase time or have they in some secret report?  Why then was Director Mazie subjecting Plaintiff to a different standard than the work rules require?

## VI. RETALIATORY UNSPECIFIED EMPLOYEE ASSISTANCE REFERRALS under 6GX13-4D1.11

Plaintiff turned to Director Mazie and told him: "You are stressing me with this avalanche of baseless and flimsy accusations and you need to ease up."  Without responding to Plaintiff's concerns, Mr. Mazie promptly announced that if Plaintiff was stressing he had to issue him a supervisory referral to the

Employee Assistance Program. Plaintiff told Mr. Mazie that was not necessary and actually irrelevant to the harassment issues at hand, which issues were in fact the problem, and that issuing a referral to the Employee Assistance Program would only stress him further.  Plaintiff kept his Employee Assistance Program appointment. Plaintiff also gave the Employee Assistance Program copies of his draft rebuttals of FOS Wallace and Bentley's April 2013 ride-along. The Employee Assistance Program found no basis for a referral, especially since Director Mazie, in his haste and gusto to harass and throw his unbridled weight around, failed to even check any of the behavioral/medical concerns which fall under School Board Rule 6GX13-4D1.11, and is required. The Employee Assistance Program also concurred with the MDCPS office of Civil Rights and stated Plaintiff needed to file a grievance through AFSCME instead of coming to their program.  Director Mazie has since issued Plaintiff another unnecessary supervisory referral to the Employee Assistance program stemming from the Conference for the Record on October 14th. 2013. When AFSCME's Vice President for Transportation, Mr. Charles Hepburn stated that: "All your women have problems talking and dealing with him". Director Mazie responded: "My women?" Mr. Hepburn repeated his statement and added: "The women FOS don't want to talk to him or have him on their routes because they say he doesn't know how to speak to people and he's always doing what he's doing now – writing and documenting incidents and encounters.  They don't like that.  Mr. Mazie responded: "If none of the FOS want to deal with him and they don't want to work with him, then we have a problem."  Director Mazie inferred from this that Plaintiff was the one at fault and stated, in the context of these remarks by Mr. Hepburn, that he would refer Plaintiff to the Employee Assistance Program for the second time over the objections of both Plaintiff and AFSCME Local 1184. Not unlike the first referral to the Employee Assistance Program however, Director Mazie failed to comply with School Board Rule 6GX13-4D1.11 since he did not check any of the behavioral/medical concerns required. Plaintiff believes, the fact that the Director only seeks to make Employee Assistance referrals, in the case of this Plaintiff, when he or his staff are accused of unprofessional or harassing behavior in addition to his repeated failure to provide specifics upon which the program can act in helping Plaintiff, demonstrates this is purely retaliatory.  Plaintiff has also learned on information and belief, that Director Mazie reviewed and copied plaintiff's confidential Employee Assistance Program file under the direction of Mr. Jimmie Brown in the main office downtown.  This is currently under investigation.

## VII. RETALIATION BY THREATS AND BULLYING

Mr. Mazie kept insisting that Plaintiff must comply. Exasperated, Plaintiff asked the Director: "What if I am unable to meet all of these demands?  What if I am unable to bring the letter in 10 days or complete the route 2244 within the new time restrictions?" Mr. Mazie stated: "Then we will have to take it to the next level."  Surprised by the ominous tone of the Director, Plaintiff asked: "What do you mean by the next level?"  And, as if to rub salt and twist the knife in the wound of retaliation and harassment with intensity and force Mr. Mazie stated: "I will cite you for: (1) insubordination; (2) unsatisfactory job performance; (3) recommend you for suspension; (4) convene a conference for the Record and (5) move for possible dismissal." Plaintiff took this as a serious threat and asked Mr. Mazie to repeat what he

meant by the next level so that he could correctly notate the five points of citation.  Mr. Mazie obliged. This litany of threats terrified Plaintiff!

**VIII. 2013-2014 MDCPS YEAR HAS BEGUN WITH A RETALIATORY BANG!**

Plaintiff may be thin skinned and overreacting but the evidence seems to show that petitioner continues to be singled out, harassed and targeted for retaliation and discipline.  At MDCPS, Plaintiff believes he now operates in a hostile work environment.  On 8/8/13 as Plaintiff reviewed routes for bidding, FOS Gordon entered the room, full of other employees, and standing adjacent and directly behind Plaintiff stated: "I hope no crazy people bid for routes I supervise this year" On 8/8/13 and 8/19/13 FOS Bentley addressing Plaintiff referred to him as "you are a special case."  In Plaintiff's experience at MDCPS being referred to as "special" is not a term of endearment but usually means one is ESE or SPED.

On 8/19/13 Plaintiff followed the procedure of calling Dispatch and getting clearance to proceed from Miami-Norland Senior High School at 2:27 p.m.  On 8/20/2013; FOS Beneby (Walthour) summoned Plaintiff and without stating her purpose had him follow her to and from Coordinator Walden's office and when Ms. Walden could not be located, had Plaintiff follow her to Dispatch office and finally to FOS Wallace's office to announce: "Yesterday I got several calls from students and administrators at Norland Senior High stating you had left students and students were running after the bus.  I know you called dispatch but as your supervisor I want you to know that kids were left and were running after the bus." Plaintiff was incandescent!  Since Plaintiff had followed procedure what was the issue?  Why did FOS Beneby (Walthour) have to parade Plaintiff from office to office seeking witnesses to underscore the fact that Plaintiff had followed procedure?  Was something more sinister occurring which Plaintiff missed?  Route 2034 does not need micro-management in 2013-2014. Plaintiff believes he is still being targeted, singled-out for strict scrutiny, and harassed until management can make or fabricate a case for disciplinary action. Plaintiff reported the incident to AFSCME Local 1184 Vice-President of Transportation, Mr. Hepburn.  Mr. Hepburn stated he would take up the issue with Coordinator Walden.

When Plaintiff signed in for the P.M. shift on 8/22/2013 his name was highlighted and a note asked that he see FOS Beneby(Walthour).  Plaintiff obliged.  FOS Beneby(Walthour) then instructed Plaintiff to follow her. Plaintiff was led into the office of Coordinator Walden.  Once there Ms. Beneby(Walthour) instructed Plaintiff to sit. Cautious, and not willing to trust these persons because of a past history of animus with both ladies as well as the antics of 8/20/13, Plaintiff asked:  "Why are we here? and What is the problem?"  Ms. Walden stated: "To discuss your route."  Plaintiff asked: "What is the problem with the route?  Ms. Walden hesitated.  **Plaintiff subsequently learned that, as they had done in the May 1st. 2013 meeting, (**when in violation of the AFSCME contract they unilaterally issued and tried to force him to sign the TOPS REMINDER) **Coordinator Walden and FOS Beneby (Walthour) fabricated and planned to discipline him for allegedly allowing a pupil to disembark at an unauthorized stop and for not advising dispatch of the same, as well as not issuing the pupil a written referral for the infraction, issues which were presented and debunked at an October 14th. 2013 Conference for The Record.** Therefore, telling Plaintiff they wanted to "discuss his route" was a brazen retaliatory ruse designed to ensnare Plaintiff.

Reasonably believing that this meeting might affect his personal working conditions and subsequently result in disciplinary action, Plaintiff invoked his right to have an AFSCME representative present.  At

Nanton-Marie- # 275229    **Statement of Essential Facts Relevant to Retaliation Claim   - 2012-2014**

first, Coordinator Walden informed Plaintiff there was no need for a Union representative. However, when Plaintiff persisted she stated "Okay, you can get Terry." Plaintiff found Shop Steward Haynes in his office and asked him to sit in on the meeting. Shop Steward, Haynes told Plaintiff he should ask Vice President of Transportation, Mr. Hepburn to witness the meeting. After Plaintiff checked and was told Mr. Hepburn was gone for the day. Plaintiff approached Shop Steward Haynes again. Mr. Haynes came to Coordinator Walden's office and asked if the meeting could be postponed since he had a prior obligation. Coordinator Walden said no, there was no need for a Union representative, since we were only discussing Plaintiff's route. Mr. Haynes left. Ms. Walden ordered Plaintiff to sit down. Plaintiff re-invoked his Weingarten Right to have a Union Representative present at the meeting.  Coordinator Walden then stated: "I have had enough of this, I am calling Mr. Mazie." Coordinator Walden left the room and when she returned she again ordered Plaintiff to sit. Plaintiff again stated he wanted a Union Reprresentative present.  At this point Coordinator Walden stated: "If you do not sit down and discuss your route I will refer you for a Conference for the Record due to insubordination. What will it be? Are you going to sit down and discuss the route or be referred for a conference for the record due to insubordination?"  Plaintiff again re-invoked his Weingarten Right to have an AFSCME representative present.  Coordinator Walden then turned to FOS Beneby (Walthour) and stated: "I want you to be my witness that I have offered Mr. Nanton-Marie the opportunity to discuss his route now or be referred for a conference for the record for insubordination" "You are dismissed now"  Déjà vu?

Plaintiff left to initiate route 2034 for the P.M. shift, but on second thought called AFSCME Local 1184, Senior Vice-President Vicki Hall and recounted the above incident.  Mrs. Hall reminded Plaintiff that management had the right to discuss work related matters without a Union representative present. However, she urged Plaintiff to bring the matter to AFSCME Vice-President of Transportation, Mr. Hepburn's attention and to give him any documents received and related to this matter.  She also expressed the opinion this would be simple.

On 8/23/2013 Plaintiff recounted the issue to Mr. Hepburn who expressed the opinion that insubordination did not apply in this case but he may be reconsidering. The issue here is not with management's right to discuss work related matters, absent disciplinary action. Rather, it is with management's exaggeration of the truth and insistence that, because they know Plaintiff documents their continued attempts to intimidate and retaliate against him by always having a witness during all interaction with Plaintiff, a witness who can corroborate their version of the meeting, that Plaintiff should also have a witness in the room during all interaction with management who, can be impartial but corroborate his side of the story. Plaintiff believes the administration has intensified bullying, intimidation and  harassment and may possibly be retaliating because they hounded Plaintiff with impunity in 2012-2013 when AFSCME Local 1184 failed to Grieve his matters, and in 2013-2014 wish to quickly document and tarnish Plaintiff's otherwise untainted 9+ years employment record.

On September 25th. -26th. 2013 FOS Bentley in a retaliatory move, possibly related to the collusive nature of this retaliation claim, Plaintiff's rebuttal of her ride-along report as well as the pervasive nature of  information sharing at the Center, accused Plaintiff of using a School Board vehicle for his personal purposes. This issue was addressed and debunked for lack of evidence in the October 14th. 2013 Conference for the Record and Plaintiff's Appendage Rebuttal to the Summary of Conference for the Record. Further to that, Plaintiff believes FOS Bentley retaliated against his rejection of her accusatory questions, by immediately following her unsubstantiated allegations of September 25th.-26th. 2013, by giving Plaintiff assignments, although she is not Plaintiff's FOS of record. *This culminated in*

16

*FOS Bentley unilaterally revoking Plaintiff's Miami Carol City Middle School block time and reassigning Plaintiff, possibly with the explicit or tacit knowledge and approval of Director Mazie and Coordinator Walden, within only one (1) day - September 27th. 2013 to(AMI)to take effect three (3) days later on September 30th. 2013I.* As soon as the revocation and reassignment was completed FOS Bentley left Plaintiff alone.

AMI is an alternative educational school operated by the Juvenile Justice System. In the three months Plaintiff has transported from AMI, pupils have cursed and used abusive language against Plaintiff calling him "massissi", "maricon" and "faggot" and making vulgar references to the LGBTQIA community and threatening to shoot him. Plaintiff has had to call law enforcement on at least two occasions to have an AMI pupil removed from the bus due to disruptive behavior which endangered the commute and unidentified pupils have broken the front door glass on the bus. Plaintiff brought this to the attention of AMI, FOS Walthour and AFSCME Local 1184, without result. It now takes Plaintiff forty-five minutes to an hour to get to AMI instead of the ten minutes to Miami Carol City Middle School. This also created a route bidding issue for Plaintiff Sharon Lewis on Route 9020 from whose bided route the pupils Plaintiff initially transported from AMI were summarily yanked. Ms. Lewis informs Plaintiff she has gone to the Superintendent over the matter and that one of the original pupils she transported is still on Plaintiff's Route 2034 bound for the identical address the pupil had when Ms. Lewis transported the pupil before the September 27th 2013 reassignment occurred. Plaintiff believes  that citing him for unsatisfactory job performance because he generally does not get to AMI on time as well as placing him in a position where he might have violence directed at him was the real purpose for FOS Bentley's expedited one day retaliatory change from his bided block time at Miami Carol City Middle School to AMI.

## IX. POST-CONFERENCE FOR THE RECORD RETALIATIONS

On the 24th. October 2013, following the Conference for the Record on October 14th. 2013, and in response to Plaintiff's Rebuttal Appendage of the Conference for the Record Summary, copied to the Superintendent of Schools, Director Mazie informed Plaintiff that the Superintendent's office had instructed the Director to provide Plaintiff with notice that Plaintiff had alleged discrimination, harassment and retaliation against the Director and Coordinator at North Transportation Center. Notwithstanding this, and most importantly, Plaintiff believes the Director and Coordinator continue to retaliate against him by stalling and seeking to obstruct the investigation before it actually begins through : **(1)** impeding  Plaintiff's access to his personnel file for weeks; **(2)** refusing to provide Plaintiff with complete copies of FOS Wallace and Bentley's April ride-along reports in his personnel file despite repeated and descriptive requests; **(3)** removing and possibly tampering with the relevant FOS Wallace and Bentley reports in Plaintiff's personnel file after Plaintiff reviewed the personnel file with those reports in the file on October 29th. 2013 – reports Director Mazie and Coordinator Walden authorized to justify reducing Plaintiff's time by 25 minutes a day on route #2244 in school year 2012-2013; **(4)** not including in Plaintiff's personnel file the rebuttals of FOS Wallace and Bentley's April 2013 ride along reports which Plaintiff gave to the Director; and (5) Coordinator Walden's violation of School Board policy in not having Plaintiff describe and sign a Driver Incident Report regarding the incident on 11/26/2013.

17

Exhibit A

Nanton-Marie- # 275229   **Statement of Essential Facts Relevant to Retaliation Claim   - 2012-2014**

**CONCLUSIONS:**

**As Plaintiff reflected he felt 2012-2013 was the year from hell, in which he had been ganged upon by the full force of micro-management, heightened scrutiny, a litany of incessant work place neglect, harassments, lies, and attempts at intimidation by management through FOS surveillance, two FOS riding the bus, up to 22 bus aides, HIPAA medical privacy violations, bogus referral for retraining, reduction of route time by over 2 hours per week, lack of due process, allegations by bus aides and on and on.** _2013-2014 with its unwarranted October 14th 2013 Conference for the Record alleging: (1) refusal to follow supervisory instructions/refusal to meet with supervisors- insubordination; (2) unauthorized use of school board vehicle; (3) failure to follow route instructions; (4) discussion of verbal interactions with parents, school and staff  as well as (5) the spiteful retaliatory reassignment to Associated Marine Institutes, which took only one day to expedite, may be intended as the proverbial "straw that breaks the camel's back"!_

No one at the School Board, or AFSCME, Local 1184 may really care about these matters. However, Plaintiff believes that what he has described above, although not perfect, and although he is not himself a saint, is a morale drainer, a lot more nuanced, intricate, widespread and systemic and requires at least a preliminary Inspector General's investigation of management and other practices at North Transportation Center.  When last has North Transportation Center been audited for unfair labor and employment practices?

NOTA bene:  Please be advised that this "Statement of Essential Facts Relevant to Retaliation Claim - 2012-2014 **must be read in conjunction with** "_Retaliation Details: What Occurred; Specific Events; Action Deemed Retaliatory_"

18

Exhibit (5)

CASE NUMBER:  CE CRC-00360
INVESTIGATOR:  Lourdes Rodriguez

R E D A C T E D

## ALLEGATIONS

On December 20, 2013, the Office of Civil Rights Compliance (CRC) received a complaint of discrimination/harassment in employment based on RETALIATION from Mr. Allan Nanton-Marie, School Bus Driver, North Transportation Center (NTC), against Mr. Randy Mazie, Director, NTC **(EXHIBIT #1)**.  On January 9, 2014, this case was assigned to Ms. Lourdes Rodriguez, Manager III, for investigation.

## SUPERVISOR/SUBJECT NOTIFICATION

On January 9, 2014, a notification letter was sent certified return receipt and regular mail to Mr. Orlando Alonso, Administrative Director, North Transportation Center and Randy Mazie, Director, North Transportation Center.

## COMPLAINANT/VICTIM:  Allan Nanton-Marie                    Employee # ▆▆▆▆

On January 9, 2014, a complainant notification letter was mailed certified return receipt and first class mail to the residence of Mr. Allan Nanton-Marie, School Bus Driver, North Transportation Center.   On January 24, 2014, at approximately 10:00 a.m., this investigator conducted an in-person, oral interview with Mr. Nanton-Marie at the Office of Civil Rights Compliance, located at 155 N.E. 15 Street, Suite P104E, Miami, Florida 33132.  No other person was present during the interview.

Mr. Nanton-Marie is presently a school bus driver at NTC and indicated that he has been in said position at NTC since the beginning of the 2012-13 school year.   He relayed that he has been employed with M-DCPS since 2004.  Mr. Nanton-Marie said that he has known Mr. Mazie in the capacity of Director since 2010-11, when they were both employed at Jack Schee Transportation Center.  Mr. Nanton-Marie denied having any social or familial relationship with him.  Mr. Nanton-Marie relayed that he reports to the Field Operations Specialist (FOS) and said, *"However, they are not deemed to be supervisors."*  He articulated that Mr. Moore, Operations Manager, Mr. Mazie, Director and Ms. Walden, Coordinator II, are deemed supervisors and may recommend disciplinary action.  Mr. Nanton-Marie indicated that he has voiced that he is being harassed and retaliated against due to heighten scrutiny by the FOS, Mr. Mazie and Ms. Walden.   Additionally, he said that he was referred to the Employee Assistance Program (EAP) without any documented reason **(EXHIBIT #2)** as further retaliation.

When asked how he believed he was discriminated against by Mr. Mazie, Mr. Nanton-Marie stated:

> *Back in 2010-11, when driver first worked with Mr. Mazie at Jack Schee Transportation Center (JSTC), Director Mazie and his staff employed heightened*

CRC Case: CE CRC-00360
Subject:  Mr. Randy Mazie

*scrutiny to driver's work. (see attached, Randy Mazie I-XII Retaliation details, dated December 20, 2013)* **(EXHIBIT #3)**

*Back in 2010-11 Mr. Mazie and his staff employed some of the same tactics that they are employing now.  Because of the heightened scrutiny that I received by Mr. Puntavold rode the route that I was on and Mr. Barr rode the bus route that I was on after I submitted a memo dated Oct 18, 2010 and sent a copy to Mr. Klein. The Memo stated that at that time one of the field operations specialists Mr. Barr accused me of leaving Jack Schee to North Transportation Center because they said that I was leaving that location because I "stole time."*

*In 2012-13 I was given the route 2244, which had 16 ESE students* **(EXHIBIT #4)**, *(2 wheelchairs, 5 harnesses and 5 car seats & some of the ESE students had other problems), in addition to 66 other regular students on the bus and they did not give me a bidded bus-aide. I had a student that has seizures often and needed an aide to attend to the child.  During the 2012-13 meeting, Mr. Mazie had mentioned that anyone that had students with harnesses or wheelchairs will have an aide on the bus.*

*I approached Mr. Mazie that I didn't have an aide and told him that I needed a bidded bus aide.  This is after I had asked acting FOS, Cauley, FOS, Gordon, Mr. Moore and Coordinator, Ms. Walden and I was not given a bidded-aide.   Mr. Mazie took the position that no aide was required.   Both Mr. Mazie and Ms. Walden stated that no aide was needed.  From the beginning of school to end of September, I had no aide.  Then they gave me different aides, sporadically, up until the end of the school year.  See attached.*

*In 2013-14, Mr. Mazie convened a conference-for-the-record (CFR) with little or no evidence to substantiate his claims* **(EXHIBIT #5).**   *On the second day of school, a student got off the wrong stop and they claimed that I did not call dispatch.  See attached CFR and rebuttal.*

Mr. Nanton-Marie stated that due to the stress of having students with special needs and no bus aide, he had three accidents **(EXHIBIT #6)**. [Route 2044 2012-13 needed aide – accidents were 9/19/12; 10/10/12; 4/12/13] Mr. Nanton-Marie divulged that he had previously filed a complaint with the CRC office.  When asked if Mr. Mazie was aware that he had previously filed a CRC complaint, he replied, "*I don't know.  ...This is the same time when I was under scrutiny in Jack Schee.*"  Mr. Nanton-Marie said that during a meeting in 2012-13 with Mr. Mazie, he signed under duress a route time report that reduced his working hours by 25 minutes daily and said, "*In 2013-14, I continued to be harassed and was eventually brought up on 4 charges at the CFR.*"  Mr. Nanton-Marie stated he reported the alleged incidents to his Union Representatives.

Mr. Nanton-Marie stated that he perceives he has been under "heightened scrutiny" since 2010-11, since FOS were placed on his route for observation and since the FOS

CRC Case: CE CRC-00360
Subject: Mr. Randy Mazie

reports, his time was reduced. When asked to elaborate on his belief that Mr. Mazie orchestrated retaliation against him, Mr. Nanton-Marie replied:

> *He wrote me a CFR and alleged that Ms. Bentley saw me that I made unauthorized use of school board vehicle, failure to follow route instructions (because a student got out at the wrong stop on 2nd day of school). Prior to this when Ms. Walden said she needed to discuss the route, when I asked for a Union Representative they claimed that I was insubordinate for not sitting down to discuss the route. They were looking for all kinds of flimsy stuff to retaliate against me and they never talked to me about it or since the beginning of the school year, then they wrote the CFR in October 2013.*

At the end of the interview, Mr. Nanton-Marie, was provided a copy of his statement to read for accuracy. Mr. Nanton-Marie, signed his statement, and a copy was provided for his records.

## SUBJECT: Randy Mazie                                    Employee # ███

| | |
|---|---|
| Notification letter mailed on: | January 9, 2014 |
| Interview Conducted: | January 29, 2014 @ 9:30 a.m. |
| Location of Interview: | CRC Office * 155 NE 15 St. Miami, Fl 33132 |
| Present during Interview: | No other person was present |

Mr. Mazie indicated that he has been employed with M-DCPS for 28 years and has been the Director at NTC for approximately 20 months. Mr. Mazie articulated that he has known Mr. Nanton-Marie for 5 years. He relayed that he became aware of this complaint when he received notification from the CRC office. Mr. Mazie said that when Mr. Nanton-Marie declared that he was being discriminated/harassed that he (Mazie) notified Mr. Nanton-Marie of the CRC office via a letter **(EXHIBIT #7)**. When asked if he had knowledge of Mr. Nanton-Marie ever filing or participating in a discrimination proceeding under Title VII of the Civil Rights Act, Mr. Mazie replied, *"Not that I'm aware of."* Mr. Mazie described Mr. Nanton-Marie's job performance as follows:

> *Over the course of time that I have known him (Nanton-Marie), he's had difficulty with his interaction with staff. He's difficult to communicate with and oftentimes unresponsive with staff. He has been given instructions by his supervisors which he has refused to follow and trying to communicate with him about these issues has been met with defense and denial. (Ms. Bentley observed him at an unauthorized stop and he refused to speak with her or come in to speak with her and he refused)*

Mr. Mazie stated that because Mr. Nanton-Marie was involved in a vehicular accident and because a parent claimed that their child alleged that the bus *"driver had been stopping the bus and putting eye drops in his eyes,"* he instructed Ms. Bentley and Ms. Wallace to ride on Mr. Nanton-Marie's route. He indicated that Ms. Wallace observed,

CRC Case: CE CRC-00360
Subject:  Mr. Randy Mazie

"*The driver rode 20 miles an hour through the whole route*" and noted that Mr. Nanton-Marie was not following the route properly.  Ms. Wallace indicated that he was leaving 10 minutes later and returning 15 minutes early.  She also indicated that he was having students call him "*daddy.*"  She continued, "*It was also reported to me that he was self-administering eye drops while on the route in front of students.*"  Moreover, Mr. Maize said, "*I requested that he provide an evaluation from his doctor indicating that this would not affect his driving.*" **(EXHIBIT #8)**  Mr. Mazie indicated that part of the responsibilities of an FOS is to observe drivers while on their bus route.  He said those were the only two occasions in which he instructed personnel to ride-along with Mr. Nanton-Marie.  Mr. Mazie articulated that although he was Mr. Nanton-Marie supervisor for part of 2011 when they worked at JSTC, he did not recall documenting Mr. Nanton-Marie at that time.

With regards to a bidded-aide not being assigned to Mr. Nanton-Marie's bus route, Mr. Mazie articulated:

> "*At the beginning of the school year, all drivers and aides get to bid for a route. Any route in which a child has an IEP which requires an aide either has and aide on it through the bidding process or is assigned one.  I don't know what the aide situation was at the time.  Sometimes there are not enough aides available.   If a driver needs an aide and one is not available, then the driver is expected to operate lifts and tie down the students.*"

When asked why he refused to provide copies of some documents in Mr. Nanton-Maire's personnel file, Mr. Mazie replied, "*There were some personal notes which were not part of the personnel file and were mistakenly handed to him with the file at the time, therefore, they were not given to Mr. Nanton-Marie.  He had the opportunity to rebut their statements when we met and spoke about this.  Ms. Wallace and Ms. Beneby's personal comments to me are not part of the file.*"

With regards to referring Mr. Nanton-Marie to EAP without identifying concerns on the referral form, which Mr. Nanton-Marie alleged was done in order to build a paper trail for his CFR, Mr. Mazie indicated that Mr. Nanton-Marie was verbally informed of the reason.  Moreover, EAP is an optional service provided to employees and "*is not used as a disciplinary action.*"  Mr. Mazie indicated that Mr. Nanton-Marie refused to meet with FOS's and other supervisors to discuss concerns that they had identified when he was asked to meet with them.  Mr. Mazie articulated that to his knowledge, Mr. Nanton-Marie has never been removed from his route due to administrative action.  He stated:

> "*I checked with payroll yesterday and noted that his time has only decreased one time and has mostly increased in the 2012-13 school year.  Drivers route time fluctuate dependent on students being added or leaving and pieces of work that may be added or taken away.  In this case, he did not have midday scheduled. Then a midday was added in November and subsequently removed in February. However, by February 28, 2013, Mr. Nanton-Marie's route time had increased by 1:40 hours.  When a school requests a midday run be added, we usually assign*

CRC Case: CE CRC-00360
Subject: Mr. Randy Mazie

*the piece of work to the driver with the lowest time and when the school no longer needs the midday run, it is removed.  ...It appears to this administrator that the charges were filed in response/retaliation to the first time in all of these issues that actual written steps were taken with the employee to address the employee's performance/insubordination via a CFR."*

At the end of the interview, Mr. Mazie, was provided a copy of his statement to read for accuracy.  Mr. Mazie, signed his statement, and a copy was provided for his records.

## WITNESS # 1: Sharon Lewis                                    Employee # ███

Notification letter mailed on:      January 24, 2014
Interview Conducted:                February 11, 2014 @ 11:30 a.m.
Location of Interview:              Telephone Interview

Ms. Lewis relayed that this is her third year as a school bus driver at Jack Schee Transportation Center and that she has been employed with M-DCPS for 23 years.  Ms. Lewis indicated that she has known Mr. Mazie for approximately 7 years because she worked with him for 2 years during his tenure at Jack Schee TC.  She said that her association with each employee is merely professional.  Ms. Lewis relayed that she met Mr. Nanton-Marie in September 2013, when her students on the route from AMI were re-assigned to him.  She indicated that she became aware of this complaint in September 2013, and contended that *"Director, Weahtersby sent an email to routing and told them to take the students from AMI from her (Lewis) route and put them on Mr. Nanton-Marie's route."*

When asked if to her knowledge anyone had concerns with regards to Mr. Nanton-Marie or Mr. Mazie, Ms. Lewis said with reference to Mr. Nanton-Marie, *"The students complain about getting home too late."*  With reference to Mr. Mazie, she stated that when he was a JSTC there was a concern about, *"him (Mr. Mazie) being prejudice against Ms. Martin, Coordinator."*   Ms. Lewis indicate that she had no knowledge of Mr. Mazie treating Mr. Nanton-Marie less favorably than other employees because they do not work at the same center.  Ms. Lewis articulated that the FOS is a school bus drivers' immediate supervisor and that when a driver requests a time change, *"an FOS has to ride on the bus to make sure that the time is correct before they do the time change."*  Ms. Lewis relayed that drivers are contracted to drive routes which they bid on and said, *"Your route can change.  They can add or remove students from your route and sometimes the routes come with a midday route.  Sometimes they add more students on the route so the time increases or changes.  If you have less students you're supposed to tell them (FOS) and your time decreases."*

Ms. Lewis added:

*"I know that what they did was retaliation.  The director told a lie that I was late and they took the AMI kids out of my bus and gave it to Mr. Marie (Nanton-*

Exhibit 13

CRC Case: CE CRC-00360
Subject:  Mr. Randy Mazie

Marie).  Directors will do that when they don't like you.  They work together and
they'll retaliate against you through your route.   It was only three kids and it
really was not necessary to give him (Nanton-Marie) the kids when I'm already
there (at AMI).  They're wasting gas and money.   This was in September of
2013."

At the end of the interview, Ms. Lewis articulated that she would visit the CRC office to
sign her statement.  Additionally, on February 13, 2014, a copy of the statement was
mailed to Ms. Lewis' address on record.  To date, however, Ms. Lewis has not returned
her signed interview statement.

**WITNESS # 2: Portia Walden**                                Employee # ████████

Interview Conducted:               February 6, 2014, @ 12:00 p.m.
Location of Interview:             CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:          No other person was present during the interview.

Ms. Walden is presently a Coordinator III at NTC.  She relayed that has been employed
with M-DCPS for 20 years and this is her fourth year in her present position at NTC.
Ms. Walden indicated that she has known Mr. Nanton-Marie since he was transferred to
NTC and Mr. Mazie for approximately 15 years, since she worked with him at Central
East Transportation Center.   Ms. Walden denied having any type of personal
relationship with either employee.  Ms. Walden states that Ms. Adderly, Bus Aide and
Ms. Harris, Bus Aide, expressed concerns about Mr. Nanton-Marie's unprofessionalism
and how he addresses them.  She said that Ms. Harris also indicated that students were
calling him "*daddy*."  Moreover, Ms. Walden indicated, "*I received referrals from AMI,
that students are complaining that he slams on the brakes* (**EXHIBIT #9**)."

When asked how Mr. Nanton-Marie is treated by Mr. Mazie compared to similarly
situated employees, Ms. Walden stated:

> "*He is pretty consistent and a pretty good supervisor.  Each situation is handled
> the way it is supposed to be handled and he follows all the rules and does not
> make a determination based on allegations.*"

With regards to the allegation that Mr. Nanton-Marie's work is under heightened
scrutiny, Ms. Walden replied:

> "*I have no idea what he is referring too.   We just follow procedures that we take
> with any employee.  FOS are asked to ride with drivers whenever the employee
> requests that their time be changed or sometimes a complaint about the way
> they drive.  If there is a situation with employees, I usually ask the employees to
> put it in writing and see their FOS first and then come see and we discuss the
> situation.*"

Exhibit (5)

CRC Case: CE CRC-00360
Subject: Mr. Randy Mazie

At the end of the interview, Ms. Walden, was provided a copy of her statement to read for accuracy.   Ms. Walden, signed her statement, and a copy was provided for her records.

## WITNESS # 3: Karen Wallace                              Employee # ▓▓▓▓

| | |
|---|---|
| Notification letter on: | February 12, 2014, hand delivered |
| Interview Conducted: | February 12, 2014 @ 8:30 a.m. |
| Location of Interview: | North Transportation Center |
| | 16150 NW 42nd Ave., Miami, FL |
| Present during Interview: | No other person was present during the interview. |

Ms. Wallace indicated that she has been employed with M-DCPS for 25 years and has been at NTC in the capacity of an FOS for 17 years.  She relayed that she became aware that Mr. Nanton-Marie filed a complaint when this investigator informed her during our meeting.  Ms. Wallace articulated that she has known Mr. Mazie as a director for 25 years and Mr. Nanton-Marie, since he became a bus driver at NTC.   She denied having any type of familial or personal relationship with either employee.

When asked if she had knowledge of any employee, student or parents having concerns with regards to Mr. Nanton-Marie or Mr. Mazie, Ms. Wallace replied, "*Everyone has concerns about him (Mr. Mazie) when they don't do what they're supposed to do.*"  With reference to Mr. Nanton-Marie, she said, "*I have concerns about him.  It's just the way that he carries himself.  He's just strange, he'll just come up to you and say, 'Is the sky blue?' and I'll say, 'What type of question is that?' and he'll respond, 'I just wanted to see what you were going to say.'   I try to avoid him.*"

Ms. Wallace had no knowledge of Mr. Mazie ever treating Mr. Nanton-Marie less favorably than other employees.  Ms. Wallace was asked to elaborate on the role of a ride-along personnel and she articulated the following:

> "*If a driver requests a time change and is more than 30 minutes, then an FOS has to ride.  For kids acting up, parents not bringing the children out to the bus stop.  If the FOS determines that changes may be needed, then we'll (FOS) report to an administrator and let them know that someone will ride with the driver.   The ride-along person then would write down the actual time that the driver stops at locations and if students are getting on or off the bus and if all the stops are needed or being used by the students and can be deleted from the route.*
>
> *For example Mr. Mazie instructed me to ride all the a.m. Metro-rail buses, to verify the times for those routes.   The ride-along can come from the administrators (FOS) or supervisors (Coordinators/Directors) if we feel a need that the bus needs to be ridden.*

CRC Case: CE CRC-00360
Subject: Mr. Randy Mazie

*I had to ride a bus with him (Nanton-Marie) one time (last school year 2012-13) and found him to be strange. He had to ride a route to Biscayne Elementary with all ESE kids and he had all of the ESE kids calling him "daddy," and I found that to be strange. As all the kids got on they started calling him "daddy" and as they conversed they called him "daddy, daddy" and I found that to be inappropriate. He had an aide on his bus, but he had to be the one to get up and buckle the car seat and the seat belts and he would not allow the aide to do it."*

Ms. Wallace stated that all drivers are aware that their routes may change during the course of the school year based on timing issues, since schools and/or students may be added or deleted. She indicated, "*This is discussed during the in-service in the beginning of the year.*" She said that it is common to adjust bus drivers' hours. With regards to the bus attendants (aides), Ms. Wallace articulated that like the bus drivers, bus attendants also bid on the routes they wish to work for the year or can bid on standby status. She relayed that those aides that do not bid on a route become substitutes and are assigned to a route as needed. Ms. Wallace said, "*We are always short aides. We never have enough aides to fill the routes.*" Ms. Wallace indicated that if Mr. Nanton-Marie did not have an aide on his route, it is because no one bid on his route or they ran out of aides. She said, "*Aides were assigned to his route as they became available.*"

With regards to the allegation that Mr. Nanton-Marie's bidded block route 2034 (in 2013-14) was revoked and he was reassigned to AMI, Ms. Wallace responded, "*The route wasn't taken away. If I'm correct, his standby status was removed and a school (AMI North) was assigned to his route 2034.*"

At the end of the interview, Ms. Wallace, was provided a copy of her statement to read for accuracy. Ms. Wallace, signed her statement, and a copy was provided for her records.


**WITNESS # 4: Sylvia Beneby-Walthour**                 Employee # 

Notification letter on:          February 12, 2014, hand delivered
Interview Conducted:          February 12, 2014 @ 10:00 a.m.
Location of Interview:          North Transportation Center
                                           16150 NW 42nd Ave., Miami, FL
Present during Interview:     No other person was present during the interview.

Ms. Walthour relayed that she has has been employed with M-DCPS since 1995 and has been at NTC since 2013. She indicated she became aware of this complaint when Mr. Nanton-Marie informed her the day that she rode his route on February 5, 2013. Ms. Walthour said that she has known both Mr. Mazie and Mr. Nanton-Marie since she started working at that NTC in 2013. She denied having any kind of social interaction with either employee.

CRC Case: CE CRC-00360
Subject: Mr. Randy Mazie

When asked if she had knowledge of anyone conveying concerns with regards to Mr. Mazie or Mr. Nanton-Marie, Ms. Walthour indicated that with regards to Mr. Mazie, "No." However, with regards to Mr. Nanton-Marie she said that the administrator from AMI, "*Mr. Remy said that the students are always complaining in regards to the driver, that he wrote the students referrals* **(EXHIBIT #9)** *and that he was driving crazy and when he puts on the brakes, he's making the students hit their heads.   As his supervisor I have not had any other complaints since 2013, when I came here.*"

Ms. Walthour had no knowledge of Mr. Mazie treating Mr. Nanton-Marie differently or less favorably than other employees.  Ms. Walthour indicated that an FOS is usually the person who rides-along with a driver and if one FOS is not available, someone else is assigned and a report is submitted to Mr. Mazie.  She said a bus is ridden for different issues.  She explained, "*it depends, sometimes it's a driver that is trying to make changes to the route and we ride-along with them, to make sure that the changes are needed.*"

When asked if she had knowledge of transportation staff members scrutinizing Mr. Nanton-Marie's work performance more than other drivers, she replied, "*no.*"  Ms. Walthour articulated that a driver's route, as well as their hours may change during the school year for various reasons.  Ms. Walthour relayed that the routing department identifies the routes that require bus attendants.  Ms. Walthour stated that she started working at NTC at the of the school year, therefore, she could not comment on why Mr. Nanton-Marie was not assigned a bus aide in 2012-13.  With regards to the allegation that Mr. Nanton-Marie's route 2034 was revoked, she indicated, "*The route was not revoked; a block time was replaced by the routing department.  He had a standby (block time) and he is getting paid to assist dispatch with any route, if they need his help.*"

Ms. Walthour articulated that recently all Metro-Rail buses are being ridden and therefore, Ms. Wallace had asked her to ride route 2034.   She said:

> "Before we left the Metro-rail station, Mr. Nanton-Marie asked me can I ask you a question, "are you riding all Metro-Rail buses?" I said, "No, I'm not riding all Metro-Rail buses, but all Metro-Rail buses are being ridden."  Then he explained to me what was going on that he went to the Civil Rights on Mr. Mazie."

At the end of the interview, Ms. Walthour, was provided a copy of her statement to read for accuracy.  Ms. Walthour, signed her statement, and a copy was provided for her records.


## WITNESS # 5: Charles Hepburn                                Employee # 

Interview Conducted:              February 13, 2014 @ 9:30 a.m.
Location of Interview:            CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:         No other person was present during the interview.

Exhibit ⑤

CRC Case: CE CRC-00360
Subject: Mr. Randy Mazie

Mr. Hepburn indicated that he is an AFSCME Union Representative and presently holds the position of Radio Routing Dispatcher at NTC. He said that he has been employed at NTC for approximately 22 years and a total of 33 years with M-DCPS. Mr. Hepburn relayed that in December 2013, Mr. Nanton-Marie and Mr. Haynes had a conversation with regards to filing a discrimination complaint, which he overheard. Mr. Hepburn articulated that he has known Mr. Mazie since he commenced his employment with M-DCPS and Mr. Nanton-Marie for approximately 2 years, since he transferred to NTC.

Mr. Hepburn was asked if he was aware of any employees, students/parents having concerns with regards to Mr. Mazie and/or Mr. Nanton-Marie. In reference to Mr. Mazie, he said, "Everyday you hear complaints, because he's the boss and nobody likes the 'Boss.'" In reference to Mr. Nanton-Marie, he said, "Nobody likes Mr. Marie. Everyone complains about him. They say he does crazy things, like park his Mercedes on the Job and then takes the bus. They call him the bag man, because he always has a bag full of papers. Other drivers complain that they don't want to drive with him 'cause he drives crazy." Mr. Hepburn indicated that he has never seen Mr. Mazie treat Mr. Nanton-Marie less favorably than other employees. When asked to elaborate on the role of ride-along personnel on a bus route, Mr. Hepburn stated:

> "That's an FOS job description. When the administrator sends an FOS out with a driver, it is to make sure the route is being done the way it is on the route report and to see if the driver needs more time or delete some time from the route. Whenever the driver does a route change or a time request change or there is a complaint, then an FOS rides with the driver."

Mr. Hepburn indicated that to his knowledge, Mr. Nanton-Marie's work performance has not be scrutinized more than other employees nor has staff been assigned to ride his route with more frequency. Mr. Hepburn stated that a bus driver's assignment can change since students may be added or deleted during the course of the year, therefore, "an FOS will ride with them to make sure that the driver still needs that time." He indicated that a drivers' hours may be adjusted, which is "very normal and according to the contract. They (administration) are able to adjust the time, up and down." With regards to the bus aides and Mr. Nanton-Marie's route 2244, Mr. Hepburn articulated:

> "A bidded bus aide is a regular bus attendant, that bidded for that route. If the aide misses the bidding time, then they become subs. What probably happened is if his route didn't get bidded out, then no one wanted it and no one bid for it, or we ran out of bus attendants. Or the attendants saw his name and did not want to bid on his route, 'cause they don't want to ride with him. Every morning, if we had an aide available, because we're short, then we'll give someone to ride with him."

When asked to elaborate on Mr. Nanton-Marie's route 2034 being revoked or he being reassigned to AMI Juvenile Justice School, Mr. Hepburn stated, "When he bidded for the route, he had a block standby time, so routing removed the block standby time

CRC Case: CE CRC-00360
Subject: Mr. Randy Mazie

because he had add-ons for his senior and added the AMI.  That's normal for all drivers. He should have been happy, 'cause they couldn't cut his time (EXHIBIT #10)."

At the end of the interview, Mr. Hepburn, was provided a copy of his statement to read for accuracy.  Mr. Hepburn, signed his statement, and a copy was provided for his records.

**WITNESS # 6: Terry Haynes**                    Employee # 

Interview Conducted:        February 20, 2014 @ 9:00 a.m.
Location of Interview:      CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:   No other person was present during the interview.

Mr. Haynes is the AFSCME Union Representative/Head Custodian at NTC and he indicated that he has been in his present position for 6 years and has been employed with M-DCPS for approximately 25 years.  Mr. Haynes relayed that he became aware of the complaint when he was informed by this investigator.  He said, *"I represented him (Nanton-Marie) during a CFR and he wanted me to file a grievance for harassment and we did not have enough basis to file the grievance for that article."*  Mr. Haynes relayed that Mr. Mazie has been his supervisor for the past two years; however, he has known him form approximately 8 years.   Mr. Haynes indicated that he has known Mr. Nanton-Marie for 7 years because he represented him as a union member when Mr. Nanton-Marie worked at a different location.

When asked if any employees, students/parents had expressed concerns with regards to Mr. Nanton-Maire or Mr. Mazie, Mr. Haynes responded that he had no knowledge of concerns regarding Mr. Nanton-Marie and stated:

> *"There have been a lot of issues coming from Mr. Mazie.  In my personal opinion, there has been retaliation coming from Mr. Mazie when employees voice their opinion.  He tries to create a paper trail on those that voice their opinion.  He had previous issues working with people under him, when they voice their opinion about issues or concerns.  There are always concerns when he's dealing with employees; it's a retaliation case, when they voice their opinion, he starts a paper trail."*

Mr. Haynes indicated that he has not seen Mr. Mazie treating Mr. Nanton-Marie differently than other employees.  Mr. Haynes articulated that if there is a problem with a bus stop or a driver requests a time change, then part of an FOS's job is to ride the bus route with the driver and turn in a report.  Mr. Haynes articulated:

> *"I think they have ridden his bus more then others (drivers).  I think they had 3 FOS ride with him and that is not normal.  This employee used to work at the same location as Mr. Mazie and he put in a transfer because he was having a problem with Mr. Mazie.  Now, Mr. Mazie got transferred to this location.*

CRC Case: CE CRC-00360
Subject:  Mr. Randy Mazie

> *Personally, I think they do (scrutinize his work) cause they have had a few FOS'*
> *ride his bus."*

Mr. Haynes stated that per policy at transportation, a driver's hours and route are subject to change due to fluctuations in students or fluctuations in the number of stops needed.  With regards to Mr. Nanton-Marie not being assigned a bidded bus aide during the 2012-13 school year, Mr. Haynes articulated that if no aide bidded on that specific route, then the route can be assigned a standby or substitute aide.  He said, "*I don't think that we have had that many standby aides so some routes may not have an aide. This particular driver I don't think that they would try to put an aide.*"  With regard to the allegation that Mr. Nanton-Marie's present route, 2034 is being revoked, Mr. Haynes responded, "*His 2034 has not been revoked, he still has the same route and the same student, they took his midday (standby status) and gave him a route.  They (the routing department) do that, they take off routes.  Routing can add a midday or remove it, but sometimes it's the FOS or Director that requests it.*"

At the end of the interview, Mr. Haynes, was provided a copy of his statement to read for accuracy.  Mr. Haynes, signed his statement, and a copy was provided for his records.


**WITNESS # 7: Warnel A. 'Angie' Moore**                    Employee # 

Notification letter on:              February 12, 2014, hand delivered
                                     North Transportation Center
                                     16150 NW 42nd Ave., Miami, FL

On February 12, 2014, this investigator briefly spoke with Ms. Moore, who verbally declined the opportunity for an interview.  She signed the Employee Interview Form **(EXHIBIT #11)**.


**ANALYSIS**

Title VII of the Civil Rights Act of 1964, the Florida Civil Rights Act of 1992, and Miami-Dade County Public School Board Policy 4362; Anti-Discrimination/Harassment, prohibits discrimination/harassment in employment against an employee on the basis of gender, race, color, religion, ethnic/national origin, political beliefs, marital status, age, sexual orientation, social and family background, linguistic preference, pregnancy or disability.  Title VII also prohibits employers from maintaining a work environment that is hostile or offensive based on any of the protected categories (**EXHIBIT #12**).  Mr. Nanton-Marie filed a complaint of discrimination based on retaliation.

Discrimination involves treating someone less favorably because of the individual's specific protected class.  Harassment is defined as persistent unwelcome or offensive conduct towards an individual based on one of the specific protected categories.  An

CRC Case: CE CRC-00360
Subject: Mr. Randy Mazie

offensive, hostile environment may consist of offensive jokes, slurs, derogatory comments, physical assaults or threats, insults, offensive objects or pictures, and interference with work performance. On the other hand, simple teasing, annoyances and isolated incidents if minor, while it may be considered offensive by some, may not rise to a level of illegality.

Retaliation occurs when an employer, takes an adverse employment action (e.g. termination, refusal to hire, denial of promotion, threats, unjustified negative evaluations) against an individual because he/she files a charge of discrimination, participates in an investigation, or opposes an unlawful employment practice. Retaliation is prohibited by state statutes, Federal law and School Board Rules.

The U.S. Equal Employment Opportunity Commission (EEOC) has established three elements of an effective retaliation case; (1) the employee participated in an investigation or opposed an unlawful employment practice; (2) the employer took adverse action against the employee because of their participation in the protected activity; (3) there was no other legitimate reason for the employee being subjected to the unfavorable conditions or a causal relationship exists between the protected activity and the adverse employment action.

Mr. Nanton-Marie believes that he has been retaliated against for the following reasons:

- Mr. Mazie refused to appoint or provide a bus aide to route 2244 (2012-13), although it warranted a "bidded" bus aide due to the number of ESE students assigned to that route. Direct bus aides were assigned only sporadically during the 2012-13 school year.
- During 2012-13 school year, Route 2044 was reduced by 25 minutes.
- His work has been under heighten scrutiny by the FOS, Mr. Mazie and Ms. Walden.
- Mr. Mazie requested that he provide an evaluation from his medical doctor indicating that the eye drops that he was administering would not affect his driving, in violation of ADA and HIPPA.
- Mr. Mazie gave him a conference-for-the-record (CFR) with little or no evidence to substantiate his claims.
- Mr. Mazie impeded his access to his own personnel file, thus denying him the opportunity to rebut the FOS reports.
- Reassigned his route 2034 (2013-14) to AMI Juvenile Justice School, where students are disrespectful to him.
- Referred him for retraining on April 24, 2013.
- Referred him to EAP, without identifying any reasons.

Records in the CRC office indicate that Mr. Nanton-Marie filed a complaint of discrimination/harassment with the CRC office in school year 2010-2011 against then District Director, Ms. Patricia Snell (CE CRC#00162). [Ms. Snell voluntarily left the District in June 2013.] When Mr. Nanton-Marie filed the complaint against Ms. Snell,

CRC Case: CE CRC-00360
Subject: Mr. Randy Mazie

four years ago, he was reporting to a different work location and Mr. Mazie was unaware that he had filed a discrimination/harassment complaint with the CRC office.

Based on this information and the time elapsed between the previous complaint against Ms. Snell and the present allegations, no causal connection could be established for a claim on the basis of retaliation. Although no further analysis is warranted, Mr. Nanton-Marie's allegations will be examined as follows:

Mr. Nanton-Marie asserts that his work is under scrutiny because several FOS employees had been assigned to ride his route with more frequency than other drivers. It must be noted that part of an FOS' job function is to monitor bus drivers' routes and make certain that the route times are accurately reflected in the driver's reports; this is especially true when drivers request time adjustments, as was the case with Mr. Nanton-Marie. Moreover, FOS must report not only the actual time the bus stops at each location but also the driving skills, general driving practices, and performance of the individual drivers which they observe during the course of the ride along. Contractually, bus drivers' routes are subject to change within the course of the school year, depending on students being added or removed within that period. All drivers are made aware of this during the bidding process (EXHIBIT #13). Once FOS have completed their observation during the ride along, they forward their findings to their administrators and the drivers' hours are adjusted, if needed.

With regards to the allegation that Mr. Mazie refused to assign a bidded-bus aide to Mr. Nanton-Marie's for route 2244, it must be noted that procedurally, at the beginning of each school year, bus drivers, as well as, bus aides are permitted to bid "request" the routes that they wish to be assigned to for that year. Those drivers and aides who do not bid for a specific route or miss the bidding process, become substitutes and are assigned routes on an as needed basis. Witnesses interviewed indicated that there was a shortage of aides available and thus aides were assigned when requested. Procedurally, drivers whose routes require an aide and do not have one permanently assigned to them, must request a substitute aide from dispatch, thus, whenever there is a substitute available they are assigned to that driver's route.

Mr. Mazie requested a doctor's note indicating that Mr. Nanton-Marie's use of eye-drops would not adversely affect his sight or ability to drive safely, is not only reasonable but prudent since Mr. Nanton-Marie is entrusted with many children's lives and their safety is a priority. Mr. Nanton-Marie has alleged that disclosing his medical information to his employer would violate HIPPA. Mr. Mazie never requested medical information; he only requested a memorandum that would ascertain that Mr. Nanton-Marie could perform the essential functions of his job (driving) while using the eye drops. As to a reasonable accommodation due to medical reasons, Mr. Nanton-Marie has never applied for special accommodations with the District's ADA office.

Mr. Nanton-Marie did not provide sufficient evidence to refute his claim that he was given a CFR with little or no substantive evidence. The CFR addressed several issues that had been personally observed by different NTC administrative personnel, at varied

*Exhibit 5*

CRC Case: CE CRC-00360
Subject: Mr. Randy Mazie

intervals of time, such as his refusal to meet with immediate supervisors when prompted or the unauthorized use of his assigned bus. Although Mr. Nanton-Marie contested the alleged inappropriate actions of his behavior in the rebuttal attached as **EXHIBIT #14**, he provided no eyewitnesses or concrete evidence to corroborate his statements.

Mr. Nanton-Marie provided no proof that his route 2034 was revoked, as alleged. On the contrary, documentation reflects that when Mr. Nanton-Marie bid on route 2034, it had a standby block. It is common knowledge that if a bus driver has a standby status on his/her route, then a route can be assigned to them during the standby block or they can be called when needed during the standby time. In the instant case, Mr. Nanton-Marie's standby status was replaced with a route to AMI, however, the rest of his route remained the same, as it is reflected in **EXHIBIT #10**.

Mr. Nanton-Marie's participation in a retraining course was not done out of retaliation as alleged, since retraining a bus driver is not a disciplinary action, but rather an opportunity for drivers to improve their skill. Additionally, when Mr. Nanton-Marie was referred for retraining on April 26, 2013 **(EXHIBIT #15)**, he had been involved in three vehicular accidents as follows: September 19, 2012; October 10, 2012; and April 12, 2013, respectively **(EXHIBIT #6)**. Coordinators and Directors are expected to follow administrative protocols and recommend drivers for retraining when they believe it might be beneficial to enhance their driving skills.

The fact that Mr. Nanton-Marie was referred to EAP is not an adverse employment action, since EAP is not a punitive action but merely a service provided for employees to receive any assistance they may need **(EXHIBIT #16)**. EAP is completely confidential and participation in the services the program provides to employees is purely voluntary. As an administrator, Mr. Mazie is within his right to make a referral of any employee to the EAP as he deems necessary.

There are no grounds to support the allegations that Mr. Nanton-Marie has suffered any adverse employment action. His wages/salary, terms, conditions, and privileges of employment remain unchanged.

**FINDINGS:** Based on the above aforementioned, there is insufficient evidence to support the allegations.

**RETALIATION     -     NO PROBABLE CAUSE**

Exhibit (6)

CASE NUMBER:   CE CRC-00362
INVESTIGATOR:   Lourdes Rodriguez

R E D A C T E D

## ALLEGATIONS

On December 20, 2013, the Office of Civil Rights Compliance (CRC) received a complaint of discrimination/harassment in employment based on RETALIATION from Mr. Allan Nanton-Marie, School Bus Driver, North Transportation Center (NTC), against Ms. Portia Walden, Coordinator III, NTC **(EXHIBIT #1)**. On January 9, 2014, this case was assigned to Ms. Lourdes Rodriguez, Manager III, for investigation.

## SUPERVISOR/SUBJECT NOTIFICATION

On January 9, 2014, a notification letter was sent certified return receipt and regular mail to Mr. Orlando Alonso, Administrative Director, North Transportation Center and Randy Mazie, Director, North Transportation Center.

## COMPLAINANT/VICTIM: Allan Nanton-Marie

Employee # 

Notification letter mailed on:   January 9, 2014
Interview Conducted:   January 24, 2014 @ 10:00 a.m.
Location of Interview:   CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:   No other person was present

Mr. Nanton-Marie is presently a school bus driver at NTC and indicated that he has been in said position at NTC since the beginning of the 2012-13 school year. He relayed that he has been employed with M-DCPS since 2004. Mr. Nanton-Marie said that he has known Ms. Walden as a Coordinator since 2006-07 when they worked at the Northeast Transportation Center. He relayed that he has never had any personal or social interaction with Ms. Walden. Mr. Nanton-Marie relayed that he reports to the Field Operations Specialist (FOS) and said, "*However, they are not deemed to be supervisors.*" He articulated that Mr. Mazie, Director, and Ms. Walden, Coordinator III, are deemed supervisors.

Mr. Nanton-Marie indicated that he is being harassed and retaliated against due to heighten scrutiny by the FOS, Mr. Mazie and Ms. Walden. Additionally, he said that he was referred to the Employee Assistance Program (EAP) without any documented reason **(EXHIBIT #2)** as a further acts of retaliation.

Mr. Nanton-Marie identified the following reasons why he believes Ms. Walden discriminated against him:

- Ms. Walden refused to appoint, provide, or assign a permanent bidded bus aide for route 2044 in 2012-13 school year. (*From the beginning of school to end of September*)

Exhibit (6)

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

- About 17 to 22 bus aides were assigned to his route, only sporadically.
- Personally authorized heightened scrutiny and surveillance by appointing FOS Wallace to ride-along on route 2244.
- Denied him AFSCME representation from Mr. Terry Haynes on August 22, 2013, then referred him to Director Mazie for a CFR.
- Denied him due process by not issuing verbal warning and written warning prior to CFR **(EXHIBIT #3)**.
- Forced him, under duress, to sign a reduced time of at least twenty-five minutes daily effective April 16, 2013, based on inaccurate reports by FOS Wallace and Bentley for route 2044, during 2012-13 school year, thus cutting his wages.
- Refused to follow required protocol and have a habitually disruptive student removed from route 2034, although he had written 5 referrals requesting that AMI revoke pupil's bus privilege. *(see attached, Retaliation details, dated December 20, 2013)* **(EXHIBIT #4)**
- Due to his disability record, he was referred to EAP twice without documenting the reasons.
- He was denied documents from his personnel file.
- His route was changed to a greater distance from the Transportation Center, where students are constantly disrespectful and insult driver

Mr. Nanton-Marie stated that due to the stress of having students with special needs and no bus aide, he had three accidents **(EXHIBIT #5)**. [Route 2044 2012-13 needed aide – accidents were 9/19/12; 10/10/12; 4/12/13] He said that he had no aide from the beginning of the school year to the end of September and that Ms. Walden stated that no aide was needed, then was given aides only sporadically.

Mr. Nanton-Marie divulged that he had previously filed a complaint with the CRC office. When asked if Ms. Walden was aware that he had previously filed a CRC complaint, he replied, *"I don't know. She knows now, since she got notice from EEOC and the office."* Mr. Nanton-Marie indicated that they (Walden, Mazie) never spoke with him regarding the concerns, then wrote the CFR. He said, *"They were looking for all kinds of flimsy stuff to retaliate against me."*

At the end of the interview, Mr. Nanton-Marie, was provided a copy of his statement to read for accuracy. Mr. Nanton-Marie, signed his statement, and a copy was provided for his records.

NOTE: Bus drivers bid on the routes they wish to service at the beginning of each school year, in order of seniority. If no driver bids on a specific route, then it is assigned to a substitute driver.

**SUBJECT: Portia Walden**                                    Employee # ▓▓▓▓▓

Notification letter mailed on:        January 9, 2014
Interview Conducted:                   February 6, 2014 @ 9:00 a.m.

Exhibit 6

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

Location of Interview:              CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:          No other person was present

Ms. Walden is presently a Coordinator III at NTC.  Ms. Walden communicated that she has been an M-DCPS employee for 20 years and this is her forth year as a coordinator at NTC.   She relayed that she has known Mr. Nanton-Marie since he transferred to that location and denied having any type of personal association with him.  Ms. Walden indicated that she was not Mr. Nanton-Marie's immediate supervisor.  She said that an FOS staff is the first line supervisor for a bus driver and that the route a driver selects determines which FOS is assigned to them.  She said his second line supervisor is the Transportation Operations Helper, Mr. Moore.  When asked if she was aware of Mr. Nanton-Marie ever filing or testifying in a Title VII Civil Rights investigation, she replied, "*I don't know.*"

Ms. Walden indicated that depending on the students' ESE codes, the routing department specifies which bus routes require bus aides.  When asked to respond to the allegation that in 2012-13, Mr. Nanton-Marie was not appointed a permanent bus aid to his route 2244, although one was needed for his route, and that a bus aide was only assigned to him sporadically, as available, Ms. Walden responded:

> "*If a route requires an aide when the bidding process starts, if there are enough employees to bid on the routes, then they bid on the route.   Let's say if there are 80 routes that require aides and we only have 70 employees, then we have 10 routes with no bus attendants.   If we have attendants that did not show up for bidding, they are considered subs and they are assigned a route that was not bidded on.   Then we have standby aides, they don't bid on routes and they just go from routes to routes when we need them to cover.*
>
> *If we don't have a bus attendant to give to an employee, then we give a substitute aide and if we don't have an attendant then we assign a substitute driver to assist, if one is available.  I believe that we had assigned Ms. Harris to Mr. Nanton-Marie until she went on maternity leave.  Then he was assigned Ms. Adderly and they started having some issues with each other and went to the FOS, then Mr. Moore and then me. She (Adderly) complained that he was driving too slow and being unprofessional and he complained that she was not being a proper attendant.   Due to the conflict and issues they kept having, she requested to be moved and since she was a sub and not a permanent aide, I removed her from the route and he was asked to follow the normal procedures and request a bus attendant from dispatch.*
>
> *I spoke with dispatch and made them aware he needed an attendant and there were times when he had an attendant if one was available.   When Ms. Harris returned from leave I placed her back on his route and she started having issues with Mr. Nanton-Marie as well.  She complained that he was sitting on the side of the road, he was being unprofessional and rude speaking to her like a child and*

Exhibit 6

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

*had students on the bus calling him daddy. She said she felt uncomfortable about having the students calling him daddy."*

With regards to the allegation that staff members at NTC have been employing "heightened scrutiny" towards Mr. Nanton-Marie, Ms. Walden indicated that the administrators just follow the same procedures with all employees and said:

*"If we get a complaint from a school, parent or another individual we try to investigate. Sometimes when students are not riding a route and the route's time needs to be adjusted, some drivers so they won't lose time they may sit on the side of the road. Since we had a complaint of more than one person that he was sitting on the side of the road, we assigned an FOS to ride with him. Sometimes if the driver is requesting and adjustment in time for their route we also assign an FOS to ride with the driver as well."*

Moreover, Ms. Walden said that she, *"received referrals from AMI, that students are complaining that he slams on the brakes* (**EXHIBIT #6**).*"* Regarding the allegation that Mr. Nanton-Marie was forced to sign under duress a reduction in time for his route, Ms. Walden explained that if drivers proclaim that their bus stop reports are inaccurate and need adjustments or additional time, then an FOS is assigned to ride the route and their report is reviewed and compared to the driver's report. If the drivers contest the new time sheet then another FOS will ride the route. In reference to Mr. Nanton-Marie's claim that Ms. Walden threatened to refer him for a CFR for insubordination because he would not meet with her without Union Representation, Ms. Walden stated:

*"I believe it was about a complaint and I wanted to discuss with him the complaint and he said that he did not want to speak with me unless he had a Union Representative and I told Mr. Nanton-Marie that there was no need for a Union Representative because it we were not going to discuss any type of disciplinary action and that I only wanted to inform him of the complaint. He did not want to hear it and said that he was not going to discuss anything without a representative and just walked out of my office. I said, 'I'm your supervisor and I'm asking you to sit with me and if you refuse to sit with me, that can be considered insubordination.'"*

As to the allegation that Mr. Nanton-Maire's route was reduced by 25 minutes, Ms. Walden indicated that *"route times can change with any driver, as students are added or deleted. The school no longer has any students riding; programs may not be going anymore, etc."* She said the routing department determines any changes or add-ons to routes and when a change is made, then a time adjustment may be necessary. Ms. Walden articulated that she did not refuse to provide Mr. Nanton-Marie with a copy of Ms. Harris report, as he alleged. Ms. Walden indicated that she informed him that the original had been misplaced and that she would have Ms. Harris rewrite the report and provide him with a copy, however, he did not want a rewritten report.

Page 4 of 16

Exhibit (6)

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

With regards to the allegation that habitually disruptive students were never removed from Mr. Nanton-Maire's bus although he had written several referrals, Ms. Walden stated that procedurally, when drivers write referrals they must turn in the originals to the school and a copy to the FOS. The school determines any disciplinary action that is needed and the driver has to request a copy of the action taken by school, then provide a copy to his FOS. She stated:

> "*If there is no action by the school and dependent of the severity, then the FOS can set up a meeting with the school and the student's parent to discuss the referrals. If the FOS does not get any information from the school, then I contact the school. ... I try to have another supervisor present when I speak with him (Nanton-Maire). I have been in the school system over 20 years and I treat every employee the same and I would not deliberately cut anyone's time. I follow the procedures and if a time change is needed it will be given whether it's an increase or deduction.*"

At the end of the interview, Ms. Walden, was provided a copy of her statement to read for accuracy. Ms. Walden, signed her statement, and a copy was provided for her records.


## WITNESS #1: Randy Mazie                                    Employee # 

Notification letter mailed on:        January 9, 2014
Interview Conducted:                   January 29, 2014 @ 9:30 a.m.
Location of Interview:                 CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:              No other person was present

Mr. Mazie indicated that he has been employed with M-DCPS for 28 years and has been the Director at NTC for approximately 20 months. Mr. Mazie articulated that he has known Mr. Nanton-Marie for 5 years in the capacity of a school bus driver and has known Ms. Walden for approximately 13 years. He relayed that he became aware of this complaint when he received notification from the CRC office. Mr. Mazie articulated that some employees had expressed concerns about Mr. Nanton-Marie's "*Inability or unwillingness to communicate with others or identify himself, provide information, and meet with staff and others.*" He indicated that Mr. Nanton-Marie is frequently unresponsive to his supervisors and refused to follow directives.

Mr. Mazie was asked to explain Ms. Walden's role within the transportation department and he articulated that as an FOS, Ms. Walden is a third line administrative supervisor who reports directly to him and handles the day to day operations, scheduling of staff and assuring that routes have personnel coverage.

With regards to the allegation that Ms. Walden refused to assign a bidded bus aide to his route 2244 and instead aides were assigned to him sporadically, Mr. Mazie explained that procedurally routes which have student with IEP's require an aide, and bus aides bid on routes at the beginning of the school year. Routes which are not

Exhibit G

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

bidded on may be assigned an aide as needed, based on availability. Mr. Mazie indicated that he had no knowledge of Ms. Walden treating Mr. Nanton-Marie less favorably than other employees or employing heightened scrutiny and surveillance, as he alleged. In response to the claim that habitually disruptive students were not removed from his route even though he had written multiple referrals, Mr. Mazie replied:

> *"Although I have no direct knowledge of this allegation, Ms. Walden would have no authority to remove the student. All she could do, would be to follow up with the school. If he was not satisfied, he could have brought it up to the next level which would have been my attention or my supervisor, Mr. Alonso."*

With regards to Mr. Nanton-Marie's reduction in time, Mr. Mazie articulated that his job assignment was not changed. However, he added, *"Drivers' route times fluctuate, dependent on students being added or leaving, and pieces of work that may be added or taken away."*

At the end of the interview, Mr. Mazie, was provided a copy of his statement to read for accuracy. Mr. Mazie, signed his statement, and a copy was provided for his records.


## WITNESS # 2: Sharon Lewis                     Employee # 

Notification letter mailed on:      January 24, 2014
Interview Conducted:                February 11, 2014 @ 11:30 a.m.
Location of Interview:              Telephone Interview

Ms. Lewis relayed that this is her third year as a school bus driver at Jack Schee Transportation Center and that she has been employed with M-DCPS for 23 years. Ms. Lewis indicated that she has known Ms. Walden for approximately 7 or 8 years. She said that her association with each employee is merely professional. Ms. Lewis relayed that she met Mr. Nanton-Marie in September 2013, when her students on the route from AMI were re-assigned to him. She indicated that she became aware of this complaint in September 2013, and contended that *"Director, Weahtersby sent an email to routing and told them to take the students from AMI from her (Lewis) route and put them on Mr. Nanton-Marie's route."*

When asked if to her knowledge anyone had concerns with regards to Mr. Nanton-Marie or Ms. Walden, Ms. Lewis said with reference to Mr. Nanton-Marie, *"The students complain about getting home too late,"* and she had no knowledge of any complaints with reference to Ms. Walden. Ms. Lewis indicated that she had no knowledge of Ms. Walden treating Mr. Nanton-Marie less favorably than other employees because they do not work at the same center. Ms. Lewis articulated that the FOS is a school bus drivers' immediate supervisor and that when a driver requests a time change, *"an FOS has to ride on the bus to make sure that the time is correct before they do the time change."* Ms. Lewis relayed that drivers are contracted to drive routes which they bid on and said, *"Your route can change. They can add or remove students from your route and*

Exhibit (6

CRC Case: CE CRC-00362
Subject:  Ms. Portia Walden

*sometimes the routes come with a midday route.  Sometimes they add more students on the route so the time increases or changes.  If you have less students you're supposed to tell them (FOS) and your time decreases."*

Ms. Lewis added:

> *"I know that what they did was retaliation.  The director told a lie that I was late and they took the AMI kids out of my bus and gave it to Mr. Marie (Nanton-Marie).  Directors will do that when they don't like you.  They work together and they'll retaliate against you through your route.   It was only three kids and it really was not necessary to give him (Nanton-Marie) the kids when I'm already there (at AMI).  They're wasting gas and money.   This was in September of 2013."*

At the end of the interview, Ms. Lewis articulated that she would visit the CRC office to sign her statement.  Additionally, on February 13, 2014, a copy of the statement was mailed to Ms. Lewis' address on record.  To date, however, Ms. Lewis has not returned her signed interview statement.


**WITNESS # 3: Karen Wallace**                               Employee # 

| | |
|---|---|
| Notification letter on: | February 12, 2014, hand delivered |
| Interview Conducted: | February 12, 2014 @ 8:30 a.m. |
| Location of Interview: | North Transportation Center |
| | 16150 NW 42nd Ave., Miami, FL |
| Present during Interview: | No other person was present during the interview. |

Ms. Wallace indicated that she has been employed with M-DCPS for 25 years and has been at NTC in the capacity of an FOS for 17 years.  She relayed that she became aware that Mr. Nanton-Marie filed a complaint when this investigator informed her during our meeting.  Ms. Wallace articulated that she has known Ms. Walden for 15 years and Mr. Nanton-Marie, since he became a bus driver at NTC.   She indicated that she is friends with Ms. Walden and denied having any type of familial or personal relationship with Mr. Nanton-Marie.

When asked if she had knowledge of any employee, student or parents having concerns with regards to Mr. Nanton-Marie or Ms. Walden, Ms. Wallace replied, *"No."*  With reference to Mr. Nanton-Marie, she said, *"I have concerns about him.  It's just the way that he carries himself.  He's just strange, he'll just come up to you and say, 'Is the sky blue?' and I'll say, 'What type of question is that?' and he'll respond, 'I just wanted to see what you were going to say.'   I try to avoid him."*
Ms. Wallace had no knowledge of Ms. Walden ever treating Mr. Nanton-Marie less favorably than other employees.  Ms. Wallace was asked to elaborate on the role of a ride-along personnel and she articulated the following:

Exhibit (6)

*"If a driver requests a time change and is more than 30 minutes, then an FOS has to ride.  For kids acting up, parents not bringing the children out to the bus stop.  If the FOS determines that changes may be needed, then we'll (FOS) report to an administrator and let them know that someone will ride with the driver.   The ride-along person then would write down the actual time that the driver stops at locations and if students are getting on or off the bus and if all the stops are needed or being used by the students and can be deleted from the route.*

*For example Mr. Mazie instructed me to ride all the a.m. Metro-rail buses, to verify the times for those routes.   The ride-along can come from the administrators (FOS) or supervisors (Coordinators/Directors) if we feel a need that the bus needs to be ridden.*

*I had to ride a bus with him (Nanton-Marie) one time (last school year 2012-13) and found him to be strange.  He had to ride a route to Biscayne Elementary with all ESE kids and he had all of the ESE kids calling him "daddy," and I found that to be strange.  As all the kids got on they started calling him "daddy" and as they conversed they called him "daddy, daddy" and I found that to be inappropriate. He had an aide on his bus, but he had to be the one to get up and buckle the car seat and the seat belts and he would not allow the aide to do it."*

Ms. Wallace stated that all drivers are aware that their routes may change during the course of the school year based on timing issues, since schools and/or students may be added or deleted.  She indicated, *"This is discussed during the in-service in the beginning of the year."*  She said that it is common to adjust bus drivers' hours.  With regards to the bus attendants (aides), Ms. Wallace articulated that like the bus drivers, bus attendants also bid on the routes they wish to work for the year or can bid on standby status.  She relayed that those aides that do not bid on a route become substitutes and are assigned to a route as needed.  Ms. Wallace said, *"We are always short aides.  We never have enough aides to fill the routes."*  Ms. Wallace indicated that if Mr. Nanton-Marie did not have an aide on his route, it is because no one bid on his route or they ran out of aides.   She said, *"Aides were assigned to his route as they became available."*

With regards to the allegation that Mr. Nanton-Marie's bidded block route 2034 (in 2013-14) was revoked and he was reassigned to AMI, Ms. Wallace responded, *"The route wasn't taken away.  If I'm correct, his standby status was removed and a school (AMI North) was assigned to his route 2034."*

At the end of the interview, Ms. Wallace, was provided a copy of her statement to read for accuracy.  Ms. Wallace, signed her statement, and a copy was provided for her records.

*Exhibit 6*

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

**WITNESS # 4: Sylvia Beneby-Walthour**                    Employee # ▮▮▮▮▮▮▮

Notification letter on:          February 12, 2014, hand delivered
Interview Conducted:          February 12, 2014 @ 10:00 a.m.
Location of Interview:          North Transportation Center
                              16150 NW 42nd Ave., Miami, FL
Present during Interview:     No other person was present during the interview.

Ms. Walthour relayed that she has has been employed with M-DCPS since 1995 and has been at NTC since 2013. She indicated she became aware of this complaint when Mr. Nanton-Marie informed her the day that she rode his route on February 5, 2013. Ms. Walthour said that she has known both Ms. Walden and Mr. Nanton-Marie since she started working at that NTC in 2013. She denied having any kind of social interaction with either employee.

When asked if she had knowledge of anyone conveying concerns with regards to Mr. Walden or Mr. Nanton-Marie, Ms. Walthour indicated that with regards to Ms. Walden, "No." However, with regards to Mr. Nanton-Marie she said that the administrator from AMI, "*Mr. Remy said that the students are always complaining in regards to the driver, that he wrote the students referrals (***EXHIBIT #6***) and that he was driving crazy and when he puts on the brakes, he's making the students hit their heads. As his supervisor I have not had any other complaints since 2013, when I came here.*"

Ms. Walthour had no knowledge of Ms. Walden treating Mr. Nanton-Marie differently or less favorably than other employees. Ms. Walthour indicated that an FOS is usually the person who rides-along with a driver and if one FOS is not available, someone else is assigned and a report is submitted to Mr. Mazie. She said a bus is ridden for different issues. She explained, "*it depends, sometimes it's a driver that is trying to make changes to the route and we ride-along with them, to make sure that the changes are needed.*"

When asked if she had knowledge of transportation staff members scrutinizing Mr. Nanton-Marie's work performance more than other drivers, she replied, "*no.*" Ms. Walthour articulated that a driver's route, as well as their hours may change during the school year for various reasons. Ms. Walthour relayed that the routing department identifies the routes that require bus attendants. Ms. Walthour stated that she started working at NTC at the of the school year, therefore, she could not comment on why Mr. Nanton-Marie was not assigned a bus aide in 2012-13. With regards to the allegation that Mr. Nanton-Marie's route 2034 was revoked, she indicated, "*The route was not revoked; a block time was replaced by the routing department. He had a standby (block time) and he is getting paid to assist dispatch with any route, if they need his help.*"
Ms. Walthour articulated that recently all Metro-Rail buses are being ridden and therefore, Ms. Wallace had asked her to ride route 2034. She said:

> "*Before we left the Metro-rail station, Mr. Nanton-Marie asked me can I ask you a question, 'are you riding all Metro-Rail buses?' I said, 'No, I'm not riding all Metro-*

Exhibit (6)

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

*Rail buses, but all Metro–Rail buses are being ridden.' Then he explained to me what was going on that he went to the Civil Rights on Mr. Mazie."*

At the end of the interview, Ms. Walthour, was provided a copy of her statement to read for accuracy. Ms. Walthour, signed her statement, and a copy was provided for her records.

## WITNESS # 5: Charles Hepburn

Employee # 

Interview Conducted:            February 13, 2014 @ 9:30 a.m.
Location of Interview:          CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:       No other person was present during the interview.

Mr. Hepburn indicated that he is an AFSCME Union Representative and presently holds the position of Radio Routing Dispatcher at NTC. He said that he has been employed at NTC for approximately 22 years and a total of 33 years with M-DCPS. Mr. Hepburn relayed that in December 2013, Mr. Nanton-Marie and Mr. Haynes had a conversation with regards to filing a discrimination complaint, which he overheard. Mr. Hepburn articulated that he has known Ms. Walden over 16 years, since she was employed at Central East, where he was the Union's Vice-President and Mr. Nanton-Marie for approximately 2 years, since he transferred to NTC.

Mr. Hepburn was asked if he was aware of any employees, students/parents having concerns with regards to Ms. Walden and/or Mr. Nanton-Marie. In reference to Ms. Walden, he said everyone complains about her and Mr. Mazie, *"because they are the "Boss." They complain that they cut their hours."* In reference to Mr. Nanton-Marie, he said, *"Nobody likes Mr. Marie. Everyone complains about him. They say he does crazy things, like park his Mercedes on the job and then takes the bus. They call him the bag man, because he always has a bag full of papers. Other drivers complain that they don't want to drive with him 'cause he drives crazy."* Mr. Hepburn indicated that he has never seen Ms. Walden treat Mr. Nanton-Marie less favorably than other employees and relayed:

> *"She never speaks to him alone and usually tries to have someone with her. I think he has a problem with women supervisors. He had a problem before with Ms. Trousdale. She (Walden) has highlighted his name a few times for him to come and see her and he doesn't come and see her. He thinks that every time that they want to see him, he needs to have a Union Representative. I told him several times that the administrators can speak to him without a Union Representative, so long as is not for disciplinary actions."*

When asked to elaborate on the role of ride-along personnel on a bus route, Mr. Hepburn stated:

> *"That's an FOS job description. When the administrator sends an FOS out with a driver, it is to make sure the route is being done the way it is on the route report*

Exhibit (6

CRC Case: CE CRC-00362
Subject:  Ms. Portia Walden

> *and to see if the driver needs more time or delete some time from the route. Whenever the driver does a route change or a time request change or there is a complaint, then an FOS rides with the driver."*

Mr. Hepburn indicated that to his knowledge, Mr. Nanton-Marie's work performance has not be scrutinized more than other employees nor has staff been assigned to ride his route with more frequency.  Mr. Hepburn stated that a bus driver's assignment can change since students may be added or deleted during the course of the year, therefore, *"an FOS will ride with them to make sure that the driver still needs that time."* He indicated that a drivers' hours may be adjusted, which is *"very normal and according to the contract.  They (administration) are able to adjust the time, up and down."* With regards to the bus aides and Mr. Nanton-Marie's route 2244, Mr. Hepburn articulated:

> *"A bidded bus aide is a regular bus attendant, that bidded for that route.  If the aide misses the bidding time, then they become subs.  What probably happened is if his route didn't get bidded out, then no one wanted it and no one bid for it, or we ran out of bus attendants.  Or the attendants saw his name and did not want to bid on his route, 'cause they don't want to ride with him.  Every morning, if we had an aide available, because we're short, then we'll give someone to ride with him."*

When asked to elaborate on Mr. Nanton-Marie's route 2034 being revoked or he being reassigned to AMI Juvenile Justice School, Mr. Hepburn stated, *"When he bidded for the route, he had a block standby time, so routing removed the block standby time because he had add-ons for his senior and added the AMI.  That's normal for all drivers. He should have been happy, 'cause they couldn't cut his time* **(EXHIBIT #7)**.*"*

At the end of the interview, Mr. Hepburn, was provided a copy of his statement to read for accuracy.  Mr. Hepburn, signed his statement, and a copy was provided for his records.

**WITNESS # 6: Terry Haynes**                    Employee # 

| | |
|---|---|
| Interview Conducted: | February 20, 2014 @ 9:00 a.m. |
| Location of Interview: | CRC Office * 155 NE 15 St. Miami, Fl 33132 |
| Present during Interview: | No other person was present during the interview. |

Mr. Haynes is the AFSCME Union Representative/Head Custodian at NTC and he indicated that he has been in his present position for 6 years and has been employed with M-DCPS for approximately 25 years.  Mr. Haynes relayed that he became aware of the complaint when he was informed by this investigator.  He said, *"I represented him (Nanton-Marie) during a CFR and he wanted me to file a grievance for harassment and we did not have enough basis to file the grievance for that article."* Mr. Haynes relayed that has known Ms. Walden for six years as his boss.  Mr. Haynes indicated that he has

Exhibit 6

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

known Mr. Nanton-Marie for 7 years because he represented him as a union member when Mr. Nanton-Marie worked at a different location.

When asked if any employees, students/parents had expressed concerns with regards to Mr. Nanton-Maire or Ms. Walden, Mr. Haynes responded that he had no knowledge of concerns regarding either employee.

Mr. Haynes indicated that he has not seen Ms. Walden treating Mr. Nanton-Marie differently than other employees. Mr. Haynes articulated that if there is a problem with a bus stop or a driver requests a time change, then part of an FOS's job is to ride the bus route with the driver and turn in a report. Mr. Haynes articulated:

> "*I think they have ridden his bus more then others (drivers). I think they had 3 FOS ride with him and that is not normal. This employee used to work at the same location as Mr. Mazie and he put in a transfer because he was having a problem with Mr. Mazie. Now, Mr. Mazie got transferred to this location. Personally, I think they do (scrutinize his work) cause they have had a few FOS' ride his bus.*"

Mr. Haynes stated that per policy at transportation, a driver's hours and route are subject to change due to fluctuations in students or fluctuations in the number of stops needed. With regards to Mr. Nanton-Marie not being assigned a bidded bus aide during the 2012-13 school year, Mr. Haynes articulated that if no aide bidded on that specific route, then the route can be assigned a standby or substitute aide. He said, "*I don't think that we have had that many standby aides so some routes may not have an aide. This particular driver I don't think that they would try to put an aide.*" With regard to the allegation that Mr. Nanton-Marie's present route, 2034 is being revoked, Mr. Haynes responded, "*His 2034 has not been revoked, he still has the same route and the same student, they took his midday (standby status) and gave him a route. They (the routing department) do that, they take off routes. Routing can add a midday or remove it, but sometimes it's the FOS or Director that requests it.*"

At the end of the interview, Mr. Haynes, was provided a copy of his statement to read for accuracy. Mr. Haynes, signed his statement, and a copy was provided for his records.


**WITNESS # 7: Warnel A. 'Angie' Moore**          Employee # 

Notification letter on:          February 12, 2014, hand delivered
                                 North Transportation Center
                                 16150 NW 42nd Ave., Miami, FL

On February 12, 2014, this investigator briefly spoke with Ms. Moore, who verbally declined the opportunity for an interview. She signed the Employee Interview Form (EXHIBIT #8).

*Exhibit (6*

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

## ANALYSIS

Title VII of the Civil Rights Act of 1964, the Florida Civil Rights Act of 1992, and Miami-Dade County Public School Board Policy **4362**; Anti-Discrimination/Harassment, prohibits discrimination/harassment in employment against an employee on the basis of gender, race, color, religion, ethnic/national origin, political beliefs, marital status, age, sexual orientation, social and family background, linguistic preference, pregnancy or disability.  Title VII also prohibits employers from maintaining a work environment that is hostile or offensive based on any of the protected categories (**EXHIBIT #9**).  Mr. Nanton-Marie filed a complaint of discrimination based on retaliation.

Discrimination involves treating someone less favorably because of the individual's specific protected class.  Harassment is defined as persistent unwelcome or offensive conduct towards an individual based on one of the specific protected categories.  An offensive, hostile environment may consist of offensive jokes, slurs, derogatory comments, physical assaults or threats, insults, offensive objects or pictures, and interference with work performance.  On the other hand, simple teasing, annoyances and isolated incidents if minor, while it may be considered offensive by some, may not rise to a level of illegality.

Retaliation occurs when an employer, takes an adverse employment action (e.g. termination, refusal to hire, denial of promotion, threats, unjustified negative evaluations) against an individual because he/she files a charge of discrimination, participates in an investigation, or opposes an unlawful employment practice. Retaliation is prohibited by state statutes, Federal law and School Board Rules.

The U.S. Equal Employment Opportunity Commission (EEOC) has established three elements of an effective retaliation case; (1) the employee participated in an investigation or opposed an unlawful employment practice; (2) the employer took adverse action against the employee because of their participation in the protected activity; (3) there was no other legitimate reason for the employee being subjected to the unfavorable conditions or a causal relationship exists between the protected activity and the adverse employment action.

Mr. Nanton-Marie believes that he has been retaliated against for the following reasons:

- Ms. Walden refused to appoint, provide, or assign a permanent bidded bus aide for route 2044 in 2012-13 school year. (*From the beginning of school to end of September*)
- About 17 to 22 bus aides were assigned to his route, only sporadically.
- Personally authorized heightened scrutiny and surveillance by appointing FOS Wallace to ride-along on route 2244.
- Denied him AFSCME representation from Mr. Terry Haynes on August 22, 2013, then referred him to Director Mazie for a CFR.

Exhibit 6

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

- Denied him due process by not issuing verbal warning and written warning prior to CFR.
- Forced him, under duress, to sign a reduced time of at least twenty-five minutes daily effective April 16, 2013, based on inaccurate reports by FOS Wallace and Bentley for route 2044, during 2012-13 school year, thus cutting his wages.
- Refused to follow required protocol and have a habitually disruptive student removed from route 2034, although he had written 5 referrals requesting that AMI revoke pupils bus privilege. *(see attached, Retaliation details, dated December 20, 2013)* **(EXHIBIT #3)**
- Due to his disability record, he was referred to EAP twice without documenting the reasons.
- He was denied documents from his personnel file.
- His route was changed to a greater distance from the Transportation Center, where students are constantly disrespectful and insult driver

Records in the CRC office indicate that Mr. Nanton-Marie filed a complaint of discrimination/harassment with the CRC office in school year 2010-2011 against then District Director, Ms. Patricia Snell (CE CRC#00162). [Ms. Snell voluntarily left the District in June 2013.] When Mr. Nanton-Marie filed the complaint against Ms. Snell, four years ago, he was reporting to a different work location and Ms. Walden was unaware that he had filed a discrimination/harassment complaint with the CRC office.

Based on this information and the time elapsed between the previous complaint against Ms. Snell and the present allegations, no causal connection could be established for a claim on the basis of retaliation. Although no further analysis is warranted, Mr. Nanton-Marie's allegations will be examined as follows:

Mr. Nanton-Marie asserts that his work is under scrutiny because several FOS employees had been assigned to ride his route with more frequency than other drivers. It must be noted that part of an FOS' job function is to monitor bus drivers' routes and make certain that the route times are accurately reflected in the driver's reports; this is especially true when drivers request time adjustments, as was the case with Mr. Nanton-Marie. Moreover, FOS must report not only the actual time the bus stops at each location but also the driving skills, general driving practices, and performance of the individual drivers which they observe during the course of the ride along. Contractually, bus drivers' routes are subject to change within the course of the school year, depending on students being added or removed within that period. All drivers are made aware of this during the bidding process **(EXHIBIT #10)**. Once FOS have completed their observation during the ride along, they forward their findings to their administrators, such as Ms. Walden and the drivers' hours are adjusted, if needed.

With regards to the allegation that Ms. Walden refused to assign a bidded-bus aide to Mr. Nanton-Marie's for route 2244, it must be noted that procedurally, at the beginning of each school year, bus drivers, as well as, bus aides are permitted to bid "request" the routes that they wish to be assigned to for that year. Those drivers and aides who do not bid for a specific route or miss the bidding process, become substitutes and are

EXHIBIT C

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

assigned routes on an as needed basis. Witnesses interviewed indicated that there was a shortage of aides available and thus aides were assigned when requested. Procedurally, drivers whose routes require an aide and do not have one permanently assigned to them, must request a substitute aide from dispatch, thus, whenever there is a substitute available they are assigned to that driver's route.

Mr. Nanton-Marie did not provide sufficient evidence to refute his claim that he was given a CFR with little or no substantive evidence. The CFR addressed several issues that had been personally observed by different NTC administrative personnel, at varied intervals of time, such as his refusal to meet with immediate supervisors when prompted or the unauthorized use of his assigned bus. Although Mr. Nanton-Marie contested the alleged inappropriate actions of his behavior in the rebuttal attached as **EXHIBIT #11**, he provided no eyewitnesses or concrete evidence to corroborate his statements. Additionally, Mr. Nanton-Marie was not denied Union Representation.  Mr. Hepburn an AFSCME representative indicated:

> "He (Nanton-Marie) thinks that every time that they want to see him, he needs to have a Union Representative. I told him several times that the administrators can speak to him without a Union Representative, so long as is not for disciplinary actions."

Mr. Nanton-Marie provided no proof that his route 2034 was revoked, as alleged.  On the contrary, documentation reflects that when Mr. Nanton-Marie bid on route 2034, it had a standby block. It is common knowledge that if a bus driver has a standby status on his/her route, then a route can be assigned to them during the standby block or they can be called when needed during the standby time. In the instant case, Mr. Nanton-Marie's standby status was replaced with a route to AMI, however, the rest of his route remained the same, as it is reflected in **EXHIBIT #6**. With regards to the allegation that disruptive students were not removed from his routes though he had written multiple referrals on the students, it must be noted that procedurally, a child's school is the authoritative entity which handles disciplinary action and can act on student referrals. Mr. Mazie indicated that "*Ms. Walden would have no authority to remove the student. All she could do, would be to follow up with the school. If he was not satisfied, he could have brought it up to the next level, which would have been my attention or my supervisor, Mr. Alonso.*"

The fact that Mr. Nanton-Marie was referred to EAP is not an adverse employment action, since EAP is not a punitive action but merely a service provided for employees to receive any assistance they may need **(EXHIBIT #12)**.  EAP is completely confidential and participation in the services the program provides to employees is purely voluntary. Moreover, he was referred to EAP by Mr. Mazie, not Ms. Walden and as an administrator, Mr. Mazie is within his right to make a referral of any employee to the EAP as he deems necessary.

There are no grounds to support the allegations that Mr. Nanton-Marie has suffered any adverse employment action and furthermore, no causal effect can be established since

CRC Case: CE CRC-00362
Subject: Ms. Portia Walden

Exhibit 6

he filed a complaint more than 4 years ago against an administrator who is no longer there. In addition, his wages/salary, terms, conditions, and privileges of employment remain unchanged.

**FINDINGS:** Based on the above aforementioned, there is insufficient evidence to support the allegations.

RETALIATION        -        **NO PROBABLE CAUSE**



CASE NUMBER:   CE CRC-00363
INVESTIGATOR:   Lourdes Rodriguez

R E D A C T E D

## ALLEGATIONS

On December 20, 2013, the Office of Civil Rights Compliance (CRC) received a complaint of discrimination/harassment in employment based on RETALIATION from Mr. Allan Nanton-Marie, School Bus Driver, North Transportation Center (NTC), against Ms. Charlene Bentley, Field Operation Specialist (FOS), NTC (**EXHIBIT #1**).   On January 9, 2014, this case was assigned to Ms. Lourdes Rodriguez, Manager III, for investigation.

## SUPERVISOR/SUBJECT NOTIFICATION

On January 9, 2014, a notification letter was sent certified return receipt and regular mail to Mr. Orlando Alonso, Administrative Director, North Transportation Center and Randy Mazie, Director, North Transportation Center.

## COMPLAINANT/VICTIM:  Allan Nanton-Marie                 Employee # ▮▮▮▮▮

Notification letter mailed on:      January 9, 2014
Interview Conducted:                January 24, 2014 @ 10:00 a.m.
Location of Interview:              CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:           No other person was present

Mr. Nanton-Marie is presently a school bus driver at NTC and indicated that he has been in said position at NTC since the beginning of the 2012-13 school year.   He relayed that he has been employed with M-DCPS since 2004.  Mr. Nanton-Marie said that he has known Ms. Bentley as an FOS since he transferred to NTC in 2012-13.  He denied having any social or familial relationship with Ms. Bentley.

Mr. Nanton-Marie stated that he believes he has been retaliated against for the following reasons:

- Employed heightened scrutiny and recommended that the time on his route 2044, be cut by 25 minutes.
- Violated ADA and HIPPA law by reporting incomplete and discreditable information on April 2013, in her ride-along report, stating that he put eye drops in his eyes and that he needed to see a doctor.
- Ms. Bentley accused him without evidence of using a school bus for private use on September 25, 2013, at Presidente Supermarket and Wells Fargo Bank in North Side Plaza.
- Denied him his Weingarten right to AFSCME representation during questioning of allegation on September 25, 2013.

Exhibit (F)

CRC Case: CE CRC-00363
Subject:  Ms. Charlene Bentley

- Revoked his bidded block time at Miami Carol City Middle and reassigned him to AMI, with the approval of Director Mazie and Coordinator Walden.
- Was referred to EAP twice, without a documented reason (**EXHIBIT #2**).
- His route was changed to AMI, which is a greater distance from the Transportation Center, with students who constantly harass and insult him.

At the end of the interview, Mr. Nanton-Marie, was provided a copy of his statement to read for accuracy.  Mr. Nanton-Marie, signed his statement, and a copy was provided for his records.


**SUBJECT:  Charlene Bentley**                                    Employee # ████

Notification letter mailed on:     January 9, 2014
Interview Conducted:               February 12, 2014 @ 11:30 a.m.
Location of Interview:             North Transportation Center
                                   16150 NW 42nd Ave., Miami, FL
Present during Interview:          No other person was present

Ms. Bentley indicated that she has been employed at NTC for 20 years and has been with the District for approximately 30 years.  Ms. Bentley is presently an FOS at NTC.  When asked to respond to the allegations made against her, she indicted that she was "*confused.*"  She said, "*I don't understand why.*"  Ms. Bentley relayed that she has known Mr. Nanton-Marie since he transferred to NTC, roughly 4 years ago and she denied having any type of social/personal interaction with him.  Ms. Bentley indicated that she is not Mr. Nanton-Marie's supervisor.  His FOS is Ms. Walthour.  Ms. Bentley said she had no knowledge of Mr. Nanton-Marie formerly filing a complaint or participating in any type of Civil Rights investigation.

With reference to the allegation that she wrongly accused Mr. Nanton-Marie of utilizing a school bus for his private use, Ms. Bentley stated:

> "*Me and another FOS, Mr. Gordon, were on our way down South to another site (Northeast terminal, this was on a Wednesday) and passed by Northside Shopping Plaza and this bus was parked.  So we took down the (bus) number and I checked with the TOH (the Key person, in charge of buses) and asked who that bus belonged to.  When I checked on that day, it's the day his route goes to Metrorail, so when I tried talking to him, he got real defensive and ugly.  So I just wrote it up and gave it to Ms. Walden.*"

Ms. Bentley explained that bus driver's route can change for various reasons, maybe when students get transferred or if there are only a few students being dropped off at that school and said, "*The driver is given a different route to help them, so the drivers can keep their hours.*"  Ms. Bentley relayed she had no knowledge of Mr. Nanton-Marie's job assignment changing or him being reassigned to AMI.  With reference to the allegation that staff were employing heightened scrutiny of his work, Ms. Bentley, responded:

~~Exhibit~~ *Exhibit F*

CRC Case: CE CRC-00363
Subject: Ms. Charlene Bentley

*"Last year I rode his bus once, only because I was on the p.m. shift and his FOS was on the a.m. shift and only because he requested a time change. When I rode his bus, he sat me down, parked the bus (after we dropped off the last student) on the side of the road and I asked, 'Why are we sitting here, let's go into the compound?' I noted that not all the students were riding his route and I wrote that he did not need the additional time.*

*There was an issue with another bus last month that rides the Metro-Rail and so Ms. Wallace has been riding all the Metro-Rail (bus routes that service the students from the Metro-Rail). She assigned a few to different FOS's to ride those buses. If your FOS is not available, then another FOS will ride the route."*

With reference to his bus for route 2044 (2012-13) not being assigned a bidded bus aide Ms. Bentley articulated that if nobody bids on a route that a standby aide or substitute is assigned to them when available and the drivers request an aide from dispatch. She said, *"He was not my driver. I don't know why an aide was not assigned to his bus."* Ms. Bentley stated, *"Why am I here? I'm only doing my job."*

At the end of the interview, Ms. Bentley was provided a copy of her statement to read for accuracy. Ms. Bentley, signed her statement, and a copy was provided for her records.

## WITNESS # 1: Randy Mazie                          Employee # ███

| | |
|---|---|
| Notification letter mailed on: | January 9, 2014 |
| Interview Conducted: | January 29, 2014 @ 9:30 a.m. |
| Location of Interview: | CRC Office * 155 NE 15 St. Miami, Fl 33132 |
| Present during Interview: | No other person was present |

Mr. Mazie indicated that he has been employed with M-DCPS for 28 years and has been the Director at NTC for approximately 20 months. He relayed that he has been Ms. Bentley's administrator at various facilities for 28 years. Mr. Mazie articulated that he has known Mr. Nanton-Marie for 5 years in the capacity of a school bus driver. Mr. Mazie denied having any type or personal or social interaction with either employee. He relayed that he became aware of this complaint when he received notification from the CRC office.

Mr. Mazie articulated that some employees had expressed concerns about Mr. Nanton-Marie's *"Inability or unwillingness to communicate with others or identify himself, provide information, and meet with staff and others."* He indicated that Mr. Nanton-Marie is frequently unresponsive to his supervisors and refuses to follow directives. When asked about the allegation that on September 26, 2013, Ms. Bentley accused him of using the school bus inappropriately without presenting sufficient evidence, Mr. Mazie responded, *"Her statement that she was an eye witness to this happening is sufficient. It is not customary for FOS to take photos, unless it is an accident."* With regards to Ms. Bentley allegedly employing heightened scrutiny and recommending that his route 2044

Exhibit (F)

CRC Case: CE CRC-00363
Subject: Ms. Charlene Bentley

(2012-13) time be reduced by 25 minutes, Mr. Mazie stated that *"Drivers' route time fluctuate dependent on students being added or leaving, and pieces of work that may be added or taken away."*

Mr. Mazie indicated that he had no knowledge of Ms. Bentley treating Mr. Nanton-Marie less favorably than other employees or employing heightened scrutiny and surveillance, as he alleged.

At the end of the interview, Mr. Mazie, was provided a copy of his statement to read for accuracy. Mr. Mazie, signed his statement, and a copy was provided for his records.

**WITNESS # 2: Sharon Lewis**                    Employee # █████

| | |
|---|---|
| Notification letter mailed on: | January 24, 2014 |
| Interview Conducted: | February 11, 2014 @ 11:30 a.m. |
| Location of Interview: | Telephone Interview |

Ms. Lewis relayed that this is her third year as a school bus driver at Jack Schee Transportation Center and that she has been employed with M-DCPS for 23 years. Ms. Lewis indicated that she has known Ms. Bentley for approximately 5 years. She relayed that she met Mr. Nanton-Marie in September 2013, when her students on the route from AMI were re-assigned to him. She said that her association with each employee is merely professional. Ms. Lewis indicated that she became aware of this complaint in September 2013, and contended that *"Director, Weahtersby sent an email to routing and told them to take the students from AMI from her (Lewis) route and put them on Mr. Nanton-Marie's route."*

When asked if to her knowledge anyone had concerns with regards to Mr. Nanton-Marie or Ms. Bentley, Ms. Lewis said with reference to Mr. Nanton-Marie, *"The students complain about getting home too late."* With reference to Ms. Bentley, she stated, *"in 2006/07, I personally had complaints with Charlene Bentley, she didn't like me and she tried to take away my route from me."*

Ms. Lewis indicate that she had no knowledge of Ms. Bentley treating Mr. Nanton-Marie less favorably than other employees because they do not work at the same center. Ms. Lewis articulated that the FOS is a school bus drivers' immediate supervisor and that when a driver requests a time change, *"an FOS has to ride on the bus to make sure that the time is correct before they do the time change."* Ms. Lewis relayed that drivers are contracted to drive routes which they bid on and said, *"Your route can change. They can add or remove students from your route and sometimes the routes come with a midday route. Sometimes they add more students on the route so the time increases or changes. If you have less students you're supposed to tell them (FOS) and your time decreases."*

Ms. Lewis added:

EXHIBIT 1

CRC Case: CE CRC-00363
Subject: Ms. Charlene Bentley

"*I know that what they did was retaliation.  The director told a lie that I was late and they took the AMI kids out of my bus and gave it to Mr. Marie (Nanton-Marie).  Directors will do that when they don't like you.  They work together and they'll retaliate against you through your route.   It was only three kids and it really was not necessary to give him (Nanton-Marie) the kids when I'm already there (at AMI).  They're wasting gas and money.   This was in September of 2013.*"

At the end of the interview, Ms. Lewis articulated that she would visit the CRC office to sign her statement.  Additionally, on February 13, 2014, a copy of the statement was mailed to Ms. Lewis' address on record.  To date, however, Ms. Lewis has not returned her signed interview statement.


**WITNESS # 3: Portia Walden**                              Employee # ███

Interview Conducted:          February 6, 2014, @ 12:00 p.m.
Location of Interview:         CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:     No other person was present during the interview.

Ms. Walden is presently a Coordinator III at NTC.  She relayed that has been employed with M-DCPS for 20 years and this is her fourth year in her present position at NTC. Ms. Walden indicated that she has known Mr. Nanton-Marie since he was transferred to NTC and Ms. Bentley for approximately 6 years.  Ms. Walden denied having any type of personal relationship with either employee.  Ms. Walden indicated that Mr. Nanton-Marie and Ms. Bentley formerly spoke to each other and said, "*Now I noticed Mr. Nanton-Marie does not say anything.  They don't speak or say good morning.*"  Ms. Walden states that Ms. Adderly, Bus Aide and Ms. Harris, Bus Aide, expressed concerns about Mr. Nanton-Marie's unprofessionalism and how he addresses them. She said that Ms. Harris also indicated that students were calling him "*daddy.*" Moreover, Ms. Walden indicated, "*I received referrals from AMI, that students are complaining that he slams on the brakes* (EXHIBIT #3)."

Ms. Walden articulated that she had no knowledge of Ms. Bentley treating Mr. Nanton-Marie differently or less favorably than other employees.  With regards to the allegation that Mr. Nanton-Marie's work is under heightened scrutiny, Ms. Walden replied:

"*I have no idea what he is referring too.   We just follow procedures that we take with any employee.  FOS are asked to ride with drivers whenever the employee requests that their time be changed or sometimes a complaint about the way they drive.  If there is a situation with employees, I usually ask the employees to put it in writing and see their FOS first and then come see and we discuss the situation.*"

At the end of the interview, Ms. Walden, was provided a copy of her statement to read for accuracy.  Ms. Walden, signed her statement, and a copy was provided for her records.

Exhibit F

CRC Case: CE CRC-00363
Subject: Ms. Charlene Bentley

**WITNESS # 4: Karen Wallace**                          Employee # ▮▮▮▮

Notification letter on:         February 12, 2014, hand delivered
Interview Conducted:         February 12, 2014 @ 8:30 a.m.
Location of Interview:        North Transportation Center
                             16150 NW 42nd Ave., Miami, FL
Present during Interview:    No other person was present during the interview.

Ms. Wallace indicated that she has been employed with M-DCPS for 25 years and has been at NTC in the capacity of an FOS for 17 years. She relayed that she became aware that Mr. Nanton-Marie filed a complaint when this investigator informed her during our meeting. Ms. Wallace articulated that she has known Ms. Bentley for 20 years and Mr. Nanton-Marie, since he became a bus driver at NTC. She relayed that she is friends with Ms. Bentley and denied having any type of familial or personal relationship with Mr. Nanton-Marie.

When asked if she had knowledge of any employee, student or parents having concerns with regards to Mr. Nanton-Marie or Ms. Bentley, Ms. Wallace replied, that there were no concerns regarding Ms. Bentley. However, with reference to Mr. Nanton-Marie, she said, "*I have concerns about him. It's just the way that he carries himself. He's just strange, he'll just come up to you and say, 'Is the sky blue?' and I'll say, 'What type of question is that?' and he'll respond, 'I just wanted to see what you were going to say.' I try to avoid him.*"

Ms. Wallace had no knowledge of Ms. Bentley ever treating Mr. Nanton-Marie less favorably than other employees. Ms. Wallace was asked to elaborate on the role of a ride-along personnel and she articulated the following:

> "*If a driver requests a time change and is more than 30 minutes, then an FOS has to ride. For kids acting up, parents not bringing the children out to the bus stop. If the FOS determines that changes may be needed, then we'll (FOS) report to an administrator and let them know that someone will ride with the driver. The ride-along person then would write down the actual time that the driver stops at locations and if students are getting on or off the bus and if all the stops are needed or being used by the students and can be deleted from the route.*
>
> *For example Mr. Mazie instructed me to ride all the a.m. Metro-rail buses, to verify the times for those routes. The ride-along can come from the administrators (FOS) or supervisors (Coordinators/Directors) if we feel a need that the bus needs to be ridden.*
>
> *I had to ride a bus with him (Nanton-Marie) one time (last school year 2012-13) and found him to be strange. He had to ride a route to Biscayne Elementary with all ESE kids and he had all of the ESE kids calling him "daddy," and I found that to be strange. As all the kids got on they started calling him "daddy" and as they conversed they called him "daddy, daddy" and I found that to be inappropriate.*

EXHIBIT F

CRC Case: CE CRC-00363
Subject: Ms. Charlene Bentley

*He had an aide on his bus, but he had to be the one to get up and buckle the car seat and the seat belts and he would not allow the aide to do it."*

Ms. Wallace stated that all drivers are aware that their routes may change during the course of the school year based on timing issues, since schools and/or students may be added or deleted. She indicated, *"This is discussed during the in-service in the beginning of the year."* She said that it is common to adjust bus drivers' hours. With regards to the bus attendants (aides), Ms. Wallace articulated that like the bus drivers, bus attendants also bid on the routes they wish to work for the year or can bid on standby status. She relayed that those aides that do not bid on a route become substitutes and are assigned to a route as needed. Ms. Wallace said, *"We are always short aides. We never have enough aides to fill the routes."* Ms. Wallace indicated that if Mr. Nanton-Marie did not have an aide on his route, it is because no one bid on his route or they ran out of aides. She said, *"Aides were assigned to his route as they became available."*

With regards to the allegation that Mr. Nanton-Marie's bidded block route 2034 (in 2013-14) was revoked and he was reassigned to AMI, Ms Wallace responded, *"The route wasn't taken away. If I'm correct, his standby status was removed and a school (AMI North) was assigned to his route 2034."*

At the end of the interview, Ms. Wallace, was provided a copy of her statement to read for accuracy. Ms. Wallace, signed her statement, and a copy was provided for her records.

**WITNESS # 5: Sylvia Beneby-Walthour**                    Employee # ███

| | |
|---|---|
| Notification letter on: | February 12, 2014, hand delivered |
| Interview Conducted: | February 12, 2014 @ 10:00 a.m. |
| Location of Interview: | North Transportation Center |
| | 16150 NW 42nd Ave., Miami, FL |
| Present during Interview: | No other person was present during the interview. |

Ms. Walthour relayed that she has been employed with M-DCPS since 1995 and has been at NTC since 2013. She indicated she became aware of this complaint when Mr. Nanton-Marie informed her the day that she rode his route on February 5, 2013. Ms. Walthour said that she has known both Ms. Bentley and Mr. Nanton-Marie since she started working at that NTC in 2013. She said that although Ms. Bentley attends her church she does not have any kind of social interaction with either employee.

When asked if she had knowledge of anyone conveying concerns with regards to Ms. Bentley or Mr. Nanton-Marie, Ms. Walthour indicated that with regards to Ms. Bentley, "No." However, with regards to Mr. Nanton-Marie she said that the administrator from AMI, *"Mr. Remy said that the students are always complaining in regards to the driver, that he wrote the student referrals (EXHIBIT #3) and that he was driving crazy and*

Exhibit F

CRC Case: CE CRC-00363
Subject: Ms. Charlene Bentley

*when he puts on the brakes, he's making the students hit their heads.   As his supervisor I have not had any other complaints since 2013, when I came here."*

Ms. Walthour had no knowledge of Ms. Bentley treating Mr. Nanton-Marie differently or less favorably than other employees.  Ms. Walthour indicated that an FOS is usually the person who rides-along with a driver and if one FOS is not available, someone else is assigned and a report is submitted to Mr. Mazie.  She said a bus is ridden for different issues.  She explained, *"It depends, sometimes it's a driver that is trying to make changes to the route and we ride-along with them, to make sure that the changes are needed."*

When asked if she had knowledge of transportation staff members scrutinizing Mr. Nanton-Marie's work performance more than other drivers, she replied, *"no."*  Ms. Walthour articulated that a driver's route, as well as their hours may change during the school year for various reasons.  Ms. Walthour relayed that the routing department identifies the routes that require bus attendants.   Ms. Walthour stated that she started working at NTC at the of the school year, therefore, she could not comment on why Mr. Nanton-Marie was not assigned a bus aide in 2012-13.  With regards to the allegation that Mr. Nanton-Marie's route 2034 was revoked, she indicated, *"The route was not revoked; a block time was replaced by the routing department.  He had a standby (block time) and he is getting paid to assist dispatch with any route, if they need his help."*

Ms. Walthour articulated that recently all Metro-Rail buses are being ridden and therefore, Ms. Wallace had asked her to ride route 2034.  She said:

> *"Before we left the Metro-rail station, Mr. Nanton-Marie asked me can I ask you a question, 'are you riding all Metro-Rail buses?' I said, 'No, I'm not riding all Metro-Rail buses, but all Metro-Rail buses are being ridden.'  Then he explained to me what was going on that he went to the Civil Rights on Mr. Mazie."*

At the end of the interview, Ms. Walthour, was provided a copy of her statement to read for accuracy.  Ms. Walthour, signed her statement, and a copy was provided for her records.


## WITNESS # 6: Charles Hepburn                    Employee # ████

Interview Conducted:            February 13, 2014 @ 9:30 a.m.
Location of Interview:          CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:       No other person was present during the interview.

Mr. Hepburn indicated that he is an AFSCME Union Representative and presently holds the position of Radio Routing Dispatcher at NTC.  He said that he has been employed at NTC for approximately 22 years and a total of 33 years with M-DCPS.  Mr. Hepburn relayed that in December 2013, Mr. Nanton-Marie and Mr. Haynes had a conversation with regards to filing a discrimination complaint, which he overheard.  Mr. Hepburn

Exhibit (7)

CRC Case: CE CRC-00363
Subject: Ms. Charlene Bentley

articulated that he has known Ms. Bentley approximately 30 years and Mr. Nanton-Marie for approximately 2 years, since he transferred to NTC.

Mr. Hepburn was asked if he was aware of any employees, students/parents having concerns with regards to Ms. Bentley and/or Mr. Nanton-Marie. He said, "Everybody loves Ms. Bentley. She's the FOS that goes beyond the call of duty. In reference to Mr. Nanton-Marie, he said, "*Nobody likes Mr. Marie. Everyone complains about him. They say he does crazy things, like park his Mercedes on the Job and then takes the bus. They call him the bag man, because he always has a bag full of papers. Other drivers complain that they don't want to drive with him 'cause he drives crazy.*" Mr. Hepburn indicated that he has never seen Ms. Bentley treat Mr. Nanton-Marie less favorably than other employees and relayed, "*I don't see why he would deal with Ms. Bentley, cause she is not his FOS.*" When asked to elaborate on the role of ride-along personnel on a bus route, Mr. Hepburn stated:

> "*That's an FOS job description. When the administrator sends an FOS out with a driver, it is to make sure the route is being done the way it is on the route report and to see if the driver needs more time or delete some time from the route. Whenever the driver does a route change or a time request change or there is a complaint, then an FOS rides with the driver.*"

Mr. Hepburn indicated that to his knowledge, Mr. Nanton-Marie's work performance has not be scrutinized more than other employees nor has staff been assigned to ride his route with more frequency. Mr. Hepburn stated that a bus driver's assignment can change since students may be added or deleted during the course of the year, therefore, "*an FOS will ride with them to make sure that the driver still needs that time.*" He indicated that a drivers' hours may be adjusted, which is "*very normal and according to the contract. They (administration) are able to adjust the time, up and down.*" With regards to the bus aides and Mr. Nanton-Marie's route 2244, Mr. Hepburn articulated:

> "*A bidded bus aide is a regular bus attendant, that bidded for that route. If the aide misses the bidding time, then they become subs. What probably happened is if his route didn't get bidded out, then no one wanted it and no one bid for it, or we ran out of bus attendants. Or the attendants saw his name and did not want to bid on his route, 'cause they don't want to ride with him. Every morning, if we had an aide available, because we're short, then we'll give someone to ride with him.*"

When asked to elaborate on Mr. Nanton-Marie's route 2034 being revoked or he being reassigned to AMI Juvenile Justice School, Mr. Hepburn stated, "*When he bidded for the route, he had a block standby time, so routing removed the block standby time because he had add-ons for his senior and added the AMI. That's normal for all drivers. He should have been happy, 'cause they couldn't cut his time* (EXHIBIT #4)."

At the end of the interview, Mr. Hepburn, was provided a copy of his statement to read for accuracy. Mr. Hepburn, signed his statement, and a copy was provided for his records.

Exhibit (F)

CRC Case: CE CRC-00363
Subject:  Ms. Charlene Bentley

## WITNESS # 7: Terry Haynes                    Employee # 

Interview Conducted:           February 20, 2014 @ 9:00 a.m.
Location of Interview:          CRC Office * 155 NE 15 St. Miami, Fl 33132
Present during Interview:       No other person was present during the interview.

Mr. Haynes is the AFSCME Union Representative/Head Custodian at NTC and he indicated that he has been in his present position for 6 years and has been employed with M-DCPS for approximately 25 years.  Mr. Haynes relayed that he became aware of the complaint when he was informed by this investigator.  He said, "*I represented him (Nanton-Marie) during a CFR and he wanted me to file a grievance for harassment and we did not have enough basis to file the grievance for that article.*"  Mr. Haynes relayed that he has known Ms. Bentley as a co-worker for approximately 8 or 9 years.  Mr. Haynes indicated that he has known Mr. Nanton-Marie for 7 years because he represented him as a union member when Mr. Nanton-Marie worked at a different location.

When asked if any employees, students/parents had expressed concerns with regards to Mr. Nanton-Maire or Ms. Bentley, Mr. Haynes responded, "No."

Mr. Haynes indicated that he has not seen Ms. Bentley treating Mr. Nanton-Marie differently than other employees.  Mr. Haynes articulated that if there is a problem with a bus stop or a driver requests a time change, then part of an FOS's job is to ride the bus route with the driver and turn in a report.  Mr. Haynes articulated:

> "*I think they have ridden his bus more then others (drivers).  I think they had 3 FOS ride with him and that is not normal.  This employee used to work at the same location as Mr. Mazie and he put in a transfer because he was having a problem with Mr. Mazie.  Now, Mr. Mazie got transferred to this location. Personally, I think they do (scrutinize his work) cause they have had a few FOS' ride his bus.*"

Mr. Haynes stated that per policy at transportation, a driver's hours and route are subject to change due to fluctuations in students or fluctuations in the number of stops needed.  With regards to Mr. Nanton-Marie not being assigned a bidded bus aide during the 2012-13 school year, Mr. Haynes articulated that if no aide bidded on that specific route, then the route can be assigned a standby or substitute aide.  He said, "*I don't think that we have had that many standby aides, so some routes may not have an aide. This particular driver I don't think that they would try to put an aide.*"  With regard to the allegation that Mr. Nanton-Marie's present route, 2034 is being revoked, Mr. Haynes responded, "*His 2034 has not been revoked, he still has the same route and the same student, they took his midday (standby status) and gave him a route.  They (the routing department) do that, they take off routes.  Routing can add a midday or remove it, but sometimes it's the FOS or Director that requests it.*"

*Exhibit (F)*

CRC Case: CE CRC-00363
Subject: Ms. Charlene Bentley

At the end of the interview, Mr. Haynes, was provided a copy of his statement to read for accuracy.  Mr. Haynes, signed his statement, and a copy was provided for his records.

**WITNESS # 8: Warnel A. 'Angie' Moore**                    Employee # 

Notification letter on:                    February 12, 2014, hand delivered
                                          North Transportation Center
                                          16150 NW 42nd Ave., Miami, FL

On February 12, 2014, this investigator briefly spoke with Ms. Moore, who verbally declined the opportunity for an interview.  She signed the Employee Interview Form **(EXHIBIT #5)**.


**ANALYSIS**

Title VII of the Civil Rights Act of 1964, the Florida Civil Rights Act of 1992, and Miami-Dade County Public School Board Policy **4362**; Anti-Discrimination/Harassment, prohibits discrimination/harassment in employment against an employee on the basis of gender, race, color, religion, ethnic/national origin, political beliefs, marital status, age, sexual orientation, social and family background, linguistic preference, pregnancy or disability. Title VII also prohibits employers from maintaining a work environment that is hostile or offensive based on any of the protected categories **(EXHIBIT #6)**.  Mr. Nanton-Marie filed a complaint of discrimination based on retaliation.

Discrimination involves treating someone less favorably because of the individual's specific protected class.  Harassment is defined as persistent unwelcome or offensive conduct towards an individual based on one of the specific protected categories.  An offensive, hostile environment may consist of offensive jokes, slurs, derogatory comments, physical assaults or threats, insults, offensive objects or pictures, and interference with work performance.  On the other hand, simple teasing, annoyances and isolated incidents if minor, while it may be considered offensive by some, may not rise to a level of illegality.

Retaliation occurs when an employer, takes an adverse employment action (e.g. termination, refusal to hire, denial of promotion, threats, unjustified negative evaluations) against an individual because he/she files a charge of discrimination, participates in an investigation, or opposes an unlawful employment practice.  Retaliation is prohibited by state statutes, federal law and School Board Policies.

The U.S. Equal Employment Opportunity Commission (EEOC) has established three elements of an effective retaliation case; (1) the employee participated in an investigation or opposed an unlawful employment practice; (2) the employer took adverse action against the employee because of their participation in the protected activity; (3) there was no other legitimate reason for the employee being subjected to

Exhibit ⑦

CRC Case: CE CRC-00363
Subject: Ms. Charlene Bentley

the unfavorable conditions or a causal relationship exists between the protected activity and the adverse employment action.

Mr. Nanton-Marie believes that he has been retaliated against for the following reasons:

- He has been under heightened scrutiny and in Ms. Bentley's April 2013 report, she recommended that the time on his route 2044 be cut by 25 minutes.
- Violated ADA and HIPPA law by reporting incomplete and discreditable information on April 2013, in her ride-along report that he put eye drops in his eyes and that he needed to see a doctor.
- Ms. Bentley accused him without evidence of using a school bus for private use at Presidente Supermarket and Wells Fargo Bank in North Side Plaza on September 25, 2013.
- Denied him his Weingarten right to AFSCME representation during questioning of allegation on September 25, 2013.
- Revoked his bidded block time at Miami Carol City Middle and reassigned him to AMI (2034), with the approval of Director Mazie and Coordinator Walden.
- Was referred to EAP twice, without a documented reason.
- His route was changed to AMI, which is a greater distance from the Transportation Center, with students who constantly harass and insult him.

Records in the CRC office indicate that Mr. Nanton-Marie filed a complaint of discrimination/harassment with the CRC office in school year 2010-2011 against then District Director, Ms. Patricia Snell (CE CRC#00162). [Ms. Snell voluntarily left the District in June 2013.] When Mr. Nanton-Marie filed the complaint against Ms. Snell, four years ago, he was reporting to a different work location and Ms. Bentley was unaware that he had filed a discrimination/harassment complaint with the CRC office.

Based on this information and the time elapsed between the previous complaint against Ms. Snell and the present allegations, no causal connection could be established for a claim on the basis of retaliation. Although no further analysis is warranted, Mr. Nanton-Marie's allegations will be examined as follows:

Mr. Nanton-Marie asserts that his work is under scrutiny because several FOS employees had been assigned to ride his route with more frequency than other drivers. It must be noted that part of an FOS' job function is to monitor bus drivers' routes and make certain that the route times are accurately reflected in the driver's reports; this is especially true when drivers request time adjustments, as was the case with Mr. Nanton-Marie. Moreover, FOS must report not only the actual time the bus stops at each location but also the driving skills, general driving practices, and performance of the individual driver they observe during the course of the ride along. Contractually, bus drivers' routes are subject to change within the course of the school year, depending on students being added or removed within that period. All drivers are made aware of this during the bidding process (**EXHIBIT #7**). Once FOS have completed their observation

Exhibit (7)

CRC Case: CE CRC-00363
Subject: Ms. Charlene Bentley

during the ride along, they forward their findings to their administrators and the drivers' hours are adjusted, if needed.

With regards to the allegation that Ms. Bentley violated ADA and HIPPA laws by reporting that he used eye drops while on his bus route, it must be noted that as an FOS, part of her official duties is to report what she observes during a ride-along. The fact that she reported her observation of Mr. Nanton-Marie's use of eye drops and that his bus was parked at North Side Plaza is understandable since it is her responsibility to do so, as delineated in her job function. As a result of her report, Ms. Bentley's supervisor, Mr. Mazie requested a doctor's note indicating that Mr. Nanton-Marie's use of eye-drops would not adversely affect his sight or ability to drive safely. It must be noted that medical information was never requested from Mr. Nanton-Marie; he was only asked to provide a memorandum that would ascertain whether he could perform the essential functions of his job (driving a school bus) while using the eye drops (**EXHIBIT #8**). This request is not only reasonable but prudent since Mr. Nanton-Marie is entrusted with many children's lives and their safety is a priority.

During the course of the school year a bus driver's route may change (students maybe added or deleted, blocks maybe added, etc.) and the drivers may request time adjustments. An FOS or other administrative personnel may ride along on the route to verify that a time adjustment is needed and then the driver's time may be adjusted accordingly. Mr. Hepburn, Union Representative confirmed that it is normal to adjust a driver's hours and this may be done as per their contract. Mr. Nanton-Marie's route 2044 (2012-13) was adjusted based on actual times reported by ride along personnel. Mr. Nanton-Marie provided no proof that his route 2034 (2013-14) was revoked, as he alleged. On the contrary, documentation reflects that when Mr. Nanton-Marie bid on route 2034, it had a standby block. In the instant case, Mr. Nanton-Marie's standby status was replaced with a route to AMI; however, the rest of his route remained the same, as it is reflected in **EXHIBIT #4**.

Mr. Nanton-Marie's claim that he was refused union representation during questioning is inaccurate since there is no need for an employee to have a representative present for every minor question an administrator may pose as indicated by his Union Representative, Mr. Hepburn, who stated, "*He thinks that every time that they want to see him, he needs to have a Union Representative. I told him several times that the administrators can speak to him without a Union Representative, so long as it is not for disciplinary actions.*" Mr. Nanton-Marie, at varied intervals, had refused to meet with immediate supervisors regarding minor concerns or the unauthorized use of his assigned bus. His refusal to briefly meet with personnel when prompted was one of the issues addressed during his CFR (**EXHIBIT #9**). Although Mr. Nanton-Marie contested the alleged inappropriate actions of his behavior in the rebuttal attached as **EXHIBIT #10**, he provided no eyewitnesses or concrete evidence to corroborate his statements.

The fact that Mr. Nanton-Marie was referred to EAP is not an adverse employment action, since EAP is not a punitive action but merely a service provided for employees to receive any assistance they may need (**EXHIBIT #11**). EAP is completely confidential and participation in the services the program provides to employees is

Exhibit F

CRC Case: CE CRC-00363
Subject:  Ms. Charlene Bentley

purely voluntary.  Moreover, He was reffered to EAP by Mr. Mazie not Ms. Bentely and as an administrator, Mr. Mazie is within his right to make a referral of any employee to the EAP as he deems necessary.

There are no grounds to support the allegations that Mr. Nanton-Marie has suffered any adverse employment action and furthermore, no causal effect can be established since he filed a complaint more than 4 years ago against an administrator who is no longer there.  In addition, his wages/salary, terms, conditions, and privileges of employment remain unchanged.

**FINDINGS:**   Based on the above aforementioned, there is insufficient evidence to support the allegations.

RETALIATION          -          **NO PROBABLE CAUSE**

# Miami-Dade County Public Schools

## giving our students the world

Superintendent of Schools
Alberto M. Carvalho

Miami-Dade County School Board
Perla Tabares Hantman, Chair
Dr. Lawrence S. Feldman, Vice Chair
Dr. Dorothy Bendross-Mindingall
Susie V. Castillo
Carlos L. Curbelo
Dr. Wilbert "Tee" Holloway
Dr. Martin Karp
Dr. Marta Pérez
Raquel A. Regalado

April 15, 2014

Mr. Allan Nanton-Marie
7580 NW 5th Street, Unit 15442
Ft. Lauderdale, Florida   33318

**Complainant Name: Nanton-Marie, Allan
Case Number: CE CRC-00360**

Dear Mr. Nanton-Marie:

The Office of Civil Rights Compliance (CRC) of Miami-Dade County Public Schools (District) has conducted and completed its review regarding your allegation that Mr. Randy M. Mazie, Director I, North Transportation Center *may* have discriminated, harassed and/or retaliated against you based on Retaliation in employment.

Based upon the totality of our investigation, it has been concluded that there is **NO PROBABLE CAUSE** to support the allegation made against Mr. Mazie. After a thorough review of all the information gathered, it has been determined that Mr. Mazie, **DID NOT** violate School Board Policy *1362 – Anti-Discrimination/Harassment*. The District considers this matter to be fully resolved and the **CASE CLOSED**.

To ensure that you are fully informed of the investigative findings and conclusion, attached is a copy of the investigative report prepared by the Office of Civil Rights Compliance.  If you should have any questions or concerns regarding the content of this correspondence, please contact Ms. Madeleine Rodriguez., at 305-995-1580.

Sincerely,

Madeleine Rodriguez
Executive Director
Office of Civil Rights Compliance

MR:ga
L06766

Attachments

cc:     Ms. Enid Weisman, Office of Human Capital Management (w/o Attachment)
        Mr. Scott B. Clark, Risk Benefits Management (w/o Attachment)
        Mr. Orlando Alonso, Transportation (w/o Attachment)
        Investigative File

**SENT CERTIFIED RETURN RECEIPT and FIRST CLASS MAIL**

Office of Civil Rights Compliance
155 Northeast 15th Street • Suite P104E • Miami, FL 33132
305-995-1580 • 305-995-2047 (FAX) • crc.dadeschools.net

87 of 97

# Miami-Dade County Public Schools

### giving our students the world

**Superintendent of Schools**
Alberto M. Carvalho

**Miami-Dade County School Board**
Perla Tabares Hantman, *Chair*
Dr. Lawrence S. Feldman, *Vice Chair*
Dr. Dorothy Bendross-Mindingall
Susie V. Castillo
Carlos L. Curbelo
Dr. Wilbert "Tee" Holloway
Dr. Martin Karp
Dr. Marta Pérez
Raquel A. Regalado

May 7, 2014

Mr. Allan Nanton-Marie
7580 NW 5th Street, Unit 15442
Ft. Lauderdale, Florida  33318

**Complainant Name: Nanton-Marie, Allan**
**Case Number: CE CRC-00362**

Dear Mr. Nanton-Marie:

The Office of Civil Rights Compliance (CRC) of Miami-Dade County Public Schools (District) has conducted and completed its review regarding your allegation that Ms. Portia M. Walden, Coordinator III, North Transportation Center *may* have discriminated, harassed and/or retaliated against you based on Retaliation in employment.

Based upon the totality of our investigation, it has been concluded that there is <u>NO PROBABLE CAUSE</u> to support the allegation made against Ms. Walden. After a thorough review of all the information gathered, it has been determined that Ms. Walden, <u>DID NOT</u> violate School Board Policy *1362 – Anti-Discrimination/Harassment*. The District considers this matter to be fully resolved and the <u>CASE CLOSED</u>.

To ensure that you are fully informed of the investigative findings and conclusion, attached is a copy of the investigative report prepared by the Office of Civil Rights Compliance.  If you should have any questions or concerns regarding the content of this correspondence, please contact Ms. Madeleine Rodriguez., at 305-995-1580.

Sincerely,

Madeleine Rodriguez
Executive Director
Office of Civil Rights Compliance

MR:ga
L06790

Attachments

cc:   Ms. Enid Weisman, Office of Human Resources
      Mr. Scott B. Clark, Risk Benefits Management
      Mr. Orlando Alonso, Transportation
      Mr. Randy M. Mazie, North Transportation Center
      Investigative File

### SENT CERTIFIED RETURN RECEIPT and FIRST CLASS MAIL

Office of Civil Rights Compliance
155 Northeast 15th Street • Suite P104E • Miami, FL 33132
305-995-1580 • 305-995-2047 (FAX) • crc.dadeschools.net



# Miami-Dade County Public Schools

### giving our students the world

Superintendent of Schools
Alberto M. Carvalho

Miami-Dade County School Board
Perla Tabares Hantman, Chair
Dr. Lawrence S. Feldman, Vice Chair
Dr. Dorothy Bendross-Mindingall
Susie V. Castillo
Carlos L. Curbelo
Dr. Wilbert "Tee" Holloway
Dr. Martin Karp
Dr. Marta Pérez
Raquel A. Regalado

May 15, 2014

Mr. Allan Nanton-Marie
7580 NW 5th Street, Unit 15442
Ft. Lauderdale, Florida  33318

**Complainant Name: Nanton-Marie, Allan**
**Case Number: CE CRC-00363**

Dear Mr. Nanton-Marie:

The Office of Civil Rights Compliance (CRC) of Miami-Dade County Public Schools (District) has conducted and completed its review regarding your allegation that Ms. Charlene M. Bentley, Field Operator Specialist, North Transportation Center *may* have discriminated, harassed and/or retaliated against you based on Retaliation in employment.

Based upon the totality of our investigation, it has been concluded that there is <u>NO PROBABLE CAUSE</u> to support the allegation made against Ms. Bentley.  After a thorough review of all the information gathered, it has been determined that Ms. Bentley, <u>DID NOT</u> violate School Board Policy *4362 – Anti-Discrimination/Harassment*.  The District considers this matter to be fully resolved and the <u>CASE CLOSED</u>.

To ensure that you are fully informed of the investigative findings and conclusion, attached is a copy of the investigative report prepared by the Office of Civil Rights Compliance.  If you should have any questions or concerns regarding the content of this correspondence, please contact Ms. Madeleine Rodriguez., at 305-995-1580.

Sincerely,

Madeleine Rodriguez
Executive Director
Office of Civil Rights Compliance

MR:ga
L06818

Attachments

cc:   Ms. Enid Weisman, Office of Human Resources
      Mr. Scott B. Clark, Risk Benefits Management
      Mr. Orlando Alonso, Transportation
      Mr. Randy M. Mazie, North Transportation Center
      Investigative File

<u>SENT CERTIFIED RETURN RECEIPT and FIRST CLASS MAIL</u>

Office of Civil Rights Compliance
155 Northeast 15th Street • Suite P104E • Miami, FL 33132
305-995-1580 • 305-995-2047 (FAX) • crc.dadeschools.net

89 of 97

*Exhibit 11*

EEOC Form 161 (11/09)                U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

*Received by:*
*ALLAN NANTON-MARIE*
*6/23/14*

## DISMISSAL AND NOTICE OF RIGHTS

To:  Allan Nanton-Marie                                  From:  Miami District Office
     7580 N.W. Fifth St., Apt. 1-5442                           Miami Tower, 100 S E 2nd Street
     Miami, FL 33152                                            Suite 1500
                                                                Miami, FL 33131

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 510-2014-01237 | Dennis Kendrick, Investigator | (305) 808-1807 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [X] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

Malcolm S. ____
District Dir ____

Enclosures(s)

cc:  Madeline Rodriguez
     Dir.Office of Civil Compliance
     SCHOOL BOARD OF MIAMI-DADE COUNTY
     155 N.E. 15TH ST., SUITE P104E
     Miami, FL 33132

*U.S. Postal Service™ CERTIFIED MAIL™ RECEIPT*
*(Domestic Mail Only; No Insurance Coverage Provided)*
*For delivery information visit our website at www.usps.com®*

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To

Street, Apt. No. or PO Box No.

City, State, ZIP+4

*See Reverse for Instructions*

Exhibit 11 

Enclosure with EEOC
Form 161 (11/09)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS    --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**the Genetic Information Nondiscrimination Act (GINA), or the Age**
**Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within**
**90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date.** Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* to you (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter
alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in
the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some
cases can be brought where relevant employment records are kept, where the employment would have been, or
where the respondent has its main office. If you have simple questions, you usually can get answers from the
office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or
make legal strategy decisions for you.

PRIVATE SUIT RIGHTS    --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than** 2 years (3 years) before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
before 7/1/10 – not 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION    --    **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, please make your review request within 6 months of this Notice. (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Exhibit (12)

To: Mr. Randy Mazie, Director John H. Schee Transportation Center

From: Nanton-Marie, Employee 275229 - Route 9208

RE: Undocumented allegations of illegal misconduct and defamation

Date: The 18th., October 2010

Today, the 18th., October 2010, I was summoned to F.O. S. Charlton Barr's office and accused of illegal misconduct in my request for extra time pay. Mr. Barr, who did not present any documentation and who has never accompanied me on any of my routes this school year verbally state:"You are stealing the employer's time." When I asked for the basis of his allegation he presented none but went on to declare that I do not listen to him nor do I understand. His litany of complaints included driving to slow and staying in the right lane. Mr.Barr further and inaccurately defamed me by stating that I had the same problems at Northeast Terminal and that is why I was transferred to John Schee Terminal.

To allege without documentation that I have "stolen time" and that I was transferred for this conduct seems to me to be not only unprincipled but also unprofessional. I fear retaliation. Today my work is under increased scrutiny as other F.O. S.' observe me on the route and ride with me at least twice in a week.

I respectfully ask that immediate action to eliminate the above while investigation is on going be taken.

C: AFSME 1184 Local
   Mr. Klein

Exhibit (13)



# MIAMI-DADE COUNTY PUBLIC SCHOOLS
### Office of Civil Rights Compliance

### EMPLOYEE COMPLAINT FORM

**NAME:** ALLAN NANTON-MARIE    **EMPLOYEE #:** 275229

**ADDRESS:** P.O. Box 1-5AA2    **POSITION:** School Bus Driver

**CITY/STATE/ZIP:** Ft Lauderdale, FL 33318    **WORK LOCATION:** 9239

**HOME PHONE:** 305-332-790A    **WORK PHONE:** 305-681-1576

**Instructions**: The purpose of this form is to assist you in presenting your complaint, in accordance with School Board guidelines. The information you provide on this form will allow staff in the Office of Civil Rights Compliance (CRC) to decide what questions to ask of individuals with knowledge of the facts concerning your complaint.

It is requested that you provide as much detail as possible when completing the *Employee Complaint Form*. Please attach any documents which you believe will support your statement. If you need additional space, feel free to attach additional pages. All the information provided must be true and accurate.

1. *What person(s) allegedly discriminated, retaliated and/or harassed you?*

PATRICIA SNELL, District Director Transportation. Mr. Snell's name is listed as the signator of the letters of rejection I received.

2. *As to each person who allegedly discriminated, retaliated and/or harassed you, please describe in detail, what occurred and specifically describe the exact event or action which you believe was discriminatory, retaliatory and/or harassing.* ① On March 25th, 2011 received six letter of rejection for Radio Routing Dispatcher at N.E. Transportation Center, Central East Transportation Center, Northwest Transportation Center and John School Transportation center, respectively, without the benefit of an interview. On April 15th, 2011 received one letter of rejection for Radio Routing Dispatcher at N.E. Transportation Center, without the courtesy of an interview despite the fact that I am eminently qualified for the positions. (see attachments 1-7)

3. *When did the alleged discrimination, retaliation and/or harassment occur? (Give an approximate date for the first time the alleged discrimination, retaliation and/or harassment occurred and, if there has been more that one act/episode.)* March 25th, 2011 —

Six such occurrences; April 15th, 2011 - One such occurrence.

(See attachments)
1-7

1

FM-5148 Rev. (08-04)

Exhibit (13)

4. Is this the first time you have been discriminated, retaliated or harassed by this individual? If not, please explain. Possibly, yes.

5. How long, and what capacity have you known the person(s) who allegedly discriminated, retaliated and/or harassed you? (Example: "I have known Mr./Ms. X for 10 years. Who He/She is currently my work site supervisor. At the time of harassment, I directly reported to him/her.") I only know Ms. Snell by reputation, in her capacity as District Director of Transportation and through her letters of rejection of my applications on the, at least, seven occasion described above.

6. In what department/office/school were you working at the time of the alleged discrimination, retaliation and/or harassment? John Schee Transportation Center

7. Where are you currently working?

John Schee Transportation Center

8. What action(s), if any, did you take after the alleged discrimination, retaliation, and/or harassment? (State as specific as possible, the dates of the action(s) taken.) ① Spoke to Mr. Pierre Chandrin and Mr. Joseph Moore, my two recommenders regarding the fact that I was rejected. ② Spoke to AFSCME representative Mrs Phyllis LeFleur and Mr. Terry Haynes. ③ Called Ms. Snell's office and sent her an e-mail requesting an explanation of the decision as well as how I might improve my presentation in subsequent applications. (May 17th 2011) Response pending on #3 (See attachment)

9. Did you report this to an administrator or worksite administrator? If yes, please give the name(s) of those individual(s) and if possible, provide a work location or phone number where they can be reached. State specifically what you said and the response(s) given and/or the action taken by the administrator. Spoke to Mr. Pierre Chandrin on March 25th 2011 and Mr. Moore on March 30th 2011. Spoke to AFSCME'' Mr. Haynes on March 25th, 2011 and Mrs. LeFleur on May 11th 2011.

2

FM-5148 Rev. (08-04)

Exhibit (15)

10. List the name(s) of other individuals who may have first-hand knowledge of the facts related to your complaint.  If possible, please provide a work location or phone number where they may be reached.

| Name | Contact Information |
|------|---------------------|
| Mr. Thaddeus Moss | 305-638-1658 |
| Mr. Randy Mazie | 305-681-1576 |
| Ms. Enid Lamblogia | 305-887-2383 |
| Ms. Mary Murphy | 305-227-1995 |

11. Please check the applicable category upon which your complaint is based.  It should be noted that the descriptions provided below are intended to assist you with understanding the varying categories and should not be considered "legal definitions."

✓ **Age** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's age.

____ **Color** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's skin tone. Color discrimination can be a subclass within a race and is based on the fact that a person's skin tone is different from their own.  As such, color discrimination can occur within the same race. For example someone who is darker complexioned may discriminate against someone who has a lighter complexion although they are both members of the same race.

____ **Disability** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because a person either has or is perceived to have a permanent impairment that substantially limits or prevents a major life activity.

____ **Ethnic or National Origin** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's or his/her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.

____ **Family Medical Leave Act (FMLA)** - this category prevents discrimination for an eligible employee exercising their right to take up to 12 workweeks of leave during any 12-month period for one or more of the reasons defined in the Family Medical Leave Act (FMLA) statute.

✓ **Gender** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's gender or sex; it ensures that males are not treated differently from females and/or vice versa.  Gender discrimination also includes sexual harassment and pregnancy discrimination which are explained below.

____ **Linguistic Preference** - a subclass of national origin discrimination, this category prevents denial of equal employment and/or educational opportunities and/or harassment because of the language a person speaks unless there is a legitimate business need for requiring that a specific language be spoken.

3

FM-5148 Rev. (08-04)

Exhibit (1 3)

_____ **_Marital Status_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because a person is or is not married.

_____ **_Political Beliefs_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's support and/or affiliation or lack thereof with a particular political party.

_____ **_Pregnancy_** - this discrimination is a form of gender/sex discrimination, this category prevents denial of equal employment and/or educational opportunities and/or harassment of women who are with child.

_____ **_Race_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's race. The five recognized races are American Indian or Alaska Native, Asian, Black or African American; Hawaiian or Other Pacific Islander; and White. Because everyone has a race they can be discriminated against because of race. Persons from mixed racial backgrounds do not need to prove their exact heritage in order to assert that they have been discriminated against based on race. Likewise this category covers persons being discriminated against because they are married to persons of a different race from their own.

_____ **_Religion_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's sincerely held religious practices. In certain circumstances it affords persons accommodations based upon their sincerely held religious practices.

_____ **_Retaliation_** - this category prevents persons from taking an adverse employment or educational action against any person that has opposed activity that violates a persons Civil Rights or participated in an investigation pertaining to Civil Rights where there is a link between the adverse employment action and the person's opposition to Civil Rights violations or participation in a Civil Rights investigation.

_____ **_Sexual Harassment_**  - this category prevents unwelcome sexual advances; requests for sexual favors; and other verbal or physical conduct of a sexual nature, when submission to such conduct is made – either explicitly or implicitly – a term or condition of employment or participation in an educational program; submission to or rejection of such conduct by an individual is used as the basis for employment or educational decisions affecting such individual; or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or offensive working or educational environment.

_____ **_Sexual Orientation_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's sexual preference, this is based on whether an individual is heterosexual, homosexual, or bi-sexual.

_____ **_Social and Family Background_** - this category prevents denial of equal employment and/or educational opportunities and/or harassment because of a person's socio-economic, familiar and/or educational background.

4

Exhibit (13)

I understand that the information I have provided will determine the scope of CRC's investigation of my complaint. I have read the above complaint and commit that the content provided is true and to the best of my knowledge, accurate. I understand that knowingly submitting false information may lead to disciplinary action(s) against me.

_____
Signature of Complainant

Ailin H. NANTON-MARTE
Printed Name

The 16th, May 2011
Date

*(Please be sure to retain a copy of this form and all other supporting documents for your records.)*

5

FM-5148 Rev. (08-04)